UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.  3:16cv2022 |
| | ) | 3:16cv2027 |
| AEROJET ROCKETDYNE HOLDINGS, INC. | ) | |
| (fka GENCORP INC.), ALLIED WASTE | ) | |
| INDUSTRIES, INC., E. I. DU PONT DE | ) | |
| NEMOURS AND COMPANY, GRAND | ) | |
| TRUNK WESTERN RAILROAD COMPANY, | ) | |
| HONEYWELL INTERNATIONAL, INC., | ) | |
| ILLINOIS TOOL WORKS, INC., PERSTORP | ) | |
| POLYOLS INC., THE MOSAIC COMPANY | ) | |
| (fka MOS HOLDINGS INC.), UNITED | ) | |
| TECHNOLOGIES CORPORATION, and | ) | |
| VARTA MICROBATTERY INC., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| STATE OF OHIO, ex rel. MICHAEL | ) | |
| DeWINE, OHIO ATTORNEY GENERAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AEROJET ROCKETDYNE HOLDINGS, INC. | ) | |
| (fka GENCORP INC.), ALLIED WASTE | ) | |
| INDUSTRIES, INC., E. I. DU PONT DE | ) | |
| NEMOURS AND COMPANY, GRAND | ) | |
| TRUNK WESTERN RAILROAD COMPANY, | ) | |
| HONEYWELL INTERNATIONAL, INC., | ) | |
| ILLINOIS TOOL WORKS, INC., PERSTORP | ) | |
| POLYOLS INC., THE MOSAIC COMPANY | ) | |
| (fka MOS HOLDINGS INC.), UNITED | ) | |
| TECHNOLOGIES CORPORATION, VARTA | ) | |
| MICROBATTERY INC., UNITED STATES | ) | |

| | |
|---|---|
| DEPARTMENT OF DEFENSE, UNITED STATES DEPARTMENT OF THE NAVY, UNITED STATES AIR FORCE, UNITED STATES DEPARTMENT OF THE ARMY, DEFENSE PLANT CORPORATION, AND UNITED STATES DEPARTMENT OF COMMERCE, | ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |
| _____ | ) |

**CONSENT DECREE**
**REGARDING OTTAWA RIVER ASSESSMENT AREA NATURAL RESOURCE DAMAGES**

## TABLE OF CONTENTS

I.      BACKGROUND ................................................................................. 1

II.     JURISDICTION ................................................................................. 5

III.    PARTIES BOUND ............................................................................. 5

IV.    DEFINITIONS .................................................................................. 6

V.     STATEMENT OF PURPOSE ........................................................... 12

VI.    RESTORATION PROJECT ............................................................. 13

VII.   REVIEW AND APPROVAL OF WORK PLANS AND
OTHER SUBMISSIONS ................................................................. 18

VIII.  PAYMENTS FOR PAST ASSESSMENT COSTS AND
TRUSTEE-SPONSORED NATURAL RESOURCE
RESTORATION ACTIVITIES ........................................................ 20

IX.    TRUSTEE-SPONSORED NATURAL RESOURCE
RESTORATION ACTIVITIES ........................................................ 25

X.     ACCESS TO RESTORATION PROPERTIES; INFORMATION
AND DOCUMENT RETENTION ..................................................... 26

XI.    INDEMNIFICATION ....................................................................... 27

XII.   FORCE MAJEURE ......................................................................... 28

XIII.  DISPUTE RESOLUTION ................................................................ 31

XIV.  STIPULATED PENALTIES ............................................................. 34

XV.   COVENANTS BY PLAINTIFFS ..................................................... 39

XVI.  RESERVATION OF RIGHTS BY PLAINTIFFS ............................. 41

XVII. COVENANTS BY SETTLING DEFENDANTS AND
SETTLING FEDERAL AGENCIES ................................................ 44

XVIII. EFFECT OF SETTLEMENT/CONTRIBUTION PROTECTION ...... 46

XIX.  NOTICES AND SUBMISSIONS ..................................................... 48

XX.   TERMINATION .............................................................................. 50

XXI.  PUBLIC COMMENT ...................................................................... 51

**XXII.**     **EFFECTIVE DATE AND RETENTION OF JURISDICTION** ........................... 51

**XXIII.**    **APPENDICES** ............................................................................................. 51

**XXIV.**    **CONSENT DECREE MODIFICATIONS** ................................................... 52

**XXV.**     **SIGNATORIES/SERVICE** ...................................................................... 52

**XXVI.**    **FINAL JUDGMENT** ............................................................................... 53

# I.      BACKGROUND

A.      The United States of America (the "United States") on behalf of the Secretary of the United States Department of the Interior ("DOI"), and the State of Ohio (the "State"), by and through the Ohio Attorney General, Michael DeWine, on behalf of and at the request of the Ohio Environmental Protection Agency ("Ohio EPA") (collectively the "Plaintiffs"), filed Complaints asserting claims under Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9607, and Section 311 of the Federal Water Pollution Control Act, as amended, 33 U.S.C. § 1321, commonly known as the Clean Water Act ("CWA"), seeking damages for injury to, destruction of, or loss of natural resources belonging to, managed by, held in trust by, controlled by, or appertaining to the United States and/or the State, resulting from releases of hazardous substances into or which have migrated into the Ottawa River Assessment Area, including the costs of assessing such injury, destruction, or loss.

B.      The Complaints filed by Plaintiffs herein allege that natural resources, including but not limited to, fish, invertebrates, migratory birds, water and sediments, have been injured and that the public has suffered the loss of natural resource services, including lost recreational fishing, bird watching, boating, and passive human use losses such as provided by parks, waterways, and a healthy ecosystem, as a result of releases of hazardous substances to the Ottawa River Assessment Area from various facilities in or near Toledo, Ohio.  The Complaints also allege that Plaintiffs have incurred costs in connection with the assessment of such injuries, destruction or losses.  The Complaints allege that hazardous substances, including, but not limited to, polychlorinated biphenyls ("PCBs"), polycyclic aromatic hydrocarbons ("PAHs"), chlorinated benzenes**,** hexachlorobenzene, dichlorodiphenyltrichloroethane ("DDT"),

dichlorodiphenyl-dichloroethylene ("DDE"), dieldrin, endrin, heptachlor, chlordane, endosulfan, lead, silver, chromium, selenium, cadmium, and mercury have been detected in the sediments, surface water, and fish of, and wetlands connected to, the Ottawa River Assessment Area.

C.     The Complaints further allege that Settling Defendants are liable for damages for injury to, destruction of, or loss of natural resources within the Ottawa River Assessment Area because Settling Defendants (or their predecessors) are owners or operators of one or more facilities from which such releases occurred or were owners, arrangers, or operators of one or more such facilities at a time hazardous substances were disposed at such facilities.  In addition, the Complaint filed by the State alleges that Settling Federal Agencies are liable for damages for injury to, destruction of, or loss of natural resources within the Ottawa River Assessment Area because Settling Federal Agencies (or their predecessors) are owners or operators of one or more facilities from which such releases occurred or were owners or operators of one or more such facilities at a time hazardous substances were disposed at such facilities.

D.     Settling Defendants do not admit any liability to the Plaintiffs or the Settling Federal Agencies arising out of the transactions or occurrences alleged in the Complaints.  The Settling Federal Agencies do not admit any liability arising out of the transactions or occurrences alleged in any claim asserted by the State or the Settling Defendants.  By entering into this Consent Decree, undertaking the obligations imposed under its terms, and making the payments required by its terms, Settling Defendants and Settling Federal Agencies do not expressly, or by implication, admit liability for damages for injury to, destruction of, or loss of natural resources in the Ottawa River Assessment Area as alleged in the Complaints or otherwise.

E.     Pursuant to Executive Order 12580 and the National Contingency Plan, 40 C.F.R. Part 300 (the "NCP"), DOI through the United States Fish and Wildlife Service ("FWS"), has

been delegated authority to act as Federal Trustee for natural resources impacted by the releases of hazardous substances into or within the Ottawa River Assessment Area.  Ohio EPA has been delegated authority to act as the State Trustee for natural resources injured by such releases of hazardous substances.

F.     FWS and Ohio EPA (collectively, the "Trustees") share trusteeship of the injured Natural Resources.  Pursuant to 43 C.F.R. Part 11, the Trustees conducted an assessment of injuries to Natural Resources resulting from the release of hazardous substances into or within the Ottawa River Assessment Area.  The Ottawa River begins southeast of Sylvania, Ohio, at the junction of Ten Mile Creek and North Ten Mile Creek.  From there it flows, generally southeast, through the City of Toledo, to Maumee Bay (Lake Erie).  Beginning in the 1940's, decades of manufacturing activity and waste disposal practices resulted in the release of hazardous substances to the Ottawa River and its watershed.  Hazardous substances migrated from landfills along the banks of the Ottawa River and from industrial facilities in the watershed, contaminating water, fish and wildlife in the Ottawa River Assessment Area.

G.     Pursuant to the Great Lakes Legacy Act of 2002 ("GLLA"), as amended, 33 U.S.C. § 1268, the United States Environmental Protection Agency ("EPA") entered into a Project Agreement with the Ottawa River Group ("ORG") that resulted in the removal of approximately 250,000 cubic yards of contaminated sediments from a segment of the Ottawa River between River Mile 3.2 (at Suder Avenue) and River Mile 8.8 (at Auburn Road), and the removal of approximately 9,500 cubic yards from Sibley Creek, including the proper disposal of such sediments.  Funding for the GLLA Project was provided by the United States and the ORG, in cooperation with the State of Ohio.

H.      The Trustees published their June 4, 2007 Natural Resource Damage Assessment Plan ("Assessment Plan") and solicited public comments including from the members of the ORG.  The Assessment Plan describes the proposed approach for determining and quantifying natural resource injuries and calculating damages associated with those injuries.  On March 4, 2016, the Trustees also issued and solicited public comment on their draft Restoration Plan and Environmental Assessment (the "Restoration Plan") as provided for under 43 C.F.R. § 11.82, which is attached to this Consent Decree as Appendix D.  Once the Trustees approve the final version of the Restoration Plan following notice and comment, they will substitute and attach the approved final version of the Restoration Plan for the draft Restoration Plan.

I.      In order to facilitate more expeditious restoration of natural resources, *de maximis, inc.*, on behalf of Settling Defendants, purchased approximately 176 acres of property (Ottawa County parcel numbers 0070333404279000, 0070333404284000, 0070333404303000) from Thomas Corogin in December 2011 ("Corogin Property").

J.      The United States, the State, the Settling Federal Agencies and the Settling Defendants (collectively, the "Parties" to this Consent Decree) recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith, that implementation of this Consent Decree will avoid prolonged and complicated litigation among the Parties, and that this Consent Decree is fair, reasonable, consistent with applicable law, and in the public interest.

NOW, THEREFORE, before the taking of any testimony, without adjudication of any issue of fact or law, except as provided in Section II (Jurisdiction), and with the consent of the Parties, it is hereby Ordered, Adjudged, and Decreed:

## II.  JURISDICTION

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345, and Sections 107 and 113(b) of CERCLA, 42 U.S.C. §§ 9607 and 9613(b).  The Court also has personal jurisdiction over the Parties.  Venue lies in this district pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), and 28 U.S.C. § 1391(b) and (e), because the releases and injuries alleged in the Complaints occurred within this district, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.  For the purposes of this Consent Decree, or any action to enforce this Decree, Settling Federal Agencies and Settling Defendants consent to this Court's jurisdiction over this Decree and any such action and over Settling Federal Agencies and Settling Defendants, as well as to venue in this district.

## III.  PARTIES BOUND

2.      The obligations of this Consent Decree apply to and are binding upon the United States, including the Settling Federal Agencies, and the State, and upon the Settling Defendants, and any successors, assigns or other persons otherwise bound by law.  No change in ownership or corporate status of a Settling Defendant including, but not limited to, any transfer of assets or real or personal property, shall relieve such Settling Defendant of its obligation to ensure that the terms of the Decree are implemented.

3.      Settling Defendants shall provide a copy of this Consent Decree to each contractor hired to perform the Restoration Work required by this Consent Decree and to each person representing any Settling Defendant with respect to the Restoration Work, and shall condition all contracts entered into hereunder upon performance of the Restoration Work in conformity with the terms of this Consent Decree.  Settling Defendants or their contractors shall provide written notice of the Consent Decree to all subcontractors hired to perform any portion

of the Restoration Work required by this Consent Decree.  Settling Defendants shall nonetheless be responsible for ensuring that their contractors and subcontractors perform the Restoration Work contemplated herein in accordance with this Consent Decree.  With regard to the activities undertaken pursuant to this Consent Decree, each contractor and subcontractor shall be deemed to be in a contractual relationship with the Settling Defendants within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

## IV.    DEFINITIONS

4.    Unless otherwise expressly provided herein, the terms used in this Consent Decree that are defined in the CWA, CERCLA, the National Contingency Plan (40 C.F.R. Part 300), or the DOI Natural Resource Damage Assessment and Restoration Regulations, 43 C.F.R. Part 11, shall have the meaning assigned to them in such statutes or regulations.  Whenever terms listed below are used in this Consent Decree or in the Appendices attached hereto and incorporated hereunder, the following definitions shall apply:

a.    "CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. § 9601 et seq.

b.    "Consent Decree" or "Decree" means this Consent Decree and all Appendices attached hereto, as well as all plans, reports or other items or deliverables approved by the Trustees pursuant to this Consent Decree.  In the event of a conflict between this Consent Decree and any Appendix hereto, or any plan, report or other item or deliverable approved by the Trustees pursuant to this Consent Decree, this Consent Decree shall govern.

c.    "Corogin Property" means that real property, located in Ottawa County, Ohio (parcel numbers 0070333404279000, 0070333404284000, 0070333404303000) with a legal description as set forth in Appendix A, attached hereto.  The Corogin Property is located at

the confluence of the Portage and Little Portage Rivers within the acquisition boundary of the

Ottawa National Wildlife Refuge in Ohio.  *De maximis, inc.*, on behalf of the Settling

Defendants, acquired the Corogin Property on December 23, 2011.

      d.       "Corogin Restoration Project" means restoration of the Corogin Property,

through controlling invasive plant species of coastal marsh and establishing up to 50 acres of

wetland, to the extent practicable depending on site conditions, which is more fully described in

the attached Corogin Restoration Statement of Work.

      e.       "CWA" means the Federal Water Pollution Control Act, as amended, 33

U.S.C. § 1251 et seq., also known as the Clean Water Act.

      f.       "Day" means a calendar day unless expressly stated to be a Working Day.

"Working Day" means a day other than a Saturday, Sunday, or Federal holiday.  In computing

any period of time under this Consent Decree, where the last day would fall on a Saturday,

Sunday, or Federal holiday, the period shall run until the close of business of the next Working

Day.

      g.       "DOI" means the United States Department of the Interior and any

successor departments or agencies of the United States.

      h.       "Effective Date" means the effective date of this Consent Decree as

provided by Section XXII (Effective Date and Retention of Jurisdiction) of this Consent Decree.

      i.       "FWS" means the U.S. Fish and Wildlife Service of the United States

Department of the Interior.

      j.       "GLLA Project" means the Great Lakes Legacy Act project to dredge and

dispose of the contaminated sediment of the Ottawa River from River Mile 3.2 (at Secor Road)

to River Mile 8.8 (at Auburn Road), and Sibley Creek, as described more particularly in the

"Project Cooperation Agreement between the United States Environmental Protection Agency and the ORG" entered into on January 26, 2009.

k.      "Interest" means interest accruing at the rate established pursuant to 28 U.S.C. § 1961.

l.      "Lodging Date" means the date on which this Consent Decree is lodged with the Court.

m.      "Natural Resources" shall mean land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States or the State.

n.      "Natural Resource Damages" shall mean any damages recoverable by the United States or the State, as Trustees or *parens patriae* on behalf of the public, under Section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4), Section 311(f)(4) or (f)(5) of the Clean Water Act, 33 U.S.C. § 1321(f)(4) or (f)(5), or state law, as compensation for injury to, destruction of, loss of, or loss of use of Natural Resources and natural resource services they provide, resulting from a release or threat of release of hazardous substances into, or which have migrated into, the Ottawa River Assessment Area, as set forth in Section 107(a)(4)(C) of CERCLA on or before the Lodging Date.  Natural Resource Damages includes, without limitation:  (i) Natural Resource Damage Assessment Costs; (ii) the costs of restoration, rehabilitation, or replacement of injured or lost Natural Resources and natural resources services, or of acquisition of equivalent resources; (iii) the costs of planning and monitoring such restoration activities; and (iv) any other compensation for diminution in value or loss of use or non-use values of Natural Resources resulting from the releases or threats of release of hazardous substances.

o.    "Natural Resource Damage Assessment Costs" shall mean the direct and indirect costs within the meaning of 43 C.F.R. § 11.15(a)(3) and (4), incurred by the Trustees, including but not limited to, direct, indirect, and administrative costs in assessing the alleged injury to, destruction of, loss of, or loss of use or non-use values of Natural Resources resulting from the releases or threats of releases of hazardous substances into, or which have migrated into, the Ottawa River Assessment Area.

p.    "NRDAR Fund" means the DOI Natural Resource Damage Assessment and Restoration Fund, established pursuant to 43 U.S.C. §§ 1474b and 1474b-1.

q.    "Ohio EPA" means the Ohio Environmental Protection Agency and any successor departments or agencies of the State of Ohio.

r.    "Ottawa River Group" or "ORG" means the following entities as of the Lodging Date of this Consent Decree:  (i) Allied Waste Industries, Inc.; (ii) E. I. du Pont de Nemours and Company; (iii) Aerojet Rocketdyne Holdings, Inc. (fka GenCorp Inc.); (iv) Honeywell International, Inc.; (v) Illinois Tool Works, Inc.; (vi) United Technologies Corporation; (vii) Grand Trunk Western Railroad Company; (viii) Perstorp Polyols Inc.; (ix) Varta Microbattery Inc.; (x) The Mosaic Company (fka MOS Holdings Inc.); and their successors and assigns.

s.    "Ottawa River Assessment Area" means (1) all waters, sediments, shorelines, connected wetlands, and natural resources of the Ottawa River primarily located in Lucas County, Ohio, from River Mile 8.8 to River Mile 0.0, at the mouth of the Ottawa River, and (2) Sibley Creek.  This Area is depicted on the Map attached as Appendix B.

t.    "Paragraph" means a portion of this Consent Decree identified by an Arabic numeral or an upper case letter.

u.      "Parties" means the United States, including the Settling Federal Agencies, the State, and the Settling Defendants.

v.      "Past Assessment Costs" means the Natural Resource Damage Assessment Costs that the Trustees have incurred on or before the Lodging Date of this Consent Decree.

w.      "Plaintiffs" means the United States and the State.

x.      "Qualified Costs" means the reasonable Natural Resource Damage Assessment Costs incurred by Settling Defendants after the Lodging Date of this Consent Decree in connection with implementation of the Corogin Restoration Project in accordance with the requirements of this Consent Decree, including reasonable costs of:

(1)      developing the Corogin Restoration Work Plan for the Corogin Property in accordance with Paragraph 7, below;

(2)      performing work in accordance with the requirements of the approved Corogin Restoration Work Plan for the Corogin Property pursuant to Paragraph 8, below (the "Restoration Work"); and

(3)      conveying the Corogin Property to the United States for administration by the Secretary of the Interior through the FWS under authority of the Ottawa National Wildlife Refuge Complex Expansion and Detroit River International Wildlife Refuge Expansion Act, 117 Stat. 704, note following 16 U.S.C. § 668dd (2003), as amended, in accordance with Paragraph 10, below; provided, however, that the term "Qualified Costs" does not include:  a) any costs of acquisition of the Corogin Property, including but not limited to, the title report, the title insurance, as built drawings, and filing fees; b) any closing costs; or c) any costs incurred in connection with any dispute

resolution proceeding pursuant to Section XIII, below, or in connection with litigation or other efforts by Settling Defendants to enforce any terms of any agreements between Settling Defendants and any person not a party to this Consent Decree.

           (4)     notwithstanding the foregoing, reasonable costs incurred by the ORG prior to the Lodging Date of this Consent Decree for: a) the demolition of the residence on the Corogin Property; b) permit fees to perform the Restoration Work; c) preparation of the Restoration Work Plan; and d) evaluation of contractors to perform the Restoration Work shall be Qualified Costs.

           y.     "Section" means a portion of this Consent Decree identified by a Roman numeral.

           z.     "Settling Defendants" means the Defendants in this Civil Action, as well as those affiliated entities identified below:  (i) Allied Waste Industries, Inc. and its predecessor Browning-Ferris Industries of Ohio, Inc.; (ii) E. I. du Pont de Nemours and Company; (iii) Aerojet Rocketdyne Holdings, Inc. (fka GenCorp Inc.); (iv) Honeywell International, Inc. and its predecessors Allied Chemical Corporation, Allied Corporation, Allied Chemical and Dye Corporation, Allied-Signal, Bendix, Grimes Aerospace and Electric Autolite; (v) Illinois Tool Works, Inc. and its predecessors The DeVilbiss Company, DeVilbiss Holding Company, Inc. and ITW Finishing, LLC, (vi) United Technologies Corporation and its former subsidiary, United Technologies Automotive Systems, Inc. (fka City Auto Stamping Company, Armored Plastics Company, Globe-Wernicke Industries, Inc., Sheller-Globe Corporation and Lear Corporation Automotive Systems (nka Lear EEDs and Interiors); (vii) Grand Trunk Western Railroad Company; (viii) Perstorp Polyols Inc., (ix) Varta Microbattery Inc. and its predecessor Barrett Battery; and (x) The Mosaic Company (fka MOS Holdings Inc.) and its predecessors

E. Rauh & Sons Fertilizer Company, International Minerals & Chemical Corporation, IMC Fertilizer Group, Inc., IMC Global Inc. and Mosaic Global Holdings Inc.; and their successors, assigns, and respective predecessors and affiliated entities listed herein.  The Settling Defendants constitute the membership of the ORG, identified in Paragraph 4.r, above, as of the Lodging Date of this Consent Decree.

aa.    "Settling Federal Agencies" means the United States Department of Defense, the United States Department of the Navy, the United States Air Force, the United States Department of the Army, the Defense Plant Corporation, the Department of Commerce, and any predecessors or successors to these departments, agencies, or components.

bb.    "State" or "State of Ohio" means the State of Ohio, on behalf of Ohio EPA.

cc.    "Trustees" means DOI and Ohio EPA.

dd.    "United States" means the United States of America, including all of its departments, agencies and instrumentalities, including, without limitation, DOI, FWS, and the Settling Federal Agencies.

## V.    STATEMENT OF PURPOSE

5.    The mutual objectives of the Parties in entering into this Consent Decree are:  (i) to provide for the restoration, replacement, or acquisition of the equivalent of the natural resources allegedly injured, destroyed, or lost as a result of releases of hazardous substances into or within the Ottawa River Assessment Area through implementation of the Corogin Restoration Project consistent with the Corogin Restoration Statement of Work and Corogin Restoration Work Plan approved by the Trustees; (ii) to reimburse Past Assessment Costs incurred and future oversight costs to be incurred by the Trustees, as provided herein; (iii) to resolve potential

liability among the Parties with respect to Natural Resource Damages as provided herein, without determining any other rights, claims or obligations of any parties; (iv) to resolve potential liability between  Settling Defendants and the Settling Federal Agencies with respect to the GLLA Project; and, (v) to avoid costly and time-consuming litigation.

## VI.      RESTORATION PROJECT

6.      Subject to the provisions of Paragraph 11, below, Settling Defendants shall implement the Restoration Project on the Corogin Property ("Corogin Restoration Project") in accordance with the provisions set forth below in this Section VI.

7.      Settling Defendants shall, within 90 Days after the Effective Date of this Consent Decree, develop and submit to the Trustees for approval, in accordance with the Corogin Restoration Statement of Work (attached hereto as Appendix C) and the provisions of Section VII (Review and Approval of Work Plan and Other Submissions), the Corogin Restoration Work Plan, providing detailed descriptions of activities proposed to be undertaken on the Corogin Property to restore, in part, the equivalent of natural resources that the Trustees allege were injured as a result of releases of hazardous substances into or within the Ottawa River Assessment Area, together with proposed schedules for implementation of such activities, estimated costs of such activities, and the basis for such cost estimates (hereinafter "Corogin Restoration Work Plan").   The Corogin Restoration Work Plan shall be consistent with the approved final version of the Restoration Plan.

8.      Upon approval of the Corogin Restoration Work Plan submitted pursuant to Paragraph 7, above, Settling Defendants shall commence and complete the Restoration Work for the Corogin Restoration Project described in such approved Corogin Restoration Work Plan in accordance with the terms and schedules therein, subject to the monetary limitation for Qualified

Costs in Paragraph 11 below, and Settling Defendants' right to contest the Trustees' approval with respect to any schedule in such Work Plan in accordance with Paragraph 47.a (Standard of Review:  Disputes Concerning Matters Accorded Record Review).  All such work shall be performed in accordance with the approved final version of the Restoration Plan, the Corogin Restoration Statement of Work, the Corogin Restoration Work Plan, and the provisions of Paragraph 15, below.

9. Within 60 Days following approval of the Corogin Restoration Work Plan, Settling Defendants shall submit to the Trustees for approval in accordance with Section VII (Review and Approval of Work Plan and Other Submissions) the following:

a. a draft general warranty deed providing for conveyance of any interest of Settling Defendants in the Corogin Property in fee simple, free and clear of liens and other encumbrances (except for encumbrances acceptable to the Trustees), to the United States and its assigns, with DOI, FWS as the acquiring federal agency, enforceable under the laws of the State of Ohio, and otherwise acceptable under the United States Attorney General's Title Regulations promulgated pursuant to 40 U.S.C. § 3111.

b. a current title insurance commitment or report prepared in accordance with the U.S. Department of Justice Standards for the Preparation of Title Evidence in Land Acquisitions by the United States (2001) (the "Standards"), or otherwise acceptable to the Trustees.

10. Subject to the monetary limitation for Qualified Costs in Paragraph 11 below, Settling Defendants shall complete the Restoration Field Work as set forth in the Corogin Restoration Work Plan before the Corogin Property is transferred to the United States.  The Restoration Field Work Completion Report shall be submitted to and approved by the Trustees

before the Corogin Property is transferred.  Within 30 Days following the Trustees' approval of the Restoration Field Work Completion Report, Settling Defendants shall:  (a) transfer or cause to be transferred a general warranty deed in fee simple, free and clear of liens and other encumbrances (except for encumbrances acceptable to the Trustees), to the "United States and its assigns, Washington, D.C." for the Corogin Property; and (b) execute and deliver to the FWS, the approved deed along with a final title evidence policy on the American Land Title Association ("ALTA") U.S. Policy Form (Revised 12-3-2012) for the Corogin Property with the "United States of America" as the insured.  Settling Defendants shall ensure that each such deed is properly recorded.  Within 30 Days following a request by the Trustees, Settling Defendants shall cause the title searches and/or title commitments of the Corogin Property to be updated. The FWS intends to add the land to the Ottawa National Wildlife Refuge which is managed in accordance with, inter alia, the following:  (a) the September 2000 Ottawa National Wildlife Refuge Comprehensive Conservation Plan, U.S. Fish and Wildlife Service, Region 3; (b) the National Wildlife Refuge System Improvement Act (1997) 16 U.S.C. §§ 668dd and 668ee; and (c) the Ottawa National Wildlife Refuge Complex Expansion and Detroit River International Wildlife Refuge Expansion Act, 117 Stat. 704, note following 16 U.S.C. § 668dd (2003).  The transfer shall be carried out in accordance with, and the general warranty deed and title evidence (including final title policy on the ALTA U.S. Policy Form (Revised 12-3-2012)) shall be prepared in accordance with, the U.S. Department of Justice Title Standards 2001, and approval of the sufficiency of title must be obtained as required by 40 U.S.C. § 3111 .

11.     Notwithstanding any other provision or obligation in this Consent Decree, Settling Defendants shall not be required to expend more than $400,000 in Qualified Costs for the preparation of the Corogin Work Plan and the Restoration Completion Report, and the

completion of the Restoration Work at the Corogin Property.  Settling Defendants shall have no responsibility to perform long term operation and maintenance of the Restored Corogin Property.

12.     Where implementation of any portion of the Corogin Restoration Project requires a federal, State or local permit, certification or approval, Settling Defendants shall ensure timely and complete applications are submitted and will take all other steps necessary to obtain such permit, certification or approval, where required.   This Consent Decree is not and shall not be construed to be a permit issued pursuant to any federal or State statute or regulation, nor shall it be construed in any way to affect any past, current or future obligation of the Settling Defendants or any other person or entity to comply with any federal, State or local law.

13.     Accounting to the Trustees.  Settling Defendants shall submit to the Trustees on a monthly basis:  (a) an accounting of costs incurred by Settling Defendants in connection with the Corogin Restoration Project, to the extent that Settling Defendants believe such costs are Qualified Costs, and (b) a statement of Settling Defendants' projected costs of completing remaining activities under the Corogin Restoration Work Plan approved under this Section VI.

14.     Settling Defendants shall notify the Trustees in writing as soon as possible if it appears that the costs identified in Paragraphs 7, 8, and 10, above, are likely to exceed the limitation on Qualified Costs in Paragraph 11, above.  After receiving any such notification, the Trustees may provide Settling Defendants with a written Statement of Priorities for proceeding with the remaining work on the Corogin Restoration Project.  Following receipt of any such statement, Settling Defendants shall implement all remaining work consistent with the Statement of Priorities but subject to the monetary limitation for Qualified Costs in Paragraph 11, above.

15.     Completion of the Corogin Restoration Project.  Within 30 Days after Settling Defendants conclude that the Corogin Restoration Project has been completed in accordance

with the Corogin Restoration Work Plan and Corogin Restoration Statement of Work, Settling Defendants shall schedule and conduct an inspection to be attended by Settling Defendants and the Trustees. If, after the inspection, the Settling Defendants still believe that the Corogin Restoration Project has been completed in accordance with the Corogin Restoration Work Plan and Corogin Restoration Statement of Work, they shall submit to the Trustees for approval a Restoration Completion Report. The Restoration Completion Report shall include a detailed description of all activities performed by Settling Defendants on the Corogin Restoration Project and shall include as-built drawings, signed and stamped by a professional engineer, for any construction undertaken pursuant to the approved Corogin Restoration Work Plan and Statement of Work. In addition, the Restoration Completion Report shall include a final statement of the total Qualified Costs incurred by Settling Defendants.

a.      The Restoration Completion Report shall state whether Settling Defendants fully implemented all provisions of the approved Corogin Restoration Work Plan and Statement of Work and provide a description of any Corogin Restoration Work Plan provisions not completed by Settling Defendants. The Restoration Completion Report shall include a statement, signed by a registered professional engineer and Settling Defendants' Project Coordinator, affirming that all restoration activities undertaken by Settling Defendants pursuant to this Section were performed in accordance with approved Corogin Restoration Work Plan and Statement of Work and all other requirements of this Consent Decree.

b.      If the Restoration Completion Report indicates that Settling Defendants did not fully implement all provisions of the approved Corogin Restoration Work Plan and Statement of Work, the Restoration Completion Report shall include a final accounting of the Qualified Costs incurred by Settling Defendants, signed and verified by Settling Defendants'

Project Coordinator, together with supporting documentation demonstrating that all such

Qualified Costs  claimed by Settling Defendants satisfy the requirements of Paragraph 4.x,

above.

        c.      The Restoration Completion Report shall contain the following statement,

signed by Settling Defendants' Project Coordinator:

> To the best of my knowledge, after thorough investigation, I certify that the
> information contained in or accompanying this submission is true, accurate and
> complete.  I am aware that there are significant penalties for submitting false
> information, including the possibility of fine and imprisonment for knowing
> violations.

## VII.      REVIEW AND APPROVAL OF WORK PLANS AND OTHER SUBMISSIONS

16.     After review of any work plan or draft deed, report, or other item submitted for

approval pursuant to this Consent Decree, the Trustees shall:  (a) approve the submission in

whole or in part; (b) approve the submission upon specified conditions; (c) modify the

submission to cure any deficiencies; (d) disapprove, in whole or in part, the submission, directing

Settling Defendants to modify the submission; or (e) any combination of the above.

17.     Following approval, approval upon conditions, or modification by the Trustees of

any work plan or other submittal pursuant to the preceding Paragraph, Settling Defendants shall

proceed to take any action required by the Corogin Restoration Work Plan, or other submittal, as

approved or modified by the Trustees, subject only to any right of such Party or Parties to contest

such disapproval or modification under Section XIII (Dispute Resolution).

18.     Resubmission of Plans.

        a.      Upon receipt of a notice of disapproval pursuant to Paragraph 16., Settling

Defendants shall, within 30 Days or such longer time as specified by the Trustees in such notice,

correct the deficiencies and resubmit the plan, report, or other item for approval.  Any stipulated

penalties applicable to the submission, as provided in Section XIV, shall accrue during the 30-day period or otherwise specified period but shall not be payable unless the resubmission is disapproved or modified due to a material defect as provided in Paragraph 20.

       b.      Notwithstanding the receipt of a notice of disapproval of any Corogin Restoration Work Plan or other submission pursuant to Paragraph 16, Settling Defendants shall proceed, at the direction of the Trustees, to take any action required by any non-deficient portion of the submission.  Implementation of any non-deficient portion of a submission shall not relieve Settling Defendants of any liability for stipulated penalties under Section XIV (Stipulated Penalties).

19.     In the event that a resubmitted Corogin Restoration Work Plan or other submission, or portion thereof, is disapproved by the Trustees, the Trustees may again require Settling Defendants to correct the deficiencies, in accordance with the preceding Paragraphs. Trustees also retain the right to modify or develop the resubmitted Corogin Restoration Work Plan or other submission.  Settling Defendants shall implement the Corogin Restoration Work Plan or any other submission as modified or developed by the Trustees, subject only to the right of Settling Defendants to invoke the procedures set forth in Section XIII (Dispute Resolution).

20.     If upon resubmission, a plan, report, or item is disapproved or modified by the Trustees due to a material defect, Settling Defendants shall be deemed to have failed to submit such plan, report, or item timely and adequately unless Settling Defendants invoke the dispute resolution procedures set forth in Section XIII (Dispute Resolution) and the Trustees' action is overturned pursuant to that Section.  The provisions of Section XIII (Dispute Resolution) and Section XIV (Stipulated Penalties) shall govern the implementation of the Work and accrual and payment of any stipulated penalties during dispute resolution.  If the Trustees' disapproval or

modification is upheld, stipulated penalties shall accrue for such violation as provided in Section XIV.

21.     The Corogin Restoration Work Plan and all other items required to be submitted to Trustees for approval under this Consent Decree shall, upon approval or modification by the Trustees, be enforceable under this Consent Decree.  In the event the Trustees approve or modify a portion of a plan, report, or other item required to be submitted to the Trustees under this Consent Decree, the approved or modified portion shall be enforceable under this Consent Decree.

## VIII.     PAYMENTS FOR PAST ASSESSMENT COSTS AND TRUSTEE-SPONSORED NATURAL RESOURCE RESTORATION ACTIVITIES

22.     <u>Payments by Settling Defendants</u>.  Within 30 Days following the Effective Date of this Consent Decree, Settling Defendants shall pay to the Trustees a total of $1,686,372 for Past Assessment Costs, oversight of the Corogin Restoration Project, future restoration projects to be determined by the Trustees, and long term operation and maintenance of the Corogin Restoration Project.

a.     <u>Payment to the United States</u>.  Settling Defendants shall pay $1,003,830, to the United States by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice account in accordance with current EFT procedures, referencing DOJ Case Number 90-11-3-09090.  Payment shall be made in accordance with instructions provided to Settling Defendants by the Financial Litigation Unit of the United States Attorney's Office for the Northern District of Ohio following lodging of the Consent Decree.  Any payments received by the Department of Justice after 4:00 p.m. (Eastern Time) will be credited on the next business day.  Of the total amount paid by Settling Defendants pursuant to this Paragraph 22.a

(1)     $891,330 shall be paid in reimbursement of DOI's Past

Assessment Costs;

(2)     $100,000 shall be deposited in a segregated sub account within the

NRDAR Fund for the joint benefit of the Trustees to pay for the  long term operation and

maintenance of the Restored Corogin Property on behalf of Ohio EPA as well as DOI;

and

(3)     $12,500 shall be deposited in a segregated sub account within the

NRDAR Fund for the joint benefit of the Trustees to pay for oversight of the Corogin

Restoration Project.

b.      <u>Payment to State of Ohio</u>.    Settling Defendants shall pay $682,542 to the

State of Ohio in reimbursement of the State of Ohio's Past Assessment Costs and for Trustee

sponsored additional natural resource restoration activities, to be selected jointly by the Trustees.

The payment shall be made in the form of an Electronic Funds Transfer to the Treasurer, State of

Ohio, pursuant to instructions provided by the State, referencing the Ottawa River NRD claim.

A copy of the Electronic Funds Transfer transmittal shall be sent to: Steven Snyder or his

successor, DERR Fiscal Officer, Ohio EPA, P.O. Box 1049, Columbus, Ohio 43216-1049; and

to Assistant Attorney General Timothy J. Kern, Environmental Enforcement Section, Ohio

Attorney General's Office, 30 East Broad Street, 25th Floor, Columbus, Ohio 43215.

(1)     $420,042 shall be deposited in the Hazardous Waste Clean-up

Fund, in reimbursement of Ohio EPA's Past Assessment Costs;

(2)     $12,500 shall be deposited in the Hazardous Waste Clean-up Fund

for the joint benefit of the Trustees to pay for Ohio EPA's oversight of the Corogin

Restoration Project; and

(3)     $250,000 shall be deposited in the Ohio Natural Resources

Damages Fund (to the "Ottawa River Restoration Account" – a segregated sub account),

to be managed by Ohio EPA for the joint benefit and use of the Trustees, to pay for one

or more additional natural resource restoration projects to be determined by the Trustees,

as set forth in Section IX of the Consent Decree.

(4)     If the Settling Defendants pay less than $400,000 for the

preparation of the Corogin Work Plan and the Restoration Completion Report, and the

completion of the Restoration Work at the Corogin Property, Settling Defendants shall

pay such remaining funds to the State of Ohio for deposit into the Ottawa River

Restoration Account for the joint benefit and use of the Trustees to pay for additional

natural resource restoration projects as set forth in Section IX of the Consent Decree.

23.    <u>Payment by Settling Federal Agencies</u>.

The Settling Federal Agencies shall pay a total of $270,624.48 as follows:

a.     As soon as reasonably practicable after the Effective Date of this Consent

Decree, the United States, on behalf of the Settling Federal Agencies, shall pay $181,318.33 to

DOI's NRDAR Fund, in reimbursement of DOI's Past Assessment Costs.  The United States on

behalf of DOI and the United States on behalf of the Settling Federal Agencies recognize and

acknowledge that the payment obligations of the Settling Federal Agencies to DOI can only be

paid from appropriated funds legally available for such purpose.  Nothing in this Consent Decree

or the Appendices hereto shall be interpreted or construed as a commitment or requirement that

the Settling Federal Agencies obligate or pay funds to DOI in contravention of the Anti-

Deficiency Act, 31 U.S.C. § 1341, or any other applicable provision of law.

b.      As soon as reasonably practical after the Effective Date of this Consent

Decree, the United States, on behalf of the Settling Federal Agencies, shall pay $89,306.15 to the

State of Ohio.  The payment shall be made in the form of an Electronic Funds Transfer to the

Treasurer, State of Ohio, pursuant to instructions provided by the State:  $28,579.46 shall

reference the Ottawa River NRD Claim and be deposited into the Hazardous Waste Clean-Up

Fund in reimbursement of Ohio EPA's Past Assessment Costs; and $60,726.69 shall be

deposited in the Ottawa River Restoration Account for the joint benefit and use of the Trustees to

pay for natural resource restoration projects as set forth in Section IX of the Consent Decree.  A

copy of the Electronic Funds Transfer transmittal shall be sent to:  Steven Snyder or his

successor, DERR Fiscal Officer, Ohio EPA, P.O. Box 1049, Columbus., Ohio 43216-1049; and

to Assistant Attorney General Timothy J. Kern, Environmental Enforcement Section, Ohio

Attorney General's Office, 30 East Broad Street, 25th Floor, Columbus, Ohio 43215.   The State

and the Settling Federal Agencies agree that in any judicial proceeding to enforce payment of the

amounts owed to the State under this Consent Decree, Settling Federal Agencies may raise as a

defense their obligation to comply with the Anti-Deficiency Act, 31 U.S.C. §§ 1341-42 and

§§ 1511-19, or any other applicable law.  While the State disagrees that such defenses exist, the

State and Settling Federal Agencies agree that it is premature at this time to raise and adjudicate

the existence of such defenses.

24.    Notice of Payment.  Upon making payments required under this Section, the Party

or Parties making the payment shall send to the following addressees written notice that payment

has been made:

For notice to the United States:

        Chief, Environmental Enforcement Section
        U.S. Department of Justice
        P.O. Box 7611
        Washington, DC 20044-7611
        Ref.  DJ # 90-11-2-210/1

U.S. Department of the Interior
        Natural Resource Damage Assessment and Restoration Program
        Attn:  Restoration Fund Manager
        1849 C Street, NW
        Mailstop 3548
        Washington, DC 20240

        U.S. Department of the Interior
        Office of the Solicitor
        Three Parkway Center, Suite 385
        Pittsburgh, PA 15220

        Attention:  Kimberly Gilmore

For notice to the State of Ohio:

        Fiscal Officer
        DERR
        Ohio EPA
        P.O. Box 1049
        Columbus, Ohio 43216-1049
            ATTN: Steven Snyder or his successor

        Timothy J. Kern
        Assistant Attorney General
        Environmental Enforcement Section
        Ohio Attorney General's Office
        30 East Broad Street - 25th Floor
        Columbus, Ohio 43215

25.    In the event that Settling Defendants do not make any payment required by this Section VIII when due, the Party or Parties responsible for such payment shall pay Interest on the unpaid balance commencing on the payment due date and accruing through the date of full payment.  In the event the United States, on behalf of the Settling Federal Agencies, does not

make any payment required under Paragraph 23 within 120 Days after the Effective Date, the

United States on behalf of the Settling Federal Agencies shall pay Interest on the unpaid balance

with Interest accrual commencing on the 121st day after the Effective Date through the date of

full payment.  All payments required pursuant to this Paragraph shall be made in the same

manner and directed to the same funds or accounts as specified in Paragraph 22.a and b (for

payments by Settling Defendants, and Paragraph 23.a and b (for payments by the United States

on behalf of the Settling Federal Agencies).  Any payments pursuant to this Paragraph shall be in

addition to any other remedies provided by this Consent Decree for failure to make timely

payments required under this Section.

### IX.    TRUSTEE-SPONSORED NATURAL RESOURCE RESTORATION ACTIVITIES

26.    All funds deposited in segregated subaccounts within the NRDAR Fund pursuant

to Paragraph 22.a(2)  shall be managed by DOI for the joint benefit of the Trustees to pay for any

administrative, legal, oversight and long term maintenance activities in connection with the

Corogin Restoration Project.  All funds deposited in the Ottawa River Restoration Account shall

be managed and used by Ohio EPA for one or more additional Trustee restoration projects to

restore, replace, or acquire the equivalent of the natural resources injured, or natural resources

lost, as a result of hazardous substance releases to or within the Ottawa River, as set forth in the

approved final version of the Restoration Plan and this Section, below.

27.    Restoration Planning. The Trustees have prepared a draft Restoration Plan

describing how the funds will be used for restoration, rehabilitation, replacement or acquisition

of equivalent resources.

28.    Use and Expenditure of Funds.  Decisions regarding any use or expenditure of

funds under this Section shall be made by the Trustees, acting through a Trustee Council.

Settling Defendants and Settling Federal Agencies shall not be entitled to dispute, in this or any other forum or proceeding, any decision of the Trustees relating to use of funds or restoration efforts under this Section.

## X. ACCESS TO RESTORATION PROPERTIES; INFORMATION AND DOCUMENT RETENTION

29.     Commencing on the Lodging Date of this Consent Decree, Settling Defendants shall provide the Plaintiffs and their representatives access at all reasonable times to the Corogin Property upon presentation of credentials, and allow Plaintiffs and their representatives to move about, without restriction, for the purposes of conducting any activity related to this Consent Decree, including but not limited to monitoring implementation of the Corogin Restoration Project, verifying any data or information submitted to the Plaintiffs under this Consent Decree, and assessing Settling Defendants' compliance with this Consent Decree.

30.      All rights of access pursuant to this Section X shall be in addition to, and shall not limit, any access rights afforded by any law, rule, or regulation.

31.     Settling Defendants shall provide to Plaintiffs, upon request, copies of all documents and information within their possession or control (or that of their contractors or agents) relating to compliance with this Consent Decree.  Settling Defendants shall also make available to Plaintiffs their employees, agents, or representatives with knowledge of relevant facts concerning their compliance with this Consent Decree.

32.     Until 10 years after the entry of this Consent Decree, Settling Defendants shall preserve and retain all records and documents now in their possession or control, or which come into their possession or control, that relate in any manner to:  (i) the claims alleged in the Complaint; or (ii) Settling Defendants' compliance with this Consent Decree.  At the conclusion of this document retention period, Settling Defendants shall notify the United States and the

State at least 90 days prior to the destruction of any such records or documents, and, upon request by the United States or the State, Settling Defendants shall deliver any such records or documents to the United States or the State.

33.     Settling Defendants may assert that certain documents and information are privileged under the attorney-client privilege or any other privilege recognized by law.  If Settling Defendants assert such a privilege in lieu of providing documents, Settling Defendants shall provide the Plaintiffs with the following:  (i) the title of the document; (ii) the date of the document; (iii) the name and title of the author of the document; (iv) the name and title of each addressee and recipient; (v) a description of the contents of the document; and (vi) the privilege asserted by Settling Defendants.  No documents or information created or generated pursuant to the requirements of the Consent Decree shall be withheld on the grounds that they are privileged.

34.     The United States acknowledges that each Settling Federal Agency is subject to all applicable Federal record retention laws, regulations and policies.

## XI.     INDEMNIFICATION

35.     Plaintiffs do not assume any liability by entering into this Consent Decree or by virtue of any activities to be performed by Settling Defendants under this Consent Decree. Settling Defendants shall indemnify, defend and hold harmless Plaintiffs and their officials, agents, employees, contractors, subcontractors or representatives for or from any and all claims or causes of actions arising from, or on account of, negligent or other wrongful acts or omissions of Settling Defendants, their officers, directors, employees, agents, contractors, subcontractors, and any persons acting on their behalf or under their control, in carrying out activities pursuant to this Consent Decree.  Further, Settling Defendants agree to pay the Plaintiffs all reasonable costs they incur including, but not limited to, attorneys' fees and other expenses of litigation and

settlement arising from, or on account of, claims made against the Plaintiffs based on negligent or other wrongful acts or omissions of Settling Defendants, their officers, directors, employees, agents, subcontractors, and any persons acting on their behalf or under their control, in carrying out activities pursuant to this Consent Decree. The Plaintiffs shall not be held out as a party to any contract entered into by or on behalf of Settling Defendants in carrying out activities pursuant to this Consent Decree. Neither Settling Defendants nor any contractor hired by them shall be considered an agent of the United States or the State of Ohio.

36.     The Plaintiffs shall give Settling Defendants notice of any claim for which the Plaintiffs plan to seek indemnification pursuant to this Section, and shall consult with the Settling Defendants prior to settling such claim.

37.     Settling Defendants waive all claims against the United States and the State of Ohio for damages or reimbursement or for set-off of any payments made or to be made to the United States or the State arising from or on account of any contract, agreement or arrangement between Settling Defendants and any person for performance of the Corogin Restoration Project, including, but not limited to, claims on account of construction delays. In addition, Settling Defendants shall indemnify and hold harmless the Plaintiffs with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement or arrangement between Settling Defendants and any person for performance of the Corogin Restoration Project, including, but not limited to, claims on account of construction delays.

## XII.     FORCE MAJEURE

38.     "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Settling Defendants, of any entity controlled by Settling Defendants or of Settling Defendants' contractors, that delays or prevents the

performance of any obligation under this Consent Decree despite Settling Defendants' best efforts to fulfill the obligation.  The requirement that Settling Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure event (1) as it is occurring and (2) following the potential force majeure event, such that the delay is minimized to the greatest extent possible.  "Force Majeure" does not include financial inability to complete any requirements of this Consent Decree.

39.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, Settling Defendants shall provide notice orally or by electronic or facsimile transmission to the Trustees, within three Days of when such Party or Parties first knew that the event might cause a delay.  Within seven Days thereafter, Settling Defendants  shall provide to the Trustees a written notice setting forth:  an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Settling Defendants' rationale for attributing such delay to a force majeure event if they intend to assert such a claim; and a statement as to whether, in the opinion of Settling Defendants, such event may cause or contribute to an endangerment to public health, welfare, or the environment.  Settling Defendants shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure.  Failure to comply with the above requirements shall preclude Settling Defendants from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure.  For purposes of this Section, circumstances known, or that should

have been known, by any Settling Defendant, any entity controlled by any Settling Defendant or any contractor retained by Settling Defendants for purposes of this Consent Decree, shall be deemed to be known by all Settling Defendants.

40.     If the Trustees agree that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by the Trustees, for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation.  If the Trustees do not agree that the delay or anticipated delay has been or will be caused by a force majeure event, the Trustees will notify Settling Defendants in writing of their decision.  If the Trustees agree that the delay is attributable to a force majeure event, the Trustees will notify Settling Defendants in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

41.     Settling Defendants may invoke the dispute resolution procedures set forth in Section XIII (Dispute Resolution) to contest any decision of the Trustees under this Section, provided that they shall do so no later than 15 Days after receipt of notice of the Trustees' decision.  In any such proceeding, Settling Defendants invoking dispute resolution shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that such Settling Defendants complied with the requirements of Paragraphs 38 and 39, above.  In any case where this burden is carried by the Party or Parties asserting the force majeure claim, the delay at issue shall be

deemed not to be a violation of the affected obligation of this Consent Decree identified to Trustees and the Court.

## XIII.    DISPUTE RESOLUTION

42.    The dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree; provided, however, that:  nothing in this Consent Decree shall be construed to authorize Settling Defendants to dispute any action or determination of the Trustees in selecting or carrying out any natural resource restoration activities or in managing or expending funds pursuant to Section IX (Trustee-Sponsored Natural Resource Restoration Activities).  The procedures set forth in this Section shall not apply to actions by Trustees to enforce obligations of any Settling Defendants that have not been disputed in accordance with this Section.

43.    <u>Informal Dispute Resolution</u>.  Any dispute subject to dispute resolution under this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be considered to have arisen when the Party contesting the action or determination of the Trustees sends the Trustees a written Notice of Dispute.  Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed 30 Days from the date the dispute arises, unless that period is modified by written agreement of the Parties to the dispute.  If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the Trustees shall be considered binding unless, within 30 Days after the conclusion of the informal negotiation period, the Party contesting the action or determination of the Trustees (the "Disputing Party") invokes formal dispute resolution procedures as set forth below.

44.    <u>Formal Dispute Resolution</u>.  The Disputing Party shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on

the Trustees a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting the Disputing Party's position and any supporting documentation relied upon by the Disputing Party. The Trustees shall serve their Statement of Position within 45 Days of receipt of the Disputing Party's Statement of Position. The Trustees' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the Trustees.

a. An administrative record of the dispute shall be maintained by the Trustees and shall contain all Statements of Position, including supporting documentation, submitted pursuant to this Section. Where appropriate, the Trustees may allow submission of supplemental Statements of Position by the parties to the dispute.

b. The Regional Director of FWS and the Ohio EPA ARCA Section Manager or their designees will jointly issue a final administrative decision resolving the dispute based on the administrative record described in Paragraph 44.a. This decision shall be binding upon the Disputing Party, subject only to the right to seek judicial review pursuant to Paragraph 45.

45. The Disputing Party may seek judicial review of the dispute by filing with the Court and serving on the Trustees, in accordance with Section XIX of this Consent Decree (Notices and Submissions), a motion requesting judicial resolution of the dispute. The motion must be filed within 30 Days of receipt of the administrative decision pursuant to Paragraph 44.b. The motion shall contain a written statement of the Disputing Party's position on the matter in dispute, including the Disputing Party's position concerning the applicable Standard of Review to be applied by the Court pursuant to Paragraph 47.a or b, below, together with any

supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

46. The Trustees shall respond to the Disputing Party's motion within the time period allowed by the Local Rules of this Court. The Disputing Party may file a reply memorandum, to the extent permitted by the Local Rules.

47. <u>Standard of Review</u>.

a. <u>Disputes Concerning Matters Accorded Record Review</u>. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 44 pertaining to: (1) the adequacy or appropriateness of implementation schedules; (2) the Trustees' review of the Corogin Project Restoration Work Plan; (3) the adequacy of the performance of restoration activities undertaken pursuant to Section VI of this Consent Decree; and (4) all other disputes that are accorded review on the administrative record under applicable principles of administrative law shall be conducted as follows: Settling Defendants shall have the burden of demonstrating, based on the administrative record, that the administrative resolution of the dispute by the Regional Director of FWS and the Ohio EPA ARCA Section Manager, or their designees, is arbitrary and capricious or otherwise not in accordance with law.

b. <u>Other Disputes</u>. Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 44 the Disputing Party shall bear the burden of demonstrating that its position complies with this Consent Decree and better furthers the objectives of the Consent Decree.

48. The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of any Settling Defendant under this

Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 50.  If the Settling Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XIV (Stipulated Penalties).

## XIV.     STIPULATED PENALTIES

49.     Settling Defendants shall be liable to Plaintiffs for stipulated penalties in the amounts set forth below in this Paragraph for failure to comply with the requirements of this Consent Decree specified below, unless excused pursuant to Section XII (Force Majeure). "Compliance" shall include completion of activities under this Consent Decree or any work plan approved under this Consent Decree in accordance with all applicable requirements of law, this Consent Decree, any applicable Statement of Work, and any plans approved by Trustees pursuant to this Consent Decree and within the specified time schedules established by and approved under this Consent Decree.

a.     The following stipulated penalties shall accrue per violation per day for each failure to submit a timely or adequate Corogin Restoration Work Plan pursuant to Paragraph 7:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $500 | 1st through 14th day |
| $1,000 | 15th through 30th day |
| $1,500 | 31st day and beyond |

      b.      The following stipulated penalties shall accrue per violation per day for each failure to implement the approved Corogin Restoration Work Plan in accordance with Paragraph 8:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $500 | 1st through 14th day |
| $1,000 | 15th through 30th day |
| $1,500 | 31st day and beyond |

      c.      The following stipulated penalties shall accrue per violation per day for each failure to make any payment required pursuant to Paragraph 22:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $500 | 1st through 14th day |
| $1,000 | 15th through 30th day |
| $1,500 | 31st day and beyond |

50.     All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs, and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity.  However, stipulated penalties shall not accrue:  (1) with respect to a deficient submission under Section VII (Review and Approval of Work Plans and Other Submissions), during the period, if any, beginning on the 31st day after the Trustees' receipt of such submission until the date that the Trustees notify Settling Defendants of any deficiency; (2) with respect to a decision by the Regional Director of FWS and the Ohio EPA ARCA Section Manager or their designees under Paragraph 44.b of  Section XIII (Dispute Resolution), during the period, if any, beginning on the 21st day after the date that Settling Defendants' reply to Trustees' Statement of Position is received until the date that the

Regional Director of FWS and the Director of Ohio EPA or their designees issue a final decision regarding such dispute; or (3) with respect to judicial review by this Court of any dispute under Section XIII (Dispute Resolution), during the period, if any, beginning on the 31st day after the Court's receipt of the final submission regarding the dispute until the date that the Court issues a final decision regarding such dispute.  Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations of this Consent Decree.

51.     Following the Trustees' determination that Settling Defendants have failed to comply with applicable requirements of this Consent Decree, the Trustees may give such Settling Defendants written notification of the same, describing the noncompliance, and a written demand for the payment of the penalties.  However, penalties shall accrue as provided in the preceding Paragraph regardless of whether the Trustees have notified the Settling Defendants of a violation.

52.     All stipulated penalties shall be due and payable within 30 Days of Settling Defendants' receipt of a demand for payment of the penalties unless Settling Defendants invoke the dispute resolution procedures under Section XIII (Dispute Resolution).  For any noncompliance referred to in Paragraph 49.a - c, above, one-half of the stipulated penalty amount due shall be paid to the United States, and one-half of the stipulated penalty amount due shall be paid to the State of Ohio as specified below in this Paragraph.  All stipulated penalties pursuant to Paragraph 49.c, above, for failure to make any payments due to any Federal Trustee pursuant to Section VIII shall be paid to the United States, as specified in Paragraph 52.a.  All stipulated penalties pursuant to 49.c, above, for failure to make any payments to State Trustee pursuant to Section IX shall be paid to the State as specified in Paragraph 52.b.

a.      All stipulated penalties due to the United States shall be paid by certified or cashier's check made payable to the United States Treasury and sent to the United States Attorney for the Northern District of Ohio and sent to:

> 801 West Superior Avenue
> Suite 400
> Cleveland, OH 44113-1852

b.      All stipulated penalties due to the State of Ohio shall be paid by certified or cashier's checks made payable to "Treasurer, State of Ohio" and sent to Scott Hainer, Paralegal, or his successor at the Office of the Attorney General of Ohio, Environmental Enforcement Section, 30 East Broad Street, 25th Floor, Columbus, Ohio 43215.

c.      Copies of the transmittal letters and checks shall be sent to the United States and to the State in the manner provided by Section XIX (Notices and Submissions).

53.      Penalties shall continue to accrue as provided in Paragraph 48 during any dispute resolution period, but need not be paid until the following:

a.      If the dispute is resolved by agreement or by a decision of the Trustees that is not appealed to this Court, accrued penalties determined to be owing shall be paid to the Trustees within 15 Days of the agreement or the receipt of the Trustees' decision;

b.      If the dispute is appealed to this Court and the Trustees prevail in whole or in part, Settling Defendants shall pay all accrued penalties determined by the Court to be owed to the Trustees within 60 Days of receipt of the Court's decision or order, except as provided in Subparagraph c below;

c.      If the District Court's decision is appealed by any Party, Settling Defendants shall pay all accrued penalties determined by the District Court to be owing to the United States and the State into an interest-bearing escrow account within 60 Days of receipt of

the Court's decision or order.  Penalties shall be paid into this account as they continue to accrue, at least every 60 Days.  Within 15 Days of receipt of the final appellate court decision, the escrow agent shall pay the balance of the account to the Trustees or to Settling Defendants to the extent that they prevail.

54.     If Settling Defendants fail to pay stipulated penalties when due, Plaintiffs may institute proceedings to collect the penalties, as well as Interest.  Settling Defendants shall pay Interest on the unpaid balance, which shall begin to accrue on the date of a demand for payment made by the Plaintiffs.

55.     The payment of penalties shall not alter in any way Settling Defendants' obligation to complete the performance of any tasks required under this Consent Decree.

56.     Nothing in this Consent Decree shall be construed as prohibiting, altering, or in any way limiting the ability of the United States or the State to seek any other remedies or sanctions available by virtue of Settling Defendants' violation of this Decree or of the statutes and regulations upon which it is based, including but not limited to injunctive relief, and civil and criminal sanctions.  Nor shall anything in this Consent Decree be construed as prohibiting, altering, or in any way limiting the ability of the DOI, FWS, or the State to seek any other remedies or sanctions available by virtue of Settling Defendants' violation of this Decree or of the statutes and regulations upon which it is based.

57.     Notwithstanding any other provision of this Section, the Plaintiffs may, in their unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this Consent Decree.

## XV.      COVENANTS BY PLAINTIFFS

58.     <u>United States' Covenants Not to Sue</u>.  In consideration of the actions that will be performed by the Settling Defendants pursuant to this Consent Decree and the payments that will be made to the Plaintiffs under the terms of the Consent Decree, and except as specifically provided in Paragraphs 62 and 63, the United States covenants not to sue or to take administrative action against Settling Defendants for Natural Resource Damages located within the Ottawa River Assessment Area pursuant to Section 107(a)(4)(C) of CERCLA, 42 U.S.C. § 9607 (a)(4)(C), Section 311(f)(4) and (5) of the CWA, 33 U.S.C. § 1321(f)(4) and (5), or federal statutory or state statutory or common law.  With respect to each Settling Defendant, these covenants are conditioned upon the satisfactory performance of such Settling Defendant's obligations under this Consent Decree.  These covenants extend only to Settling Defendants and do not extend to any other person.

59.     <u>State's Covenants Not to Sue the Settling Defendants</u>.  In consideration of the actions that will be performed by the Settling Defendants and the payments that will be made to the Plaintiffs under the terms of the Consent Decree, and except as specifically provided in Paragraphs 62 and 63, the State covenants not to sue or to take administrative action against Settling Defendants for Natural Resource Damages located within the Ottawa River Assessment Area pursuant to Section 107(a)(4)(C) of CERCLA, 42 U.S.C. § 9607 (a)(4)(C), Section 311(f)(4) and (5) of the CWA, 33 U.S.C. § 1321(f)(4) and (5), or federal statutory or state statutory or common law.  With respect to each Settling Defendant, these covenants are conditioned upon the satisfactory performance of such Settling Defendant's obligations under this Consent Decree.  These covenants extend only to Settling Defendants and do not extend to any other person.

60.     Except as specifically provided in Paragraphs 62 and 64 and in consideration of actions taken and payments made, DOI and FWS covenant not to take administrative action against the Settling Federal Agencies for Natural Resource Damages located within the Ottawa River Assessment Area pursuant to Section 107(a)(4)(C) of CERCLA, 42 U.S.C. § 9607 (a)(4)(C), Section 311(f)(4) and (5) of the CWA, 33 U.S.C. § 1321(f)(4) and (5), or federal statutory or state statutory or common law.  These covenants by DOI and FWS shall take effect upon the receipt of the payments required by Paragraph 23.a of Section VIII (Payments For Past Assessment Costs And Trustee-Sponsored Natural Resource Restoration Activities).  These covenants by DOI and FWS are conditioned upon the satisfactory performance by Settling Federal Agencies of their obligations under this Consent Decree.  DOI's and FWS' covenants extend only to the Settling Federal Agencies and do not extend to any other person.

61.     <u>State's Covenant Not to Sue the Settling Federal Agencies</u>. Except as specifically provided in Paragraphs 62 and 65 and in consideration of actions taken and payments made, the State of Ohio covenants not to sue, take administrative action, or issue administrative findings and orders against the United States, including the Settling Federal Agencies, for Natural Resource Damages pursuant to Section 107(a)(4)(C) of CERCLA, 42 U.S.C. § 9607 (a)(4)(C), Section 311(f)(4) and (5) of the CWA, 33 U.S.C. § 1321(f)(4) and (5), or federal statutory or state statutory or common law.  The State's covenants shall take effect upon the receipt of the payment required by Paragraph 23.b of Section VIII (Payments For Past Assessment Costs And Trustee-Sponsored Natural Resource Restoration Activities).  The State's covenants are conditioned upon the satisfactory performance by the Settling Federal Agencies of their obligations under this Consent Decree.  The State's covenants extend only to the United States and do not extend to any other person.

## XVI.    RESERVATION OF RIGHTS BY PLAINTIFFS

62.    <u>General Reservations of Rights</u>.   The covenants set forth in Section XV (Covenants by Plaintiffs) do not pertain to any matters other than those expressly specified in Paragraphs 58-61, above.  The Plaintiffs reserve, and this Consent Decree is without prejudice to, all rights against Settling Defendants, and DOI, FWS, and the State reserve, and this Consent Decree is without prejudice to, all rights against Settling Federal Agencies, with respect to all other matters.  Notwithstanding any other provision of this Consent Decree, the United States and the State reserve all rights against Settling Defendants, and DOI, FWS, and the State reserve all rights against Settling Federal Agencies, with respect to:

a.    claims based on a failure by any Settling Defendant or Settling Federal Agency to meet a requirement of this Consent Decree;

b.    liability for any other damages that are not within the definition of Natural Resource Damages;

c.    liability based on any future releases, discharges, or spills of hazardous substances by a Settling Defendant or Settling Federal Agency after the Lodging Date of this Consent Decree, but not including any liability arising from further migration of previously released hazardous substances present in the environment of the Ottawa River Assessment Area as of the Lodging Date;

d.    criminal liability.

63.    <u>Special Reservations Regarding Natural Resource Damages</u>.  Notwithstanding any other provision of this Consent Decree, the Plaintiffs reserve, and this Decree is without prejudice to, the right to institute proceedings against any Settling Defendant in this action or in a new action seeking recovery of Natural Resource Damages, including costs of damages

assessments, based on:  (i) conditions in the Ottawa River Assessment Area, previously unknown to the Trustees, that cause or contribute to new or additional injuries to, destruction of, or loss of Natural Resources, or new or additional service losses ("Unknown Conditions"); or

(ii) information, previously unknown to the Trustees, received in whole or in part by the Trustees after the Lodging Date which indicates that the releases of hazardous substances at the Ottawa River Assessment Area have resulted in injury to, destruction of, or loss of Natural Resources of a type or future persistence that was unknown to the Trustees as of the Lodging Date ("New NRD Information").  For purposes of this Paragraph, the information and conditions known to the Trustees shall include information or conditions referenced in the administrative record supporting the Trustees' 2007 Ottawa River Assessment Plan or information and conditions contained in, referenced by, listed or identified in records or relating to the Ottawa River Assessment Area that were in the possession or under the control of the Trustees as of the Lodging Date, regarding injuries, losses or destruction of Natural Resources, or the services they provide, resulting from such conditions.  Finally, each of the following shall not be considered to be an Unknown Condition or New Information within the meaning of this Paragraph: (1) an increase solely in the Trustees' assessment of the magnitude of a known injury to, destruction of, or loss of Natural Resources or in the resulting Natural Resource Damages; or (2) injury to, destruction or loss of Natural Resources at the Site arising from re-exposure, re-suspension, or migration by natural causes of hazardous substances known to be present in the sediments at the Ottawa River Assessment Area.

      64.    <u>Special Reservations by FWS and DOI Regarding Natural Resource Damages</u>.

Notwithstanding any other provision of this Consent Decree, DOI and FWS reserve the right, and this Decree is without prejudice to take administrative action against Settling Federal

Agencies for the recovery of Natural Resource Damages, including costs of damages assessments, based on:  (i) conditions, with respect to the Ottawa River Assessment Area, that are Unknown Conditions; or (ii) New NRD Information.  For purposes of this Paragraph, the information and conditions known to FWS and Ohio EPA shall include information or conditions referenced in the administrative record supporting the Trustees' 2007 Ottawa River Assessment Plan or information and conditions contained in, referenced by, listed or identified in records relating to the Ottawa River Assessment Area that were in the possession or under the control of FWS and Ohio EPA as of the Lodging Date, regarding injuries, losses or destruction of Natural Resources, or the services they provide, resulting from such conditions.  Finally, each of the following shall not be considered to be an Unknown Condition or New Information within the meaning of this Paragraph: (1) an increase solely in the Trustees' assessment of the magnitude of a known injury to, destruction of, or loss of Natural Resources or in the resulting Natural Resource Damages; or (2) injury to, destruction or loss of Natural Resources at the Site arising from re-exposure, re-suspension, or migration by natural causes of hazardous substances known to be present in the sediments at the Ottawa River Assessment Area.

65.    <u>Special Reservations By The State Regarding Natural Resource Damages</u>. Notwithstanding any other provision of this Consent Decree, the State reserves the right to institute proceedings against the Setting Federal Agencies in this action or in a new action seeking recovery of Natural Resource Damages, including costs of damages assessments, based on:  (i) conditions, with respect to the Ottawa River Assessment Area, that are Unknown Conditions; or (ii) New NRD Information.  For the purpose of this Paragraph, the information and conditions known to FWS and Ohio EPA shall include information or conditions referenced in the administrative record supporting the Trustees' 2007 Ottawa River Assessment Plan or

information and conditions contained in, referenced by, listed or identified in records relating to

the Ottawa River Assessment Area that were in the possession or under the control of FWS and

Ohio EPA as of the Lodging Date , regarding injuries, losses or destruction of Natural Resources,

or the services they provide, resulting from such conditions.  Finally, each of the following shall

not be considered to be an Unknown Condition or New Information within the meaning of this

Paragraph: (1) an increase solely in the Trustees' assessment of the magnitude of a known injury

to, destruction of, or loss of Natural Resources or in the resulting Natural Resource Damages; or

(2) injury to, destruction or loss of Natural Resources at the Site arising from re-exposure, re-

suspension, or migration by natural causes of hazardous substances known to be present in the

sediments at the Ottawa River Assessment Area.

## XVII.    COVENANTS BY SETTLING DEFENDANTS AND SETTLING FEDERAL AGENCIES

66.    <u>Covenants Not to Sue By Settling Defendants</u>.  Settling Defendants hereby

covenant not to sue and agree not to assert any claims or causes of action against the United

States (including Settling Federal Agencies) or the State, or their contractors or employees, with

respect to Natural Resource Damages, including payments made under Section VIII of this

Consent Decree, or any liability for costs incurred in connection with any response actions

undertaken in the Ottawa River Assessment Area pursuant to the Great Lakes Legacy Act, 33

U.S.C. § 1268,  including but not limited to:  (i) any direct or indirect claims for reimbursement

of any payment for Natural Resource Damages based on Sections 107 or 113 of CERCLA, 42

U.S.C. §§ 9607 or 9613, (ii) any claim against the United States or the State pursuant to Sections

107 and 113 of CERCLA, 42 U.S.C. §§ 9607 and 9613, (iii) any claim against the United States

or the State pursuant to Section 311 of the CWA, 33 U.S.C. § 1321, or (iv) federal statutory or

state statutory or common law relating to Natural Resource Damages or any response actions

undertaken in the Ottawa River Assessment Area pursuant to the Great Lakes Legacy Act, 33 U.S.C. § 1268.  These covenants not to sue shall not apply in the event that the United States or the State take administrative action, issue administrative findings and orders, or bring a cause of action against Settling Defendants for Natural Resource Damages pursuant to the reservations set forth in Paragraphs 62 and 63, above, but only to the same extent and for the same matters, transactions, or occurrences as are raised in the claims asserted by the United States or the State pursuant to such reservations.

67.    <u>Covenant by Settling Federal Agencies</u>.  Settling Federal Agencies hereby agree not to assert against FWS any direct or indirect claim for reimbursement of any payment for Natural Resource Damages based on Sections 107 or 113 of CERCLA, 42 U.S.C.  §§ 9607 or 9613, Section 311 of the CWA, 33 U.S.C. § 1321, or federal statutory or state statutory or common law, including payments made under Section VIII of this Consent Decree; and covenant not to sue Settling Defendants or the State under Sections 107 or 113 of CERCLA, 42 U.S.C. §§ 9607 or 9613, Section 311(f)(4) and (5) of the CWA, 33 U.S.C. § 1321(f)(4) and (5), or federal statutory or state statutory or common law, with respect to Natural Resource Damages, including payments made under Section VIII of this Consent Decree, or any liability for costs incurred in connection with any response actions undertaken in the Ottawa River Assessment Area pursuant to the Great Lakes Legacy Act, 33 U.S.C. § 1268.  These covenants shall not apply in the event that DOI and/or FWS take administrative action against Settling Federal Agencies pursuant to the reservations set forth in Paragraphs 62 or 64, above, but only to the same extent and for the same matters, transactions, or occurrences as are raised in the administrative actions taken by DOI and/or FWS pursuant to such reservations.  Nor shall these covenants by Settling Federal Agencies apply in the event the State brings a claim and/or

administrative action against the Settling Federal Agencies pursuant to the reservations set forth

in Paragraphs 62 or 65, above, but only to the same extent and for the same matters, transactions,

or occurrences as are raised in  the claims or actions brought by the State pursuant to such

reservations.

68.     <u>Reservations of Rights By Settling Defendants and Settling Federal Agencies</u>.

Nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of

action to, any person not a Party to this Consent Decree.  The Settling Defendants and the United

States on behalf of the Setting Federal Agencies each reserve any and all rights (including, but

not limited to, any right to contribution immunity), defenses, claims, demands, and causes of

action which each Party may have with respect to any matter, transaction, or occurrence relating

in any way to the Ottawa River Assessment Area against any person not a Party hereto, including

the right to assert and maintain claims against any person for recovery of any costs incurred in

connection with any response action undertaken in the Ottawa River pursuant to the GLLA

Project.

### XVIII.     EFFECT OF SETTLEMENT/CONTRIBUTION PROTECTION

69.     The Parties agree, and by entering this Consent Decree this Court finds, that each

Settling Defendant and the United States on behalf of the Settling Federal Agencies is entitled, as

of the Effective Date of the Consent Decree, to protection from contribution actions or claims as

provided by CERCLA Section 113(f)(2), 42 U.S.C. § 9613(f)(2), or other federal law, for matters

addressed in this Consent Decree.  For these purposes, the "matters addressed" in this Consent

Decree are Natural Resource Damages, as defined herein.

70.     Each Settling Defendant agrees that with respect to any suit or claim for

contribution brought against it for matters related to this Consent Decree, it will notify, in

writing, the United States and the State within 10 Days of service of any complaint on them.  In addition, each Settling Defendant shall notify the United States and the State within 10 Days of service or receipt of any Motion for Summary Judgment and within 10 Days of receipt of any order from a Court setting a case for trial.

      71.    <u>Waiver of Claim-Splitting Defenses</u>.

      a.    In any subsequent administrative or judicial proceeding initiated by the United States or the State for injunctive relief, or Natural Resource Damages or other relief related to the Ottawa River Assessment Area, Settling Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, *res judicata*, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the Covenants by Plaintiffs set forth in Section XV.

      b.    In any subsequent administrative or judicial proceeding initiated by the State for injunctive relief, or Natural Resource Damages or other relief related to the Ottawa River Assessment Area, the Settling Federal Agencies shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, *res judicata*, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the State in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the Covenants by Plaintiffs set forth in Section XV.

## XIX.    NOTICES AND SUBMISSIONS

72.    Whenever, under the terms of this Consent Decree, written notice is required to be given or a plan, report or other submission is required to be sent by one Party to another, it shall be directed to the individuals at the addresses specified below, unless those individuals or their successors give notice of a change to the other Party in writing.  All notices and submissions shall be considered effective upon receipt, unless otherwise provided.  Written notice as specified herein shall constitute complete satisfaction of any written notice requirement of the Consent Decree.

**As to the United States**:

> For the Department of Justice:
>
> Chief, Environmental Enforcement Section (DJ #90-11-3-09090)
> Environment and Natural Resources Division
> U.S. Department of Justice
> P.O. Box 7611
> Washington, DC  20044-7611
>
> Chief, Environmental Defense Section (DJ # 90-11-6-16703)
> Environment and Natural Resources Division
> U.S. Department of Justice
> P.O. Box 7611
> Washington, DC  20044-7611
>
> For DOI:
>
> Office of the Solicitor
> U.S. Department of the Interior
> Three Parkway Center, Suite 385
> Pittsburgh, PA 15220
>
> Attention:  Kimberly Gilmore

**As to the State**:

    For the Ohio Attorney General's Office:

    Timothy J. Kern
    Assistant Attorney General
    Environmental Enforcement Section
    Ohio Attorney General's Office
    30 East Broad Street - 25th Floor
    Columbus, Ohio 43215

    For Ohio EPA:

    Ohio EPA
    Division of Environmental Response and Revitalization
    Northwest District Office
    347 North Dunbridge Road
    Bowling Green, Ohio 43402

    ATTN:  Archie L. Lunsey II

**As to Settling Defendants**:

    Joseph A. Heimbuch
    *de maximis, inc.*
    4006 Crockers Lake Boulevard
    Suite 215
    Sarasota, FL 34238

    Ralph E. Cascarilla
    Walter | Haverfield LLP
    1301 East Ninth Street, Suite 3500
    Cleveland, Ohio 44114-1821

    73.    <u>Certification of Notices and Submissions</u>.  All notices and submissions required

by this Consent Decree to be submitted by or on behalf of any Settling Defendant(s) shall be

certified by a responsible official or designated representative of the respective Settling

Defendant(s), and accompanied by the following certification:

    I certify that the information contained in or accompanying this submission is true,
    accurate and complete.  This certification is based on my personal preparation, review, or
    analysis of the submission, and/or supervision of persons who, acting on my direct

instructions, made the verification that the submitted information is true, accurate and complete.

## XX.    TERMINATION

74.    <u>Request for Termination</u>.  Settling Defendants may serve upon Plaintiffs a Request for Termination of Consent Decree With Respect to Settling Defendants, together with supporting information, once:  (1) Settling Defendants have paid all amounts due pursuant to Paragraph 22, and all accrued stipulated penalties as required by this Consent Decree; (2) Settling Defendants have completed all requirements of Section VI (Corogin Restoration Project),and (3) Trustees have approved the Restoration Completion Report submitted pursuant to Section VI.

75.    Following receipt by Plaintiffs of any Request for Termination pursuant to the preceding Paragraph, Plaintiffs may confer informally with Settling Defendants to resolve any question or disagreement concerning whether Settling Defendants have satisfied the applicable criteria under Paragraph 74 for termination of this Consent Decree.  If Plaintiffs agree that the applicable criteria have been satisfied by the requesting Party, Plaintiffs and Settling Defendants shall submit for the Court's approval a joint stipulation terminating the Decree with respect to the requesting Party.

76.    If Plaintiffs do not agree that Settling Defendants have satisfied the applicable criteria under Paragraph 74 for termination of this Consent Decree, Settling Defendants may invoke dispute resolution under Section XIII of this Decree.  However, Settling Defendants shall not seek dispute resolution of any dispute regarding termination, under Paragraph 44 of Section XIII (Dispute Resolution), until 60 Days after service of its Request for Termination.

77.    The provisions set forth in Paragraph 32 and in Sections XV (Covenants by Plaintiffs), XVI (Reservation of Rights by Plaintiffs), XVII (Covenants by Settling Defendants

and Settling Federal Agencies), and XVIII (Effect of Settlement/Contribution Protection) will remain enforceable notwithstanding termination of this Consent Decree.

## XXI. PUBLIC COMMENT

78. This Consent Decree shall be lodged with the Court for a period of not less than thirty (30) days, for public notice and comment in accordance with the provisions of 28 C.F.R. § 50.7. The United States and the State reserve the right to withdraw or withhold their consent if the comments received disclose facts or considerations which indicate that the Consent Decree is inappropriate, improper, or inadequate.

## XXII. EFFECTIVE DATE AND RETENTION OF JURISDICTION

79. This Consent Decree shall take effect upon entry by the Court; provided, however, that Settling Defendants shall be bound upon the lodging of this Consent Decree to comply with obligations of Settling Defendants specified in this Consent Decree as accruing upon lodging.

80. The Court shall retain jurisdiction to modify and enforce the terms and conditions of this Consent Decree and to resolve disputes arising hereunder as may be necessary or appropriate for the construction or execution of this Consent Decree.

## XXIII. APPENDICES

81. The following Appendices are attached to and incorporated into this Consent Decree:

|            |                                                                                      |
| ---------- | ------------------------------------------------------------------------------------ |
| Appendix A | Legal Description of Corogin Property                                                 |
| Appendix B | Map of the Ottawa River Assessment Area                                              |
| Appendix C | Statement of Work for the Corogin Restoration Project                                 |
| Appendix D | Draft Natural Resource Restoration Plan and Environmental Assessment for the Ottawa River Assessment Area |

## XXIV.    CONSENT DECREE MODIFICATIONS

82.    Any material modification of this Consent Decree shall be made by agreement of the Parties to this Consent Decree and in writing, and shall not take effect unless approved by the Court.  Any non-material modification of this Decree shall be made by agreement of the Parties to this Consent Decree and in writing, and shall not take effect until filed with the Court. Nothing in this Consent Decree shall be deemed to alter the Court's power to enforce, supervise, or approve modifications to this Consent Decree.

83.    The provisions of this Consent Decree are not severable.  The Parties' consent hereto is conditioned upon the entry of the Consent Decree in its entirety without modification, addition, or deletion except as agreed to by the Parties.

84.    Unanticipated or increased costs or expenses associated with the implementation of actions called for by this Consent Decree and economic hardship or changed financial circumstances shall not serve as a basis for modifications of this Consent Decree.

## XXV.    SIGNATORIES/SERVICE

85.    The undersigned representatives of Settling Defendants, the State, and the Assistant Attorney General for the Environment and Natural Resources Division of the United States Department of Justice, each certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind such Party to this document.

86.    Settling Defendants hereby agree not to oppose entry of this Consent Decree by this Court or to challenge any provision of this Consent Decree unless the United States or the State has notified Settling Defendants in writing that they no longer support entry of the Consent Decree.

87.    Settling Defendants shall identify, on the attached signature page, the name, address and telephone number of an agent who is authorized to accept service of process by mail on their behalf with respect to all matters arising under or relating to this Consent Decree. Settling Defendants hereby agree to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including but not limited to service of a summons.

## XXVI.    FINAL JUDGMENT

88.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment between and among the United States, the State, and Settling Defendants.

SO ORDERED THIS __21st__ DAY OF ___February___, ___2017___.


/s/ James G. Carr
_____

United States District Judge

THE UNDERSIGNED PARTIES enter into this Consent Decree Regarding the Ottawa River Assessment Area Natural Resource Damages.

FOR THE UNITED STATES OF AMERICA:

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20530

STEVEN D. ELLIS
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611

Date: July 27, 2016

PERRY ROSEN
Trial Attorney
Environmental Defense Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611

THE UNDERSIGNED PARTIES enter into this Consent Decree Regarding the Ottawa River
Assessment Area Natural Resource Damages

CAROLE S. RENDON
Acting United States Attorney
Northern District of Ohio

Date: 7/28/16

STEVEN J. PAFFILAS
Assistant United States Attorney
Northern District of Ohio
801 West Superior Avenue; Suite 400
Cleveland, Ohio 44113-1852
(216) 622-3600

FOR THE STATE OF OHIO

MICHAEL DeWINE
OHIO ATTORNEY GENERAL

Date: _____

TIMOTHY J. KERN
Assistant Attorney General
Environmental Enforcement Section
30 East Broad Street, 25th Floor
Columbus, Ohio 43215

THE UNDERSIGNED PARTIES enter into this Consent Decree Regarding the Ottawa River
Assessment Area Natural Resource Damages

CAROLE S. RENDON
Acting United States Attorney
Northern District of Ohio

Date: _____          _____

STEVEN J. PAFFILAS
Assistant United States Attorney
Northern District of Ohio
801 West Superior Avenue; Suite 400
Cleveland, Ohio 44113-1852
(216) 622-3600

FOR THE STATE OF OHIO

MICHAEL DEWINE
OHIO ATTORNEY GENERAL

Date: *August 11, 2016*          *Timothy J. Kern*

TIMOTHY J. KERN
Assistant Attorney General
Environmental Enforcement Section
30 East Broad Street, 25th Floor
Columbus, Ohio 43215

THE UNDERSIGNED PARTY enters into this Consent Decree Regarding Ottawa River
Assessment Area Natural Resource Damages:

FOR SETTLING DEFENDANT
ALLIED WASTE INDUSTRIES, ~~INC.~~ LLC
(fka Allied Waste Industries, Inc.)

Date: April 6, 2016

Signature

Typed Name: Tim M. Benter
Title: Vice President
Address: 18500 N. Allied Way
Phoenix, AZ 85054

Agent Authorized to Accept Service on Behalf of Above-Signed Party:

Typed Name: Jonathan R. Haden
Title: Attorney
Address: Lathrop & Gage LLP
2345 Grand Blvd, Ste 2700
Kansas City, MO 64108-2618

25515631v1

THE UNDERSIGNED PARTY enters into this Consent Decree Regarding Ottawa River
Assessment Area Natural Resource Damages:

FOR SETTLING DEFENDANT

E.I. du Pont de Nemours & Co., Inc. (DuPont)

Date: 4-28-2016

Signature

Typed Name: Tom A. Ei

Title: Leader – Corporate Remediation Group

Address:  DuPont Company

Corporate Remediation Group

974 Centre Road

Chestnut Run Plaza, Bldg 730

Wilmington, Delaware 19805

Consent Decree, *United States et al. v. Allied Waste Industries, Inc.* (N.D. Ohio) (Natural Resource Damages)

THE UNDERSIGNED PARTY  ENTERS INTO THIS Consent Decree Regarding Ottawa River Assessment Area Natural Resources Damages:

FOR SETTLING DEFENDANT
Aerojet Rocketdyne Holdings, Inc.
(Formally Known As GenCorp Inc.)

Date: _4/14/16_

_____
Signature

Typed Name:  Chris Conley
Title:            Vice President, Safety, Health & Environment
Address:       P.O. Box 537012
                   Sacramento, CA  95853

Agent Authorized to Accept Service on Behalf of Above-Signed Party:

Typed Name:   CT Corporation System
Title:              Registered Agent
Address:         1300 East 9th Street
                     Suite 1010
                     Cleveland, OH  44114

THE UNDERSIGNED PARTY enters into this Consent Decree Regarding Ottawa River Assessment Area Natural Resource Damages:

FOR SETTLING DEFENDANT
Honeywell International Inc.

Date: _7/14/16_

Signature

Typed Name: John Morris

Title: Global Remediation Director

Address: Honeywell International Inc.

101 Columbia Rd.

Morristown NJ, 07962-1057

Agent Authorized to Accept Service on Behalf of Above-Signed Party:

Typed Name: Allison Rumsey

Title: Partner

Address: Arnold & Porter LLP

601 Massachusetts Ave., NW

Washington DC, 20001-3743

Consent Decree, *United States et al. v. Allied Waste Industries, Inc.* (N.D. Ohio) (Natural Resource Damages)
Page 56

THE UNDERSIGNED PARTY enters into this Consent Decree Regarding Ottawa River Assessment Area Natural Resource Damages:

FOR SETTLING DEFENDANT
Illinois Tool Works Inc.

Date: April 19, 2016

Signature

Typed Name: Randall J. Scheuneman

Title: Vice President and Chief Accounting Officer

Address: Illinois Tool Works Inc.

155 Harlem Avenue

Glenview, IL 60025

Agent Authorized to Accept Service on Behalf of Above-Signed Party:

Typed Name: Ken Brown, CHMM

Title: Manager of Environmental & Chemical Compliance

Address: Illinois Tool Works Inc.

155 Harlem Avenue

Glenview, IL 60025

THE UNDERSIGNED PARTY enters into this Consent Decree Regarding Ottawa River Assessment Area Natural Resource Damages:

FOR SETTLING DEFENDANT

United Technologies Corporation and its former subsidiary, United Technologies Automotive Systems, Inc. (fka City Auto Stamping Company, Armored Plastics Company, Globe-Wernicke Industries, Inc., Sheller-Globe Corporation, and Lear Corporation Automotive Systems (nka Lear SEDs and Interiors))

Date:  April   , 2016

_____
Signature

Typed Name:   Richard H. Bennett

Title:   Vice President, Environment, Health & Safety

Address:   United Technologies Corporation

9 Farm Springs Road

Farmington, CT 06032

Agent Authorized to Accept Service on Behalf of Above-Signed Party:

Typed Name:   David W. Nunn

Title:   Counsel

Address:   Eastman & Smith LTD
One Seagate, 24th Floor
555 North Summit Street

Toledo, OH 43699



THE UNDERSIGNED PARTY enters into this Consent Decree Regarding Ottawa River Assessment Area Natural Resource Damages:

FOR SETTLING DEFENDANT

_VARTA Microbattery Inc._

Date: _4/20/16_

_____
Signature

Typed Name: _James Bremner_

Title: _CFO_

Address: _555 Theodore Fremd_

_Ste C-304_

_Rye NY 10580_

Agent Authorized to Accept Service on Behalf of Above-Signed Party:

Typed Name: _Meagan L. Moore_

Title: _Attorney_

Address: _Brouse McDowell_

_600 Superior Ave East, Suite 1600_

_Cleveland, Ohio 44114_

Brands of
VARTA Microbattery:

☑ **VARTA**

powerone )))

Registered Office:
Hannover
Local Court:
Hannover HRB 59633

THE UNDERSIGNED PARTY enters into this Consent Decree Regarding Ottawa River Assessment Area Natural Resource Damages:

FOR SETTLING DEFENDANT
The Mosaic Company

Date: April 13, 2016

Signature

Typed Name: Mark J. Isaacson

Title: Senior Vice President, General Counsel and Corporate Secretary

Address: 3033 Campus Drive

Suite E490

Plymouth, MN 55441

Agent Authorized to Accept Service on Behalf of Above-Signed Party:

Howard & Howard
Typed Name: Gary A. Peters

Title: Attorney

Address: 450 West Fourth Street

Royal Oak, MI 48067

THE UNDERSIGNED PARTY enters into this Consent Decree Regarding Ottawa River Assessment Area Natural Resource Damages:

FOR SETTLING DEFENDANT
Perstorp Polyols, Inc.

Date: July 6, 2016

Signature

Typed Name: Larry Fioritto

Title: Site Manager

Address: 600 Matzinger rd

Toledo, OH 43612

Agent Authorized to Accept Service on Behalf of Above-Signed Party:

Typed Name: Larry Fioritto

Title: Site Manager

Address: 600 Matzinger Rd

Toledo, OH 43612

THE UNDERSIGNED PARTY enters into this Consent Decree Regarding Ottawa River Assessment Area Natural Resource Damages:

FOR SETTLING DEFENDANT

_____
Grand Trunk Western Railroad Company

Date: __4/18/16__

*Richard A. Verkler*
Signature

Typed Name: Richard Verkler

Title: Environmental Counsel

Address: 17641 S. Ashland Avenue

Homewood, IL  60430

Agent Authorized to Accept Service on Behalf of Above-Signed Party:

Typed Name: Illinois Corporation Service Company

Title: Agent

Address: 801 Adlai Stevenson Drive

Springfield, IL  62703-4261

Appendix A

Legal Description of Corogin Property

## Legal Description of Corogin Property

Situated in the Township of Bay, County of Ottawa and State of Ohio: Being the southwest quarter fractional of Section No. 5, Township 6, Range 16, containing 71.41 acres, also the southeast corner of the south part fractional of Section No. 6, township 6, and Range 16, containing 28.59 acres.

Containing in all 100 acres, more or less, but subject to all legal highways.

Also the northwest fraction of Section No. 8, Township 6, and Range 16, containing 76.52 acres, more or less, being the part of said Section lying northwest of the Little Portage River.

| Permanent Parcel No. | 007-03334-04279-000 |
|---|---|
| | 007-03334-04284-000 |
| | 007-03334-04303-000 |

| Prior Deed Reference: | Deed Book 254, page 44; Deed Book267, page 685 |
|---|---|
| Property Address: | Darr Hopfinger Road; Portage River South Road |

Appendix B

Map of the Ottawa River Assessment Area

# APPENDIX B

## OTTAWA RIVER ASSESSMENT AREA



Appendix C

Statement of Work for the Corogin Restoration Project

**Statement of Work for the
Corogin Restoration Work Plan
Appendix C to Consent Decree**

## I.      Purpose

This purpose of this Statement of Work is to describe the Trustees' minimum requirements for a Corogin Restoration Work Plan to be developed by the Ottawa River Group (ORG) for restoration of the former Corogin Property (Corogin Restoration Project).  The Corogin Restoration Work Plan will be submitted to the Trustees for their review and approval pursuant to this Consent Decree.

## II.      Corogin Restoration Project

The restoration project has been identified as a 175 acre parcel located at the confluence of the Portage and Little Portage Rivers in Ottawa County. This parcel, which is within the acquisition boundary of the Ottawa National Wildlife Refuge (ONWR), is approximately 30 miles southeast of the Ottawa River Assessment Area. 50 acres of the property is currently being used for agriculture (currently soybean production).  A house, barn, and smaller out-building are located on the interior of the parcel. The remaining acreage (approximately 125 acres) is currently marginal coastal wetland.  The restoration of the property would provide habitat types and services similar to those injured in the Ottawa River Assessment Area.

The Corogin Restoration Work Plan will specify a detailed description of activities to be performed during the implementation of the Corogin Restoration Project. General Work Plan requirements are provided below and reflect the scope of the project as envisioned by the Trustees.

The Trustees' concept for the ORG completed restoration project includes the following:

1. De maximis, inc. has acquired the property and will transfer the ownership to the United States and its assigns, with DOI through FWS as the administering federal agency.

2. Based on the results of future topographic and orchid surveys to be conducted by the FWS, and in consultation with the Trustees, restore as appropriate, the coastal marsh and improve native species through the control of invasive species.

3. Based on the results of the future topographic survey, and in consultation with the Trustees, create new connected wetlands in the current agricultural areas to the extent practicable (*e.g.*, up to 50 acres).

4. Clean any debris that may be left at the Corogin Property.  Demolish the existing home and smaller out-building.  Keep barn structure in place.

5. Close, remove and dispose in accordance with applicable state and federal law, the small on-property underground storage tank (UST) and any related contaminated soil.

### III.    Restoration Work Plan Requirements (General)

Within 90 days following the Effective Date of the Consent Decree, the Settling Defendants shall submit a Restoration Work Plan for the Corogin Restoration Project to the Trustees for their approval.  The Restoration Work Plan shall include:

1. Maps showing the location of the property and its proximity to the Ottawa River, ONWR, and related areas.

2. The total acreage of the property and the acreages and descriptions of the planned restored habitats.  Aerial maps, photographs or GIS interpretations of the acreages and habitat types are to be included.

3. A brief description of the ecological value and natural resources and services of the Corogin Restoration Project.

4. A  description of wetlands and other features on the property that will be enhanced through actions such as control of exotic and/ or invasive species, establishment of native species, or establishment of hydraulic connections to the Portage River, and a plan for implementation of such activities to enhance natural resource services provided by the property.

5. The results of the topographic and orchid surveys.

6. A detailed description of the creation of the interior wetlands.

7. A brief description of trash and/or debris, if any, on the property and a plan for removal and off-site disposal of such in accordance with applicable state and federal law.

8. A brief description of the current buildings and plans for their demolition and related activities including the removal and off-site disposal of such materials in accordance with applicable state and federal law.

9. A description of the on-property UST and the plan for its closure, removal, and disposal of associated materials including contaminated soil, if appropriate, and in accordance with applicable state and federal law.

10. Detailed Corogin Restoration Project cost estimates, the basis for those cost estimates, and an implementation schedule for items 4 through 8 above.

The ORG shall obtain all needed permits required for implementation of the Corogin Restoration Project.

## IV.    Restoration Work Plan Requirements (Specific)

In addition to the General Requirements described above, the Corogin Restoration Work Plan for the Corogin Restoration Project shall include:

1. An topographic survey to evaluate the feasibility of increasing the passive hydrological connection between the existing and/or created wetlands and the Portage River, and a detailed design for construction of such hydrological connection as follows:

    i. If elevation differences will allow a passive hydrologic connection between the existing or created wetland on the property and the Portage River without draining the wetland under normal water levels in the Portage or Little Portage Rivers, then a detailed design for construction of such a connection.

2. A detailed design for initial removal of exotic and/or invasive species throughout the property.

3. Planting of native species of plants and shrubs where needed to enhance the existing emergent wetland habitat, if needed.

4. Identification, removal and off-site disposal of all debris and trash within the boundaries of the property in accordance with applicable state and federal law.

5. Detailed cost estimates and an implementation schedule for items 1 through 4 above.

6. Specific performance measures for the restoration of the coastal marsh, the creation of the new, interior wetland, removal and offsite disposal of the UST and related contaminated soil and the demolition of any buildings and removal of debris from the property.


## V.      Progress Reports and Periodic Restoration Meetings

During the period of the implementation of the Corogin Restoration Work Plan, the ORG shall submit brief (1 to 2 page) monthly progress reports delineating the status of the various components of the Corogin Restoration Project.  The progress report for each month shall be submitted by the 10th day of the following month.  The frequency of the progress reports may be reduced as agreed to by the Trustees.  Periodic (*e.g.,* monthly) restoration meetings/teleconferences between the ORG and Trustee technical representatives shall be held to facilitate the restoration activities. The frequency of the meeting/teleconferences shall be determined by joint agreement between the technical representatives.  The Progress Reports shall include:

1. Activities conducted during the period.
2. Problems encountered during the period.
3. Schedule variances and corrective actions, if necessary.
4. Projected activities for the next month.
5. Brief summary/minutes of the technical meetings.
6. Status of permits and applications, if appropriate.
7. Status of Budget.


## VI.      Deliverables

The following deliverables will be generated and submitted to the Trustee representatives for approval as per the schedule below.  Note that some specific deliverables may be streamlined or waived at the discretion of the Trustees.

| DELIVERABLE (UNLESS WAIVED BY THE TRUSTEES) | DUE DATE |
|---|---|
| Restoration Work Plan | Due 90 days after the effective date of the Consent Decree |
| Progress Reports | By the 10th day of the subsequent month  during the period of implementation of the Corogin Restoration Work Plan, unless the due |

| | date is modified or the requirement is waived by the Trustees |
|---|---|
| Maintenance and Monitoring Plan | Due 30 days after the Corogin Restoration Work Plan has been approved, but prior to commencement of work to be done under the Restoration Workplan, unless the deliverable is waived by the Trustees |
| Restoration Completion Report | In accordance with the Consent Decree |

In addition to the requirements of Section XIX of the Consent Decree, deliverables shall also be submitted via electronic mail to the individuals at the addresses specified below, unless those individuals or their successors give notice of a change to the ORG in writing:

- Deborah Millsap, U.S. Fish and Wildlife Service, Deborah_millsap@fws.gov

- Brian Tucker, Ohio EPA, Brian.Tucker@epa.ohio.gov

Appendix D

Final Natural Resource Restoration Plan and Environmental Assessment
for the Ottawa River Assessment Area

# Final Natural Resource Restoration Plan

# &

# Environmental Assessment

# for the

# Ottawa River Assessment Area

**27 June 2016**

*Prepared by:*

**U.S. Fish and Wildlife Service, Region 3**

**Ecological Services**

**4625 Morse Road, Suite 104**

**Columbus, OH  43230**

***and***

**Ohio EPA**

**Division of Environmental Response and Revitalization**

**Northwest District Office**

**347 N. Dunbridge Road**

**Bowling Green, OH  43402**





| TRUSTEES: | State of Ohio |
| | Ohio Environmental Protection Agency |
| | U.S. Department of the Interior |
| | U.S. Fish and Wildlife Service |

| LEGAL AUTHORITY: | Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (as amended), 42 U.S.C. § 9601, *et seq.* |
| | Federal Water Pollution Control Act (Clean Water Act) (as amended), 33 U.S.C. § 1251, *et seq.* |
| | Natural Resource Damage Assessment, 43 C.F.R. Part 11 |
| | National Environmental Policy Act, 42 U.S.C. §§4321-4347 |

| RESPONSIBLE FEDERAL AGENCY: | Region 3, U.S. Fish and Wildlife Service |

| RESPONSIBLE STATE AGENCY: | Ohio Environmental Protection Agency |

| CONTACT: | Archie L. Lunsey II |
| | Manager |
| | Division of Environmental Response and Revitalization |
| | Northwest District Office |
| | 347 N. Dunbridge Road |
| | Bowling Green, Ohio 43402 |
| | |
| | Deborah Millsap |
| | NRDA Case Manager |
| | U.S. Fish and Wildlife Service |
| | 4625 Morse Road, Suite 104 |
| | Columbus, Ohio 43230 |

1

# TABLE OF CONTENTS

**Page Number**

SECTION 1  INTRODUCTION AND SUMMARY                                    6

SECTION 2  PURPOSE AND NEED FOR RESTORATION                            8

    2.1    The Ottawa River Assessment Area – Summary of Release History

    2.2    Natural Resource Injuries

    2.3    Authority and Legal Requirements

    2.4    Overview of Damage Determination

SECTION 3  RESTORATION ALTERNATIVES                                    13

    3.1    Alternative A:  No Action

    3.2    Alternative B: Natural Resource Based Restoration Inside the Western Lake Erie Basin and/or the Ottawa River (Selected Alternative)

    3.2.1    Wetland, Flood Plain, Riparian and Associated Upland Habitat Preservation, Reestablishment or Enhancement Projects

    3.2.1.1 Acquisition of Natural Areas

    3.2.1.2 Invasive Species Removal and Planting of Native Species

    3.2.1.3 Avian Resource Enhancement Projects

    3.2.1.4 Fishery Resource Enhancement Projects

    3.3    Current Projects Supported by the Trustees

    3.3.1    ORG Restoration Project

    3.3.2    The City of Toledo Low Service Pump Station Project

    3.3.3    The City of Toledo Manhattan Marsh Restoration Project

    3.4    Alternative C:  Natural Resource Based Restoration Outside the Western Lake Erie Basin and/or Ottawa River

    3.5    Alternatives B and C:  Criteria and Priorities for Restoration Project Categories

    3.5.1    Technical Feasibility

3.5.2    Benefit Scope

3.5.3    Quantifiable Benefits

3.5.4    Potential Impacts

3.5.5    Other Project Support

3.5.6    Voluntary Land Acquisition/Easements

3.5.7    Tribal Cultural Resources

3.6      Selected Alternative

3.7      Summary of Alternative Actions


SECTION 4  AFFECTED ENVIRONMENTS                                    26


4.1      Physical Characteristics

4.2      Biological Environment

4.2.1    Habitat/Vegetation

4.2.2    Listed, Proposed, and Candidate Species

4.2.2.1 Birds

4.2.2.2 Mammals

4.2.2.3 Aquatic Organisms

4.2.2.4 Reptiles

4.2.2.5 Plants

4.2.2.6 State-Listed Plants

4.2.3    Other Fish and Wildlife Species

4.3      Land Use

4.4      Cultural Resources


SECTION 5  ENVIRONMENTAL CONSEQUENCES                               32


5.1      Alternative A:  No Action

5.1.1    Habitat Benefits

5.1.2    Biological Benefits

5.1.3    Listed, Proposed, and Candidate Species

3

5.1.4   Cultural Resources

5.1.5   Environmental Justice

5.1.6   Socioeconomic Effects

5.1.7   Cumulative Effects

5.2     Alternative B:  Natural Resource Based Restoration Inside the Western Lake Erie
        Basin and/or the Ottawa River (Selected Alternative)

5.2.1   Habitat Benefits

5.2.2   Biological Benefits

5.2.3   Listed, Proposed, and Candidate Species

5.2.3.1 Birds

5.2.3.2 Mammals

5.2.3.3 Reptiles

5.2.3.4 Aquatic Organisms

5.2.3.5 Plants

5.2.4   Cultural Resources

5.2.5   Environmental Justice

5.2.6   Socioeconomic Effects

5.2.7   Elements Common to All Injuries

5.2.8   Cumulative Effects

5.3     Alternative C:  Natural Resource Based Restoration Outside the Western Lake
        Erie Basin and/or the Ottawa River

5.3.1   Habitat Benefits

5.3.2   Biological Benefits

5.3.3   Listed, Proposed, and Candidate Species

5.3.4   Cultural Resources

5.3.5   Environmental Justice

5.3.6   Socioeconomic Effects

5.4     Summary of Environmental Consequences for Each Alternative

4

SECTION 6  CONSULTATION AND COORDINATION WITH THE PUBLIC

        AND OTHERS                                                                                      42

      6.1    National Historic Preservation Act Compliance

      6.2    Endangered Species Act Compliance

      6.3    Public Participation

SECTION 7  CURRENT TRUSTEE TEAM                                              42

Appendix A:  Service Intra-Service Section 7 Biological Evaluation Form

Appendix B:  Transcript of April 7, 2016 Public Meeting on Draft RP/EA and Written Comments
          Submitted to the Trustees

Appendix C:  Trustees' Responses to Public Comments

Appendix D:  U.S. Department of the Interior Approval, Environmental Action Statement
         and Finding of No Significant Impact

**SECTION 1**

## INTRODUCTION AND SUMMARY

This Final Restoration Plan (RP) and Environmental Assessment (EA) (collectively referred to as the RP/EA) has been prepared by the State and Federal natural resource Trustees to address natural resources injured and ecological services lost due to releases of hazardous substances to the Ottawa River Assessment Area (the Assessment Area).  The Assessment Area means all portions of the following waterways, including sediment deposits that contain natural resources: (1) a segment of the Ottawa River, primarily located in Lucas County, Ohio, from River Mile 8.8 to River Mile 0, at the mouth of the Ottawa River, and (2) Sibley Creek. This Assessment Area is depicted on Figure 1.



**FIGURE 1**

**OTTAWA RIVER ASSESSMENT AREA**

The Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, *et seq.* (CERCLA, or more commonly known as the federal "Superfund"

law) and the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (more commonly known as the Clean Water Act or (CWA)) authorize States, Indian Tribes, and certain Federal agencies that have authority to manage or control natural resources, to act as "Trustees" on behalf of the public, to restore, rehabilitate, replace, and/or acquire natural resources equivalent to those injured by hazardous substance releases.  The Department of the Interior's Natural Resource Damage Assessments (NRDAs) regulations for CERCLA cases are set forth at 43 C.F.R Part 11.

The State of Ohio, represented by the Ohio Environmental Protection Agency (Ohio EPA) and the United States Department of the Interior (DOI), represented by the United States Fish and Wildlife Service (Service) (collectively, referred to as the Trustee Council) have worked together in a cooperative process to determine what is necessary to address natural resource injuries caused by releases of polychlorinated biphenyls (PCBs) and other hazardous substances in the Assessment Area.

The State of Ohio and the United States are in settlement negotiations with Potentially Responsible Parties (PRPs) in which the PRPs would implement various projects to in part, restore, replace, rehabilitate and/or acquire the equivalent of the natural resources injured at the Assessment Area and/or the services those resources provide.  In addition to the PRP conducted restoration projects discussed below, the Trustees expect to recover funds to complete additional restoration projects.  Future/Trustee implemented restoration projects will be selected consistent with the objectives and conclusions set forth in this Final RP/EA.  This Final RP/EA describes the proposed PRP sponsored restoration projects and proposes those objectives and conclusions to guide the Trustees in selecting the future Trustee implemented restoration projects.

In summary, the purpose of this Final RP/EA is to present the Trustees' Selected Alternative to accomplish the goal of restoring, rehabilitating, replacing and/or acquiring the equivalent of those natural resources and the services those resources provide that have been injured in the Assessment Area.  The Trustees sought published notice of the draft RP/EA, offered an opportunity for public comments, and held a public meeting to explain and hear further comments regarding the draft RP/EA.  The Trustees considered the public comments that were submitted on the Draft RP/EA and revised the RP/EA as appropriate.

Further, after consideration of the comments received and the environmental assessment prepared in the Draft RP/EA, the USFWS, on behalf of the Trustees, has issued a Finding of No Significant Impact (FONSI) for the Selected Alternative.

7

**SECTION 2**

PURPOSE AND NEED FOR RESTORATION

2.1    The Lower Ottawa River Watershed – History of Release

The Ottawa River begins southeast of Sylvania, Ohio at the junction of Ten Mile Creek and North Ten Mile Creek.  From there it flows, generally south east, through the City of Toledo, to Maumee Bay (Lake Erie), entering Maumee Bay/Lake Erie approximately 2.3 miles north of the Maumee River in Monroe County Michigan.  The City of Toledo, with a population of more than 250,000 is the only significant urban center in the watershed. Upstream of Toledo, land use is primarily agricultural with some residential development.  There is substantial marina development near the confluence of the Ottawa River with Maumee Bay.  Northern Maumee Bay is a protected shallow aquatic ecosystem, in the Western Basin of Lake Erie, with several islands and shallows supporting submergent and emergent vegetation.  The combination of hydraulically connected wetlands near the Ottawa River, islands, and shallows in Maumee Bay, result in an area of significant natural resource value.


Decades of manufacturing activity and improper waste disposal practices have resulted in the release of hazardous substances to the Ottawa River and its watershed. Hazardous substances have migrated from landfills along the banks of the Ottawa River and from industrial facilities in the watershed, contaminating sediments, water, fish, and wildlife in the Ottawa River.  The landfills and Sibley Creek, which were sources of hazardous substances to the Ottawa River, have been remediated under CERCLA and other authorities.


The Ottawa River Remedial Action (RA) was conducted through the Great Lakes Legacy Act (GLLA) by the U.S. Environmental Protection Agency's (EPA) Great Lakes National Program Office (GLNPO) and its non-federal partner, the Ottawa River Group (ORG), to remediate contaminated sediments from the Ottawa River and Sibley Creek in Toledo, Ohio. The remediation focused on a stretch of the river that was contaminated due to historical industrial discharges, wastewater and combined sewer overflow (CSO) releases. The ORG split the cost of the sediment cleanup 50-50 with EPA.  At the time, the ORG consisted of a local consortium of Allied Waste Industries, Inc., Chrysler LLC, the city of Toledo, E.I. DuPont de Nemours and Company, GenCorp, Inc., Honeywell International, Inc., Illinois Tool Works, Inc., and United Technologies Corporation. The RA included environmental dredging of approximately 250,000 cubic yards (CY) of contaminated sediment from the Ottawa River at 33 separate dredge

management units (DMU).  Fourteen sub-areas within these DMUs contained about 14,500 CY of sediment with TSCA-level concentrations of PCBs (greater than or equal to 50 ppm or milligrams per kilogram [mg/kg]).  In addition, approximately 9,500 cubic yards of sediments were removed from Sibley Creek.  Additional information on the GLLA RA can be found here:
http://www.epa.gov/glnpo/sediment/legacy/ottawa/index.html


## 2.2    Natural Resource Injuries


Injuries to surface water resources and biological resources have occurred.  An estimated 724 acres of the Ottawa River and related riparian habitat have been contaminated by hazardous substances.  Primary contaminants of concern in the Ottawa River included PCBs, metals (primarily lead) and polycyclic aromatic hydrocarbons (PAHs).  Injured habitats include forested, submergent and emergent wetlands, as well as surface waters and sediments of the Ottawa River.


Toxic contaminants have wide ranging effects on aquatic and terrestrial life.  Acute (short term) effects may include the death or reduced growth of plants, birds, fish and other animals.  Chronic (long term) effects on aquatic life may include shortened lifespans, reproductive problems, population structures and changes in appearance or behavior.  Many hazardous substances, including PCBs, are categorized as persistent, bio-accumulative, and toxic compounds.  They degrade very slowly in the environment, accumulate in living things and concentrate in tissues as they are transferred up food chains.  General information on potential effects of the hazardous substances detected can be found in the Agency for Toxic Substances and Disease Registry (ATSDR) fact sheets (www.atsdr.cdc.gov) and the U.S. EPA ECOTOX database (www.epa.gov/ecotox).


The Ottawa River has been of particular concern for regulatory agencies due to suspected contamination, possible health concerns and natural resource injuries for some time.  Reports on specific injuries at the Assessment Area can be found at:
http://www.fws.gov/midwest/es/ec/nrda/Ottawa/index.html


Additionally, several Ohio EPA water quality and related reports can be found at:

http://epa.ohio.gov/portals/35/documents/ottawa91.pdf

http://epa.ohio.gov/portals/35/documents/ottawa96.pdf

http://epa.ohio.gov/portals/35/documents/Ottawa99.pdf

http://epa.ohio.gov/portals/35/documents/Aquablok.pdf

http://epa.ohio.gov/portals/35/documents/AquaBlok2001.pdf

http://epa.ohio.gov/portals/35/documents/OttawaRDura2002.pdf

http://epa.ohio.gov/portals/35/documents/OttawaRiver2007TSD.pdf

Due to past contamination in the Ottawa River, contact and consumption advisories have been in place on parts of the Ottawa River since 1991.  Details on the consumption advisories and their relationship to natural resource injuries can be found here:

http://www.fws.gov/midwest/es/ec/nrda/Ottawa/documents/ottawarfishadvrpt8-31-09.pdf

Given the bio-accumulative properties of PCBs and other contamination in the Assessment Area, evaluations of top predators were completed as part of the damage assessment of the Ottawa River.  Of particular concern were fish eating birds that may migrate to and from the Ottawa River and use the area for nesting and foraging during large portions of the year.

In summary, injuries occurred to biological resources including their supporting ecosystems, surface water, and lost human use of those injured resources.  Injuries are likely have occurred to fish-eating bids and migratory birds.

## 2.3    Authority and Legal Requirements

This Final RP/EA has been prepared jointly by Ohio EPA and the Service.  Each of these Agencies is a designated natural resources Trustee under Section 107(f) of CERCLA, 42 U.S.C. § 9607(f), Section 311 of the CWA, 33 U.S.C. § 1321, and other applicable law, including Subpart G of the National Contingency Plan (NCP), 40 C.F.R. §§ 300.600-300.615.  As a Trustee, each Agency is authorized to act on behalf of the public to assess natural resource injuries and recover damages for injuries to natural resources and losses of natural resource services attributed to releases of hazardous substances. The Federal Authorized Official (AO) is the DOI official that has been delegated the authority to act on behalf of the Secretary of the Department of the Interior to conduct a natural resource damage assessment and restoration.  The AO is the Region 3 Regional Director for the Service, and represents the interests of the

Department, including all affected Bureaus.  In accordance with 42 U.S.C. §
9607(f)(2)(B), the Director of Ohio EPA has been designated the natural resource
Trustee of Ohio according to Ohio Governor John Kasich's letter dated June 30, 2011.

The purpose of the RP/EA is to consider alternative actions to restore, rehabilitate,
replace, and/or acquire the equivalent of any natural resources injured and natural
resource services lost as a result of releases of PCBs and other hazardous substances
into the lower 8.8 miles of the Ottawa River, Sibley Creek and adjacent wetlands and
related habitats in the Assessment Area, pursuant to applicable State and Federal laws
and regulations.  This document will also serve as the RP for implementing the selected
Alternative as required under the CERCLA NRDA regulations.

Any restoration of natural resources under the CERCLA and CWA must comply with the
National Environmental Policy Act (NEPA), as amended (42 U.S. C. §4321, et seq.), the
Council on Environmental Quality regulations (40 CFR parts 1500-1508) and DOI's
implementing NEPA regulations at 40 C.F.R. Part 6.  In compliance with NEPA and its
regulations, this Environmental Assessment (EA) summarizes the current environmental
setting, describes the purpose and need for action, identifies alternative actions,
assesses their applicability and environmental consequences, and summarizes
opportunities for public participation in the decision making process.  For the actions
proposed in this EA, the appropriate context for considering potential significance of the
actions is local, as opposed to national or worldwide.

The Alternative selected in the RP must be consistent with statutory mandates and
regulatory procedures that specify that recovered damages are used to undertake
feasible, safe, and cost-effective projects that address injured natural resources,
consider actual and anticipated conditions, have a reasonable likelihood of success,
and are consistent with applicable laws and policies.

## 2.4    Overview of NRDA and Restoration Process

DOI has adopted regulations under CERCLA and the CWA establishing procedures for
assessing natural resource damages.  The CERCLA NRDA regulations are codified at 43
C.F.R. Part 11.

As defined in the NRDA regulations, injury is an adverse biological, chemical, or physical effect on natural resources, such as death, decreased population, or lost services (*e.g.*, fishing or hunting opportunities, ecosystem functions).  Damages are the estimated dollar value of the injured resources.  The objective of the NRDA process is to compensate the public through environmental restoration for injuries to natural resources that have been caused by releases of hazardous substances into the environment.  Under Section 107(f)(1) of CERCLA, damage settlements can only be used to restore, rehabilitate, replace, and/or acquire the equivalent of trust resources injured, destroyed, or lost as a result of the release of hazardous substances.  NRDAs can be performed using multiple approaches that quantify the injuries for which damages can be determined for the injuries. An alternate method includes habitat to habitat or resource to resource evaluations. Habitat equivalency analysis (HEA) or resource equivalency analysis (REA) are techniques based on a methodology used to determine compensatory projects for such resource injuries. The principal concept underlying the methods is that the public can be compensated for past losses of habitat resources or services through habitat replacement projects providing additional resources of the same type or quality.  HEA was used in estimating the loss of the resources and services in the Assessment Area and to determine the size and scope of restoration projects required to adequately compensate the public.

Accordingly, this Final RP/EA has been developed to evaluate and, ultimately, select restoration projects designed to compensate the public for injuries that occurred to natural resources in the Assessment Area.  The RP/EA is not intended to completely quantify the extent of restoration needed.  Implementation of selected restoration projects will occur over a period of time, dependent upon the project type and the ability of the parties to complete the restorations.

The CERCLA NRDA regulations provide that restoration plans should consider ten factors when evaluating and selecting projects to restore or replace injured natural resources.  The following factors will be used to select an Alternative and to compare projects within an Alternative. (See 43 C.F.R. § 11.82)

1. Technical feasibility.

2. The relationship of the expected costs of the Alternative to the expected benefits.

3. Cost-effectiveness.

4. The results of actual or planned response actions.

12

5.      The potential for additional injury resulting from the proposed actions.

6.      The natural recovery period.

7.      Ability of the resources to recover with or without alternative actions.

8.      Potential effects of the action on human health and safety.

9.      Consistency with relevant Federal, State, and Tribal policies.

10.     Compliance with applicable Federal, State, and Tribal laws.

As discussed, the selected Alternative must restore, rehabilitate, replace and/or acquire the equivalent of those natural resources injured by the discharge or release of PCBs and other hazardous substances into the Assessment Area.

Based on the recommendations of the Trustee Council and input from the public, the AO and Ohio Trustee has selected one of the Alternatives.  The AO has determined, based on the facts and recommendations contained herein, and public comment, that the EA is adequate to support a Finding of No Significant Impact (FONSI), and that no Environmental Impact Statement (EIS) is required.

## SECTION 3

## RESTORATION ALTERNATIVES

### 3.1    Alternative A:  No Action

The No Action Alternative, required by the National Environmental Policy Act (NEPA) consists of expected conditions under current programs pursued outside the NRDA process.  It is the baseline against which other actions can be compared.  If this Alternative were implemented, the Trustee Council would not initiate specific actions to restore injured natural resources or compensate the public for ongoing natural resource injuries caused by releases of hazardous substances into the environment.  Existing environmental degradation not directly related to hazardous substance releases would continue to occur (land development, shoreline hardening, etc.), and perhaps worsen under Alternative A. The State and Federal agencies would continue to manage, conserve and protect the Ottawa River as outlined in current programs and regulations and within current budget constraints.  The public would not be compensated for injuries to natural resources.

13

3.2     Alternative B:  Natural Resource Based Restoration Inside the Western Lake Erie
         Basin and/or the Ottawa River (Selected Alternative)


CERCLA authorizes Trustees to replace and/or acquire natural resources equivalent to those injured by hazardous substance releases, in lieu of or in addition to, restoring or rehabilitating the injured natural resource.


Alternative B involves projects that would restore and replace injured and lost natural resources, while concurrently providing enhanced ecosystem and public use services to compensate for injuries caused by releases of hazardous substances.  Because the ability to restore or preserve large and potentially healthy and diverse wetlands within the urban environment of the lower Ottawa River Watershed is extremely limited, Alternative B projects could be implemented within the Western Lake Erie Basin and/or the Ottawa River.  See figure 2 for the Alternative B project area.   Alternative B projects are focused on maintaining the important linkages between the physical, chemical and biological properties of the overall ecosystem and the services it provides.  Specifically, the lower Ottawa River prior to development consisted of large coastal marshes that were hydraulically connected to Lake Erie.  Many of the landfills responsible for contributing to the contamination within the lower Ottawa River were located in these large and sensitive wetlands.  Alternative B projects include the following:


1.  Restoration, reestablishment, and preservation of coastal marshes and wetlands in Western Lake Erie Basin and/or the Ottawa River.

2.  Enhancement and preservation of riparian, wetland and upland habitat providing benefits to avian and fisheries resources in the Western Lake Erie Basin and/or the Ottawa River.

3.  General improvement of aquatic habitat.

**Figure 2:**  Alternative B: Natural Resource Based Restoration Inside the Western Lake Erie Basin and/or the Ottawa River



Each of these categories of projects is expected to improve and enhance the ecosystem to benefit injured natural resources.  Concomitantly, these projects would benefit the public by enhancing active and passive outdoor recreational opportunities.  These goals would be accomplished through the acquisition, restoration, and preservation of new and/or contiguous tracts of coastal marshes and other valuable habitat where feasible, which would be made available to the public for active and/or passive recreational use. This approach supports the goal of restoring, replacing and rehabilitating injured resources and enhancing outdoor recreational activities.

The Trustee Council anticipates that ecological priorities for all restoration project categories under Alternative B will be influenced primarily by the following key factors:

1. Relationship to injuries (restoration opportunities that address the habitat types, services, and values similar to those lost due to the release of hazardous substances are preferred).

2. Quality and size of restoration opportunities (projects with substantial ecological opportunities are preferred).

3. Ecological function/hydraulic connectivity (areas in the Western Lake Erie Basin and/or the Ottawa River are preferred).

15

4. Cost and cost-effectiveness (projects with lower cost per restored or replaced services or values are preferred).

Prior to the selection and implementation of any Site specific actions, the Trustees will review the specific projects to determine if any further work is required to comply with all applicable requirements (*e.g.*, Historic Preservation Act, Endangered Species Act, Americans with Disabilities Act).

### 3.2.1  Wetland, Flood Plain, Riparian and Associated Upland Habitat Preservation, Reestablishment or Enhancement Projects

Restoration projects under this Alternative would concentrate on the need to preserve and enhance certain properties in the Western Lake Erie Basin and/or the Ottawa River which provide ecological services similar to those lost in the Assessment Area.  Protection and restoration of Lake Erie coastal wetlands and associated riparian habitat and ecologically associated uplands would foster and promote increased spawning and nursery habitats and nesting and foraging opportunities for a wide variety of fish, birds and other wildlife.  Such projects will also reduce erosion and resultant sediment, pesticide, and nutrient loading to Lake Erie.  Restoration projects described in Alternative B would provide ecological functions similar to, but not necessarily the same as, those injured by hazardous substances.

Wetland, flood plain, riparian and ecologically associated upland protection and enhancement would help replace habitats that have been impaired or destroyed in the Assessment Area.

The Trustee Council's wetland, flood plain, riparian, and upland habitat reestablishment and enhancement strategy would include active restoration projects such as improving existing flood plain(s), establishing and/or preserving coastal and other wetlands, establishing interconnections between surface water and wetlands, and removing invasive plant species.  Low impact techniques such as closing off drainage ditches, disrupting (or not repairing) drain tile systems and reestablishing wetland and flood plain plants and other native vegetation in order to reestablish natural characteristics that have been eliminated would also be utilized, as appropriate.  The Trustee Council intends to target restoration of wetland, riparian, and upland habitats located in coastal areas, within flood plains and adjacent to existing valuable natural areas.  Wetland, flood plain, riparian, and ecologically associated upland reestablishment and enhancement projects that will

16

improve water quality in Lake Erie (including reducing loadings of suspended sediments, nutrients, and pesticides) and provide habitat for biological resources are preferred.

### 3.2.1.1 *Acquisition of Natural Areas*

Alternative B recognizes the significance of preserving the riparian, coastal and other wetlands, flood plains and upland habitat of the Western Lake Erie Basin/Ottawa River watershed.  To achieve this goal, the Trustee Council will focus its efforts on identifying, acquiring, and preserving parcels of land with the following attributes:

1. Coastal areas.

2. Areas with agricultural, commercial and/or residential development pressure.

3. Contiguous parcels.

4. Areas of high natural quality.

Areas with high natural quality or "natural areas" are those parcels of land that significantly contribute to the ecological qualities of the Western Lake Erie Basin and/or Ottawa River watershed.  Public passive and active recreational activities improve with preserved and protected natural areas and through restoration of lost or injured resources.

The Trustee Council will select specific areas for preservation based upon the following criteria:

1. The ecological value of the habitat.

2. The ability to improve the habitat.

3. The ability to preserve the habitat.

4. The geographical and ecological diversity of the parcel(s).

5. The local and regional development plans.

6. The ability to find willing landowners and/or sellers.

7. The concerns and comments of the public.

17

Preservation of properties would be achieved through fee title purchase from willing land owners and/or through the purchase of conservation easements or the establishment of environmental covenants.  Those properties that could be preserved in perpetuity will be considered a higher priority than those with fixed durations.  Land acquired will be conveyed to individual State, Federal, or local governmental agencies, land trusts, or non-governmental conservation organizations following specific procedures and standards for each entity.

While the primary purpose of the preservation of land is to protect and preserve fish and wildlife habitats, portions of the acquired properties will likely be available to the public for passive and/or active recreational opportunities.  The parcels may be available to serve as fishing spots, or for other activities such as wildlife viewing, hiking, or hunting.

### 3.2.1.2 *Invasive Species Removal and Planting of Native Species*

Restoration projects under Alternative B may include the replanting and reestablishment of native species on preserved or protected properties.  Reestablishment efforts will focus on restoring natural areas that are in a somewhat degraded natural condition.  Native species will be reestablished once non-native species have been removed and/or controlled.  The removal of non-native species and planting of native species will enhance ecosystem function and, as a result, enhance the ecosystem functions provided to the natural resources and the public.

### 3.2.1.3 *Avian Resource Enhancement Projects*

The assessment process showed substantial injury to fish that are a food source for fish eating birds, and because of this, injury to fish eating birds has likely occurred in the Assessment Area.  In light of this, the Trustees selected projects designed to increase habitat for a wide range of avian species including water fowl and other migratory birds.  Projects in Alternative B will, therefore, focus on the following: (1) acquisition and improvement of tracts of land within Atlantic and Mississippi flyways with emphasis on the Western Lake Erie Basin, which will provide forging, nesting, and loafing habitat for a wide range of avian species, and (2) restoration of certain existing wetlands along the Ottawa River and Western Lake Erie, which will provide improved foraging, nesting, and loafing areas for a wide range of avian species.

18

### 3.2.2  Fishery Resource Enhancement Projects

The abundance and diversity of fish species that once inhabited the Ottawa River is very different from the fishery currently observed due to anthropogenic effects, including effects of pollutants.  The Trustees have, therefore, proposed projects designed to increase spawning and nursery habitat for a wide range of fish species.  Projects in Alternative B will, therefore, focus on the following: (1) acquisition of tracts of land, including current and historical wetlands, within the Western Lake Erie Basin and/or the Ottawa River watershed, (2) establishment of hydrological connections between the wetlands and Lake Erie tributaries, which will provide significant spawning and nursery areas for fish.

### 3.3     Current Projects Supported by the Trustees

Three projects have been proposed by settling parties and are supported by the Trustees.  Sections 3.2.4 through 3.2.6 describe the restorations that will in-part, compensate the public for injuries incurred in the Assessment Area. These three projects include all of the preferred alternative characteristics listed in section 3.2.1 above and score favorably using the selection criteria presented below (section 3.4). Additional projects will be selected using the criteria discussed in this RP/EA.

### 3.3.1  *ORG Restoration Project*

The ORG has purchased approximately 175 acres in Ottawa County, with the plan of restoring the property to include in part, coastal, connected emergent wetlands similar to those injured on the Ottawa River and to transfer the property to the United States with management by the Ottawa National Wildlife Refuge for long-term protection, maintenance, and enjoyment by the public.  Similar to the habitats in and adjacent to the Ottawa River, the restoration project is located on the banks of the Portage and Little Portage Rivers. This area is included in the Western Lake Erie basin.   The project will include reconnecting the majority of the agricultural fields to the Portage River, drain tile removal, installation of water control structures, and planting with native wetland species.  The Trustees support this project as being direct replacement and acquisition of natural resources equivalent to those injured in the Assessment Area.  In addition, acquiring property of such size and quality in the Ottawa River is highly unlikely given the development and urban nature of the lower Ottawa River.

### 3.3.2   *The City of Toledo Low Service Pump Station Restoration Project*

The first of two (2) restoration projects to be completed by the City of Toledo includes the restoration of "Toledo Low Service Pump Station." This property comprises approximately 58 acres located in Lucas County at 1002 North Yondota Road, Curtice, Ohio, with latitude and longitude coordinates of latitude 41.674197 and longitude -83.309728.  This property shares a border with the Cedar Point National Wildlife Refuge.

The City will enter into a long term access agreement with the U.S. Department of the Interior for at least 50 years and for up to 58 acres of the Property.  The restoration will include:

> 1. Maintaining the acreage as wetland, forested wetland habitats, or other habitats as determined by the Refuge.

> 2. Transferring approximately 1 acre of the property to the United States with management by the Refuge for maintaining, repairing, or constructing new water control structures (*e.g.,* dikes, levees) that have failed.

> 3. Maintaining native wetland plants through an invasive plant species control program.

> 4. Increasing wet meadow and wetland habitat through selected tree removal, producing open areas suitable for colonization by a federally threatened native plant species, the eastern prairie fringed orchid and state species of concern, the Kirtland's snake and the Blanding's turtle. All of these special interest species have been determined to use or have used the property in recent past.  By improving the property, it is anticipated to better support these protected species.

### 3.3.3   *The City of Toledo Manhattan Marsh Restoration Project*

The second project to be completed by the City of Toledo is called the Manhattan Marsh.

Several properties would be consolidated into a total of approximately 70 acres located in North Toledo within the vicinity of and bounded in part by Bassett Street, Manhattan Boulevard and Suder Avenue. The restoration will consist of acquiring and maintaining the property as wetland and related habitat through removal of debris, refuse, and likely the installation of water control structures to support wetland habitats. Native plants will be maintained through an invasive plant species control program.  The property will be transferred to Toledo Metro Parks for long term control and stewardship.  Public use of the wetland and

related habitats will be increased via developed trails/walkways in sections the restored marsh and opening up viewing of the marsh by removing invasive species along the edges.  Increased awareness of wetland habitat is likely due to the location of the wetland within the community, being adjacent to a senior living center on one side and Chase elementary school on another.  It is likely students will experience the restored habitat first-hand as part of classes at the elementary school.  The Trustees and City of Toledo recognize that the availability of such a large and potentially healthy and diverse wetland within the City of Toledo, or any large metropolitan area, is a rare and fortunate opportunity. The increased use of the restored marsh would offset, in part, lost recreational uses that have incurred along the Ottawa River.

## 3.4    Alternative C:  Natural Resource Based Restoration Outside the Western Lake Erie Basin and Ottawa River Watershed

Alternative C involves projects of the type described in Alternative B, above.  However, those projects would be implemented outside the Western Lake Erie Basin.  Projects outside of the Western Lake Erie Basin would provide services similar to those in Alternative B, but may not benefit directly those species and populations injured by hazardous substance releases in the Ottawa River.

## 3.5    Alternatives B and C:  Criteria and Priorities for Restoration Project Categories

Alternatives A, B and C were evaluated using the following seven (section 3.5.1 through 3.5.7) criteria.  In addition, the three projects described above and future restoration projects will be similarly evaluated to ensure the appropriateness of the restoration.

### 3.5.1  *Technical Feasibility*

Projects that use reliable, proven methods are preferred to those that rely on experimental or untested methods.  Other factors that can affect project success, such as validity of assumptions inherent to the project approach, will also be considered by the Trustee Council.

21

### 3.5.2   *Benefit Scope*

Restoration projects that provide a broad scope of measurable ecological benefits to large geographic areas and numerous fish or wildlife populations are favored over those that are focused on a limited set of benefits to a limited area or population.  Restoration projects benefiting fish, wildlife species, and populations of the type known or believed to have been injured in the Assessment Area will be favored over those benefitting other species or populations.  Restoration projects with a high ratio of expected ecological benefits to expected cost are preferred.  Projects that provide natural resource services through protection and/or enhancement of the natural resources providing those services are preferred over projects designed solely to provide services.  Projects that benefit more than one injured natural resource are expected to be given priority.  Wherever possible, natural habitat functions that are self-sustaining and essential to maintain the habitat will be restored, enhanced and/or protected.  If projects provide equal benefits, at equal costs, those closest with minimal operation and maintenance activities will be preferred.

### 3.5.3   *Quantifiable Benefits*

Projects expected to provide quantifiable benefits and likely to achieve success will have a higher priority than projects that do not.  Restoration projects should include an evaluation of success and a monitoring component to determine the effectiveness of restoration actions in providing the public with similar services and values to those lost because of releases of hazardous substances into the environment.  A timeline outlining the implementation and progression of the restoration project will be used by the Trustee Council to determine completion and success of the project.  Overall success of the RP will depend upon success of each restoration project.

### 3.5.4   *Potential Adverse Effects to Natural Resources*

Preference will be given to projects that avoid or minimize additional natural resource injury or environmental degradation.  The Trustee Council will require that requisite permits are obtained and comply with applicable regulations.  All projects selected for implementation will be expected to comply with applicable and relevant laws, policies and regulations.

### 3.5.5  *Other Project Support*

Preference is expected to be given to projects or aspects of Trustee Council projects that are not already being implemented or have insufficient funding under other programs. Although the Trustee Council may use restoration planning efforts completed by other programs, preference is given to projects that would not otherwise be implemented without NRD restoration funds.

### 3.5.6  *Voluntary Land Acquisition/Easements*

Preservation of habitats through acquisition of land, Environmental Covenants, or Conservation Easements will only be from willing sellers or participants.  Landowners are, and will be, under no obligation to sell land to the government agencies or other organizations associated with the Trustee Council.  Neighbors adjacent to land purchased for preservation under this RP will retain all of their current rights to their land.  Land acquisitions may be conducted by government agencies using settlement moneys, or directly by settling PRPs.  The government agencies are required to pay fair market value for land purchased.  Fair market value would be determined through established appraisal procedures.

### 3.5.7  *Tribal Cultural Resources*

The preservation or restorations of specific areas or resources that have appreciable cultural value to Indian tribes are important to the Trustee Council.  A search of the Native American Consultant Database maintained by the National Park Service identified no Indian tribes with relevant interest in the ORG or City of Toledo restoration project areas.

## 3.6   Selected Alternative

The Trustee Council has selected Alternative B that includes the ORG and City of Toledo restoration projects.  Natural resource based restoration outside the Western Lake Erie Basin (Alternative C) may provide services similar to those within the Western Lake Erie Basin.  However, because of the distinct nature of Western Lake Erie and its tributaries (shallow, highly productive, warm water habitat), such projects would not benefit the same species assemblages that were injured in the Assessment Area.  In addition, federal wildlife refuges, state wildlife areas in the Western Lake Erie Basin, as well as the City of

23

Toledo's location on the Ottawa River provide existing entities and infrastructure for highly cost effective long term operation of projects. The final decision on the selected Alternative has been made by the State of Ohio Trustee and the Federal AO based on recommendations from the Trustee Council staff and input from the public.

## 3.7    Summary of Alternative Actions

## Table 1:  Comparison of Alternatives A, B & C

| Actions | Alternative A | Alternative B | Alternative C |
|---|---|---|---|
| | No Action | Natural Resource Based Restoration in the Western Lake Erie Basin and/or the Ottawa River (Selected Action) | Natural Resource Based Restoration Outside the Western Lake Erie Basin and/or Ottawa River Watershed |
| Restore, rehabilitate, replace and/or acquire the equivalent of natural resources injured from the release of hazardous substances into the environment and services those resources provide | No | Yes | Partial.  Species assemblages would not be the same as those injured |
| Rehabilitate wetlands, flood plains, riparian and associated upland habitat | No | Yes | Yes |
| Improve aquatic habitat and near-shore habitat | No | Yes | Possibly |
| Provide for enhancement of abundance and diversity of self-sustaining fish populations | No | Yes | Partial. Species assemblages would be different from those injured |
| Preservation of wetlands, flood plain, riparian and associated upland habitat | No | Yes | Yes |
| Improve outdoor recreational opportunities/enhance public awareness | No | Yes | Yes |

# SECTION 4

# AFFECTED ENVIRONMENTS

The terrestrial, wetland, and aquatic habitats of the Assessment Area support a wide diversity of birds, fish, and mammals, including many rare, threatened, and endangered species.  The health of the ecosystem and the quality of its habitats are vital to the invertebrates, plants, fish, and wildlife of the area.  Public uses and enjoyment of these resources also depend on the health and quality of these areas.

## 4.1    Physical Characteristics

The   Assessment Area is located in northwestern Ohio in Lucas and Ottawa Counties. It includes the lower 8.8 miles of the Ottawa River.  Figure 1, identifies the Assessment Area.

## 4.2    Affected Environments and Species

### 4.2.1  Habitat/Vegetation

The City of Toledo, with a population of more than 250,000 is the only significant urban center in the Assessment Area.  There is extensive urban development along the Ottawa River in the City of Toledo, with substantial marina development near the confluence of the Ottawa River with Maumee Bay.  However, there is still some undeveloped land in the lower reaches of the Ottawa River, including hydraulically connected wetland complexes within the City of Toledo.  Habitat along the Lake Erie shoreline from Toledo to Port Clinton, Ohio is primarily agricultural, with some residential development.

There are several State Wildlife Areas and National Wildlife Refuges along the southern shoreline or a few miles inland of Lake Erie.  These include Cedar Point National Wildlife Refuge, Ottawa National Wildlife Refuge, Magee Marsh State Wildlife area, Toussaint State Wildlife Area, Mallard Club State Wildlife Area, and the Metzger Marsh State Wildlife Area.  These areas are managed primarily for waterfowl habitat and most include coastal wetlands hydraulically connected to Western Lake Erie, which provide spawning and nursery habitat for Western Lake Erie and tributary fish species.

26

### 4.2.2   Listed, Proposed, and Candidate Species

The Assessment Area and proposed restoration project locations fall within range of the Indiana bat, piping plover, and clubshell mussel, which are Federally-listed endangered species.  In addition, the federally listed threatened native plant species, the eastern prairie fringed orchid and State species of concern, the Kirtland snake and the Blanding's turtle have been identified in the restoration boundaries.  An endangered species is any species that is in danger of extinction throughout all or a significant portion of its range.  A threatened species is likely to become endangered in the foreseeable future.  A candidate species is a species for which the Service has sufficient information on their biological status and threats to propose listing them as endangered or threatened under the Endangered Species Act, but for which development of a proposed listing regulation is precluded by other higher priority listing activities.

The Federally-listed species discussed above are potentially present in the restoration area boundaries for both Alternative B and C.  The following sections provide additional information on Federally-listed species.

### 4.2.2.1     <u>Birds</u>

Piping plover *(Charadrius melodus)* habitat includes sand or pebble beaches with sparse vegetation along the shore of Lake Erie.  The piping plover was designated as endangered in the Great Lakes watershed in December 1985.  The decline in piping plover populations has been linked to natural and human caused factors such as high water levels, eroding beaches, and commercial and residential beach front.  Critical habitat for the piping plover was designated in 2001 at Headlands Dune in neighboring Lake County and Sheldon Marsh in north central Ohio's Erie County.  Critical habitat is an area that is essential for the conservation of a threatened or endangered species that may require special management and protection.

The bald eagle *(Haliaeetus leucocephalus)* has been documented in Lucas and Ottawa counties.  Bald eagles build large stick nests lined with soft materials such as grass, leaves, and Spanish moss.  Nests are used for several years by the same pair of eagles, with the birds adding materials each year.  The bald eagle was designated as endangered in the lower 48 states in March of 1967 due to declining populations resulting from chemical usage, shooting and persecution of individual birds, and the loss of nesting habitat due to development along the coast and near inland rivers and

waterways.  After years of protection, decrease in chemical usage in the United States, and education against shooting eagles, there has been an increase in eagle populations.  The bald eagle was reclassified as threatened in 1995.  In 2007, the bald eagle was de-listed, but is still protected under various Federal statutes.

### 4.2.2.2     Mammals

The Indiana bat *(Myotis sodalis)* was designated as endangered throughout its range in March of 1967.  Limestone caves are used for winter hibernation.  The decline of this species has been attributed mainly to human disruption and commercialization of roosting caves.  During the summer months, the bats roost in trees which have exfoliating bark, and dead or live trees with split tree trunks and/or branches, and cavities (that may be used as maternity or male roost areas).  Stream corridors, riparian areas, and upland woodlots provide forage sites.

The northern long-eared bat (*Myotis septentrionalis*) (NLEB) was listed as threatened on May 4, 2015, under the Endangered Species Act (ESA) (87 Stat. 884, as amended; 16 U.S.C. 1531 *et seq.*).  See, 80 Fed. Reg. 2371 (January 16, 2015). At this time, no critical habitat has been proposed for the NLEB.  The entire state of Ohio is within the known range of the NLEB.  During the summer, NLEBs typically roost singly or in colonies in cavities, underneath bark, crevices, or hollows of both live and dead trees and/or snags (typically ≥3 inches diameter breast height).  Males and non-reproductive females may also roost in cooler places, like caves and mines.  This bat seems opportunistic in selecting roosts, using tree species based on presence of cavities or crevices or presence of peeling bark.  It has also been occasionally found roosting in structures like barns and sheds (particularly when suitable tree roosts are unavailable).  They forage for insects in upland and lowland woodlots and tree lined corridors.  During the winter, NLEBs predominately hibernate in caves and abandoned mine portals.  Additional habitat types may be identified as new information is obtained.  Therefore, if suitable NLEB habitat is present within the proposed project area, further coordination with the Service should occur to avoid potential project delays.

### 4.2.2.3     Aquatic Organisms

The clubshell mussel (*Pleurobema clava*) is a federally endangered species that was once found from Michigan to Alabama, and from Illinois to West Virginia. Extirpated from Alabama, Illinois and Tennessee, it occurs today in portions of only 12 streams. Reasons for its decline in the upper Ohio and Wabasha watersheds have been principally due to pollution from agricultural run-off and industrial wastes, and extensive

impoundments for navigation. These are thought to be also responsible for its decline elsewhere as well.

### *4.2.2.4*     Reptiles

The eastern massasauga rattlesnake *(Sistrurus catenatus)* has now been proposed to Federal Candidate status in 1999.  Destruction and modification of habitat is the main threat to this species.  The massasauga is a small to medium-sized snake that inhabits various wetland types as well as dry, well-drained sandy uplands.

### 4.2.2.5 *Plants*

The eastern prairie fringed orchid (*Platanthera leucophaea*) is a federally threatened species that occurs in a wide variety of habitats, from mesic prairie to wetlands such as sedge meadows, marsh edges, even bogs. It requires full sun for optimum growth and flowering and a grassy habitat with little or no woody encroachment. A symbiotic relationship between the seed and soil fungi, called mycorrhizae, is necessary for seedlings to become established. These fungi help the seeds assimilate nutrients in the soil.  Decline of this species is mainly due to the loss of habitat from the drainage and development of wetlands. Other reasons for the current decline include succession to woody vegetation, competition from non-native species and over-collection.

### *4.2.2.6*     State-Listed Species

In addition to Federally-listed endangered and threatened species, the state of Ohio Department of Natural Resources Division of Natural Areas and Preserves maintains a database of rare plants and animals.  The following general listing categories are used: (1) *endangered* - a native species or subspecies threatened with extirpation from the State:  this danger may result from one or more causes, such as habitat loss, pollution, predation, interspecific competition or disease; (2) *threatened* - a species or subspecies whose survival in Ohio is not in immediate jeopardy, but to which a threat exists: continued or increased stress will result in its becoming endangered; and, (3) *species of concern* - a species or subspecies which might become threatened in Ohio under continued or increased stress, or a species or subspecies for which there is some concern but for which information is insufficient to permit an adequate status evaluation. In Lucas and Wood Counties, there are 80 endangered, 66 threatened, and 14 species

29

of special concern.  Section 4.2.3 discusses some of these and other Ohio species.  A complete list of listed species in Lucas and Wood counties can be found here:

http://wildlife.ohiodnr.gov/portals/wildlife/pdfs/species%20and%20habitats/state-listed%20species/lucas.pdf

http://wildlife.ohiodnr.gov/portals/wildlife/pdfs/species%20and%20habitats/state-listed%20species/wood.pdf

### 4.2.3   *Other Fish and Wildlife Species*

The following section provides a general list of fish and wildlife found in the Ottawa River as well as other tributaries to Western Lake Erie.  The Ottawa River and Lake Erie shoreline between Toledo and Port Clinton, Ohio are located on both the Atlantic and the Mississippi flyways, with over three million ducks and geese using this corridor (see Figure 4).  Many migratory bird species nest on the outer breakwalls and wetlands near the river and Lake Erie.  These include, but are not limited to, the osprey *(Pandion haliaetus)*, wood duck *(Aix sponsa)*, Canada goose *(Branta canadensis)*, common merganser *(Mergus merganser)*, great blue heron *(Ardea herodias)*, cliff swallow *(Hirundo pyrrhonta)*, tree swallow *(Tachycineta bicolor)*, Caspian tern *(Sterna caspia)*, Forster's tern *(Sterna forsteri)*, common tern *(Sterna hirundo)*, mallard *(Anas platyrhynchus)*, black duck *(Anas rubripes)*, lesser scaup *(Aythya affinis)* and kingfisher *(Ceryle alcyon)*.  Numerous additional species of migratory neotropical songbirds inhabit the area seasonally.  Smaller mammals likely to use the Ottawa River area include opossum *(Didelphis virginiana)*, eastern cottontail rabbit *(Sylvilvagus floridanus)*, eastern chipmunk *(Tamias striatus)*, woodchuck *(Marmota monax)*, eastern gray squirrel *(Sciurus gireus)*, red fox *(Vulpes fulva)*, striped skunk *(Mephitis mephitis)*, and raccoon *(Procyon lotor)*.

Fish species in, or seasonally using the Ottawa River and other Western Lake Erie tributaries include, but are not limited to, least brook lamprey (*Lampetra aepyptera*), northern bigeye chub (*Notropis amblops*), rosyface shiner (*Notropis rubellus*), mimic shiner (*Notropis volucellus*), spottail shiner (*Notropis hudsonius*), emerald shiner (*Notropis atherinoides*), black redhorse (*Moxostoma duquesnei*), silver redhorse (*Moxostoma anisurum*), white sucker (*Catostomus commersoni*), rainbow darter (*Etheostoma caeruleum*), Johnny darter (*Etheostoma nigrum*), log perch (*Percina caprodes*), walleye (*Stizostedion vitreum*), yellow perch (*Perca flavescens*), white bass (*Morone chrysops*), smallmouth bass (*Micropterus dolomieui*), pumpkinseed (*Lepomis gibbosus*), white crappie (*Pomoxis annularis*), common carp (*Cyprinus carpio*), brown bullhead (*Ictalurus nebulosus*), alewife (*Alosa pseudoharangus*), rainbow smelt

(*Osmerus mordax*), freshwater drum (*Aplodinotus grunniens*), lake sturgeon (*Acipenser fulvescens*), coho salmon *(Oncorhynchus kisutch)* and Chinook salmon *(Oncorhynchus tschawytscha).*  Rainbow smelt *(Osmerus mordax)*, rainbow trout *(Oncorhynchus mykiss)*, coho salmon *(Oncorhynchus kisutch)* and Chinook salmon *(Oncorhynchus tschawytscha)* are anadromous fish species.  Great Lakes populations of lake trout *(Salvelinus namaycush),* yellow perch *(Perca flavescens)*, lake sturgeon *(Acipenser fulvescens)*, walleye *(Stizostedion vitreum)* and forage fish are nationally significant fish stocks pursuant to the Great Lakes Fish and Wildlife Restoration Act.  A variety of reptile and amphibian species are potentially present in the area, including snapping turtle *(Chelydra serpentine)*, green frog *(Rana clamitans)*, and eastern milk snake *(Lampropeltis triangulum)* (U.S. FWS 2001).

**Figure 3**:  North American Migration Flyways – Atlantic flyway through Wood, Lucas and Ottawa Counties, Ohio.



4.3    Land Use

Land use in the Western Lake Erie Basin/Ottawa River watershed is comprised of urban development along the shores of the Ottawa and Maumee Rivers and is primarily

agricultural along the Lake Erie shoreline from Toledo to Port Clinton, Ohio.  The City of Toledo, with a population of more than 250,000 is largest Ohio urban center in the Western Lake Erie Basin/Ottawa River watershed.   There is extensive urban development along the Ottawa River in the City of Toledo, with substantial marina development near the confluence of the Ottawa River with Maumee Bay.  However, there is still significantly undeveloped land in the lower reaches of the Ottawa River, including hydraulically connected wetland complexes within the City of Toledo.  Habitat along the Lake Erie shoreline from Toledo to Port Clinton, Ohio is primarily agricultural, with some residential development.

## 4.4    Cultural Resources

At least one historic archaeological site is located near the proposed ORG restoration project.  The Two Rivers site, located at the confluence of the Portage and Little Portage Rivers, is designated as 33-ot-17 on the Ohio Archaeological Inventory.  The site appears to be a significant representation of post 1400 A. D. habitation by Upper Mississippian peoples.  There are likely additional sites within the area south of the Lake Erie shoreline.  Archaeological sites and other cultural resources will be identified prior to restoration and applicable State and federal rules and regulations will be followed.

SECTION 5

ENVIRONMENTAL CONSEQUENCES

5.1    Alternative A:  No Action

### *5.1.1*  Habitat Benefits

Under Alternative A, no habitat would be restored, enhanced, or preserved beyond what the Trustees are currently doing within mandates, policies and restricted budgets.  Loss of habitat due to development and other sources of environmental degradation not related to hazardous substance releases is expected to continue to occur.  The public would not be compensated for injuries to natural resources from the releases of hazardous substances into the environment.

32

### 5.1.2  Biological Benefits

Fish and wildlife harmed by releases of hazardous substances into the environment would not be restored, rehabilitated, replaced and/or the equivalent acquired. Populations of fish and wildlife species that rely on wetlands for spawning and nurseries would not increase sufficiently to compensate for past losses**.**

### 5.1.3  Listed, Proposed, and Candidate Species

Negative effects to listed species would not be reduced under this Alternative.

### 5.1.4  Cultural Resources

Cultural resources would not be impaired.

### 5.1.5  Environmental Justice

Executive Order 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations* (59 Fed.  Reg. 7629 (1994)), directs Federal agencies to incorporate environmental justice in their decision making process.  Federal agencies are directed to identify and address as appropriate, any disproportionately high and adverse environmental effects of their programs, policies and activities on minority or low-income populations.

Under the No Action Alternative, wildlife viewing and environmental education opportunities would not improve through enhancement projects.  While affluent individuals can afford to travel and pay for alternatives in other locations, low-income individuals are less capable of doing so.

### 5.1.6  Socioeconomic Effects

This Alternative would not result in any positive indirect improvement on the local economy.  This Alternative would not result in additional lands that could provide increased recreational opportunities and related economic development in the area.

### 5.1.7  Cumulative Effects

If this Alternative was implemented, the public would not be compensated for injuries to natural resources.  The exclusive reliance on regulations and policies do not necessarily provide for long term preservation of valuable wetland and upland habitats.  The watershed of the Ottawa River includes many different habitats, such as flood plain forests, dry upland forests, emergent, submergent and forested wetlands.  Open water fisheries exist in the Western Lake Erie basin.  Birds use the shoreline along the Ottawa River and Western Lake Erie as migration corridor habitat.  Injuries to these and other resources would continue due to historical and on-going development.  No fishery resource enhancement projects would be implemented under the No Action Alternative, thus further impacting the fishery.  The loss and degradation of coastal and riparian wetlands would contribute to the continued instability of the fish community in the Ottawa River and Western Lake Erie.  The continued loss of habitat could also adversely affect migratory birds that use the area for resting grounds, and nesting area for those species that remain for the nesting season.

### 5.2    Alternative B:  Natural Resource Based Restoration Inside the Western Lake Erie Basin and/or the Ottawa River (Selected Alternative)

### 5.2.1  Habitat Benefits

Preserving, restoring or enhancing riparian, wetland, flood plain and upland habitats along the southern shoreline of the Western Lake Erie Basin and the Ottawa River improves ecological functions that are essential for many fish and wildlife species.  In addition, habitat restoration and preservation also improve public use and enjoyment of these resources.  Benefits of aquatic and near-shore habitat improvements or enhancement would include improved water quality, reduced nutrient, sediment, and pesticide loadings, restored habitat for fish and wildlife species, and increased ecological productivity.  Improving the quality of vegetation and habitat for fish and birds would provide similar, though not the same ecological functions, as those injured by hazardous substances.  These and other long-term benefits outweigh any adverse effects associated with specific habitat restoration or enhancement methods.

Under Alternative B, there would be minimal short-term degradation of habitat due to the manipulation of soil required to complete wetland and aquatic habitat restoration and enhancement projects.  Some injuries could occur if habitat is destroyed to construct trails, boat ramps, or other public use facilities.  However, these same projects would also be directed to control and monitor human pressure on those resources.

### 5.2.2  Biological Benefits

The restoration alternatives would benefit many different species of fish and wildlife found in the area.  Preservation, reestablishment and enhancement of wetland, flood plain, riparian, associated upland, and aquatic habitats would benefit such species as waterfowl, rails, terns, songbirds, osprey, mink, and beaver.  Fishery resource enhancement projects would benefit species such as the northern pike, black redhorse, rock bass, and smallmouth bass leading to the development of a balanced, healthy fish community.  Through the habitat quality improvement projects there would be an increase in shallow waters and beds of submergent and emergent vegetation providing habitat for migrating waterfowl, feeding areas for shorebirds, waterbirds, and many species of fish found in the area.  There would be minimal negative effects to biological resources from human disturbance in relation to use of preserved areas and natural resource based public use projects.  The public use projects would also protect and potentially minimize human disturbance to fish and wildlife by controlling human pressure on those resources.

### 5.2.3  Listed, Proposed, and Candidate Species

Federal and State-listed or endangered species would receive further protection and aid in the recovery of the species if this Alternative was implemented.  Wetland, flood plain, riparian, associated upland and aquatic habitat preservation would most likely benefit bald eagles, eastern massasauga rattlesnake, eastern fringed orchid, Kirtland's snake, and Blanding's turtle.  Although a no effect determination was made in regard to the Indiana bat and the northern long-eared bat, there is a potential for a positive effect once the restoration is complete. Protective measures (Appendix A) would be taken during implementation of any projects.  Adherence to the restrictions should provide for no adverse effects on the listed species.

### 5.2.3.1      <u>Birds</u>

Bald eagle nesting and species that are prey to bald eagles could be directly or indirectly reestablished, enhanced, or preserved through the restoration alternatives.  Alternative B could include protection or acquisition of habitat needed by the piping plover for nesting.

*5.2.3.2*        **Mammals**

The Indiana bat may use stream corridors or uplands restored or acquired under Alternative B.  State-listed endangered species such as the black bear or the bobcat may use lands restored or acquired under Alternative B.

**5.2.3.3**        ***Reptiles***

Populations of the federal candidate species eastern massasauga rattlesnake, and the State-listed (threatened) spotted turtle *(Chlemmys guttata)*, have been affected by habitat fragmentation and encroachment throughout their range.  These species may benefit from projects involving restoration of habitats such as wetlands and associated uplands.

*5.2.3.4*        **Aquatic Organisms**

The least brook lamprey, rosyface shiner, big eye chub, mimic shiner, and black redhorse are pollution sensitive State-listed declining species, which may return to the Ottawa River.  Protection of riparian forests and aquatic resources will help maintain the presence of these species.  The clubshell mussel and other mussel species (*e.g.,* State-threatened black sandshell *(Ligumia recta)*) require clean waterways.  Mussel populations may return to surrounding waterways once aquatic and near-shore habitat restoration projects improve overall water quality in the area.

*5.2.3.5*        **Plants**

The eastern prairie fringe orchid and other plants would benefit from habitat protection and improvement by implementing this alternative.  The City of Toledo Low Service Pump Station project specifically targets habitat improvement and restoration for this species.

*5.2.4*  **Cultural Resources**

Projects covered under this document such as plugging drainage ditches, breaking drainage tile systems, stabilizing stream banks, acquiring wetlands, and development for public uses have the potential to affect properties meeting the criteria for the Natural

Register of Historic Places and other cultural resources.  The Trustees are in the process of determining specific areas for wetland restorations, stream bank stabilization and land acquisition.  When these project areas have been determined, and prior to making final decisions about these projects, the Field Supervisor, Columbus Ecological Field Office of the Service, will initiate consultation with the Ohio State Historic Preservation Officer and, with the assistance of the Service Regional Historic Preservation Officer, will complete the Section 106 (54 U.S.C. §306108) process as described in 36 Code of Federal Regulations Part 800.

### 5.2.5  Environmental Justice

Wetland, flood plain, riparian and upland preservation would involve transactions with willing landowners.  No minority or low-income populations would be displaced or negatively affected in any way.  While the primary purpose of the restoration of this land is for fish and wildlife, portions of the acquired properties may be used by the public for active and passive natural resource based recreational and educational activities, such as fishing and/or wildlife viewing.  Aquatic habitat improvement would also enhance recreational opportunities in and around the Ottawa River. The Manhattan Marsh Project is a good example of these increased opportunities with its location near to lower income households and minority populations within the City of Toledo.

### 5.2.6  Socioeconomic Benefits

The overall quality of life for the surrounding communities would improve with the restoration of the area.  Protection of wetlands, riparian, flood plains, and uplands would provide wildlife viewing, fishing and hunting, and help create positive economic growth on the local economy through the increase of travel and recreational opportunities.  Aquatic habitat improvements or enhancements would provide more options for public enjoyment of natural resources.

Land acquisition procedures would involve transactions with willing sellers/land owners who would be paid fair market value.  There would be little or no change on the market price or on landowners in the area who choose not to sell.  There would be minimum effects on the local economy and tax base because the areas identified for preservation are currently undeveloped.

### *5.2.7*  Elements Common to All Benefits

Other impairments to the ecosystem such as pollution associated with development would continue to affect the area where restoration projects would be implemented. These additional sources of habitat degradation may also inhibit the ability of the natural resources to fully recover or may act negatively on other restoration projects undertaken by the Trustee Council.

### *5.2.8*  Cumulative Effects

Cumulative effects from habitat restoration or enhancement implemented under Alternative B including the Trustee supported projects would be a net positive influence on the region as a whole.  Despite the existence of laws and regulations designed to minimize wetland and aquatic habitat losses, threats to wetlands and aquatic habitat from indirect sources, cumulative small scale injuries, or surrounding land use changes still exist.  Partnering with various State and Federal programs (*e.g.*, EPA's Section 319 Clean Water Act State Grants, National Coastal Wetlands Conservation Grants) that already contribute to improving the health of the ecosystems and watersheds will aid in restoring more habitats and increasing fish and wildlife populations.

Migratory birds would benefit from this Alternative because there would be more undisturbed areas for spring and fall migration resting and feeding stopovers, as well as nesting habitat for other bird species.  This Alternative would contribute to the stabilization of fish communities by implementing appropriate fishery resource projects such as restoring fish spawning and nursery habitats.

### 5.3    Alternative C:  Natural Resource Based Restoration Outside the Western Lake Erie Basin and/or Ottawa River

### 5.3.1   *Habitat Benefits*

Under this Alternative there would be improvement of habitats for fish and wildlife. However, those improvements would accrue to species and populations different from those injured at the Assessment Area.  Habitat losses along the shoreline of the Western Basin of Lake Erie and the Ottawa River would likely continue.

### 5.3.2  *Biological Benefits*

Under this Alternative biological productivity would potentially be increased.  However, the increases would involve species and populations different from those injured.

### 5.3.3  *Listed, Proposed, and Candidate Species*

Since specific projects outside the Western Lake Erie basin have not been identified, it is unknown if listed, proposed, or candidate species within the Assessment Area or Western Basin of Lake Erie would benefit from projects outside of those areas.

### 5.3.4  *Cultural Resources*

Projects covered under this document have the potential to affect properties meeting the criteria for the Natural Register of Historic Places and other cultural resources.  With the exception of the CDM Property, specific project sites have not been determined. When these project areas have been determined, and prior to making final decisions about these projects, the Field Supervisor, Columbus Ecological Field Office of the Service, will initiate consultation with the Ohio State Historic Preservation Officer and, with the assistance of the Service's Regional Historic Preservation Officer, will complete the Section 106 (54 U.S.C. §306108) process as described in 36 CFR Part 800.

### 5.3.5  *Environmental Justice*

Land acquisitions and other activities would involve transactions with willing landowners.  No minority or low-income populations would be displaced or negatively affected in any way.  Provision of fishing piers and other structures could improve access for lower income individuals.

### 5.3.6  *Socioeconomic Effects*

The overall quality of life for the surrounding communities would improve with the restoration of the area.  Augmentation of human use related services would help create positive economic impacts on the local economy.

## 5.4    Summary of Environmental Consequences for Each Alternative

## Table 2:  Comparison of Alternative A, B & C Environmental Consequences

| Attributes | Alternative A<br><br>No Action | Alternative B<br><br>Natural Resource Based Restoration Inside the Western Lake Erie and/or Ottawa River (Selected Alternative) | Alternative C<br><br>Natural Resource Based Restoration Outside the Western Lake Erie Basin and/or Ottawa River |
|---|---|---|---|
| Wetlands | Expected continued net loss of habitat | Increase of wetland habitat | Increase of wetland habitat outside the targeted area |
| Uplands associated with wetlands | Expected continued net loss of habitat | Increase of upland habitat associated with wetlands | Increase of upland habitat associated with wetlands outside the targeted area |
| Aquatic and near-shore habitat | Expected continued degradation and loss of habitat | Increase of aquatic habitat | Increase of aquatic habitat outside the targeted area |
| Fish resources | Expected populations would remain unbalanced for a greater length of time | Expected general increase diversity of fish community and populations | Expected general increase diversity of fish community and populations. Communities and population would be different from those injured |
| Wildlife resources | Expected continued harm and decrease of numbers | Expected general increase in populations | Expected general increase in populations. Populations would differ from those injured. |
| Listed threatened or endangered species | Expected negative impacts would continue | Expected to provide further recovery of species in the area | May, or may not assist recovery of species in the area of the Site |
| Cultural resources | N/A | Cultural resources protected | Cultural resources protected |
| Surface water | Expected to remain degraded due to nutrient loading and historic pollution in sediment | Expected general increase in surface water quality | Expected general increase in surface water quality |
| Environmental justice issues | No opportunities for increased quality of life | Expected increased quality of life in Ottawa and Lucas counties | Expected increased quality of life in Ottawa and Lucas counties |
| Socioeconomic issues | Expected local economy would remain the same or decrease due to continued injury without restoration | Local economy could potentially increase due to restoration | Expected local economy would remain the same or decrease due to continued injury without restoration |
| Recreational use<br><br>Environmental education and resource enjoyment | No enhancement or increase of low impact recreational opportunities or environmental education | Increase opportunities for wildlife/bird viewing, fishing as well as enhancement of understanding of the ecosystem | Increase opportunities for wildlife/bird viewing, fishing as well as enhancement of understanding of the ecosystem, but outside of the injured area |
| Cumulative effects | Potential decrease in populations of migratory birds, continued degraded fishery and continued loss of wetland and associated upland habitat in the EA area | Expected increase populations of migratory birds and greater diversity in the fish community; some ecosystem functions are to be restored or compensated | Expected increase populations of migratory birds and greater diversity in the fish community; ecosystem functions in the area of injury would not be addressed |

# SECTION 6

## CONSULTATION AND COORDINATION WITH THE PUBLIC AND OTHERS

### 6.1    National Historic Preservation Act Compliance

The Service's Project Leader for Columbus Ecological Services will provide the State Historic Preservation Officers with this Final RP/EA as part of the public review and comment process.

### 6.2    Endangered Species Act Compliance

This Final RP/EA complies with Section 7 of the ESA of 1973 as amended, 16 U.S.C. § 1531, *et seq.,* and its implementing regulation (50 C.F.R. 402) (Appendix A).

### 6.3    Public Participation

Public review of the Final RP/EA is an integral component of the assessment and restoration planning process.  Through the public review process, the Trustees sought public comment on the actions proposed to restore injured natural resources or replace lost resource services.  The Draft RP/EA was available for review and comment by the public.  A public meeting was held to present the restoration actions proposed to compensate the public for injuries to those natural resources covered herein.  Notice of the meeting date and time was published in the local newspaper.

## SECTION 7

## 2016 TRUSTEE TEAM

Archie L. Lunsey II

Manager

Division of Environmental Response and Revitalization

Northwest District Office

347 N. Dunbridge Road

Bowling Green, Ohio 43402

Timothy J. Kern

Principal Assistant Attorney General

Ohio Attorney General Office

Environmental Enforcement Section

30 East Broad St. 25th Floor

Columbus, Ohio 43215-3400


Kimberly Gilmore

U.S. Department of the Interior - Office of the Solicitor

Three Parkway Center, Room 385

Pittsburgh, PA  15220


Deborah Millsap

NRDA Case Manager

Ohio Ecological Field Office

U S Fish and Wildlife Service

Columbus Ohio Field Office

4625 Morse Road, Suite 104

Columbus, Ohio 43230


Kimberly Rhoads

Staff Attorney

Ohio EPA's Office of Legal Services

50 W. Town St., Ste. 700

P.O. Box 1049

Columbus, OH 43216

Steven Ellis

Senior Counsel

U.S. Department of Justice

Environmental Enforcement Section

Patrick Henry Building

601 D Street, N.W.

Washington, D.C. 20004

Brian Tucker

NRD Coordinator

Ohio EPA, Division of Environmental Response & Revitalization

50 W. Town St., Ste. 700

P.O. Box 1049

Columbus, OH 43216

Ohio Environmental Protection Agency Approval of the

Final Natural Resource Restoration Plan &Environmental Assessment

for the Ottawa River Assessment Area

Approved:

_____    AUG 0 4 2016

Craig W. Butler, Director        Date

Ohio Environmental Protection Agency

45

**U.S. Department of the Interior Approval**
**of the**
**Final Natural Resource Restoration Plan &Environmental Assessment**
**for the Ottawa River Assessment Area**

In accordance with the U.S. Department of the Interior policy regarding documentation for natural resource damage assessment and restoration projects (521 DM 3), the Authorized Official for the Department must approve the final restoration plan.

The Regional Director of Region 3 of the U.S. Fish & Wildlife Service is the Authorized Official for the Ottawa River Natural Resource Damage Assessment and approves the Final Natural Resource Restoration Plan & Environmental Assessment for the Ottawa River Assessment Area.

Approved:

Thomas Melius        Charles M. Wooley          Date
Regional Director    Acting Regional Director
Midwest Region
U.S. Fish & Wildlife Service

Appendix A:  Service Intra-Service Section 7 Biological Evaluation Form

# Intra-Service Section 7 Biological Evaluation Form

## Region 3

| | | | |
|---|---|---|---|
| Originating Person: | Deborah Millsap | Date Submitted: | 5/3/2016 |
| Telephone Number: | 614-416-8993 ex 14 | | |

For assistance with section 7 reviews, go to Region 3's Section 7 Technical Assistance website: http://www.fws.gov/midwest/endangered/sectiort7/s7process/

I.  Service Program and Geographic Area or Station Name:
U.S. Fish and Wildlife Service, Ohio Ecological Services Field Office, Columbus, OH

II.  Location: Location of the project including County, State and TSR (township, section & range): Ottawa River NRDA site, Lucas and Ottawa Counties, Lake Erie Watershed, Ohio

III.  Species/Critical Habitat: List federally-listed, proposed, and candidate species or designated or proposed critical habitat that may occur within the action area:

- Indiana bat (*Myotis sodalis*) Endangered
- Northern long-eared bat (*Myotis septentrionalis*) Threatened
- Karner blue butterfly (*Lycaeides melissa samuelis*) Endangered
- Kirtland's warbler (*Setophaga kirtlandii*) Endangered
- Piping plover (*Charadrius melodus*) Endangered
- Rayed bean (*Villosa fabalis*) Endangered
- Red knot (*Calidris canutus rufa*) Threatened
- Eastern massasauga rattlesnake (*Sistrurus catenatus catenatus*) Candidate
- Bald eagle (*Haliaeetus leucocephalus*) Species of Concern
- Eastern fringed orchid (*Platanthera leucophaea*) Threatened
- Lakeside daisy (*Hymenoxys herbacea*) Threatened
- Lake Erie watersnake (*Nerodia sipedon insularum*) Species of Concern

These species occur within Lucas and Ottawa Counties, though most occur outside of the project area. Only the bald eagle is known to occur within the project area. Due to the location, type of project proposed, and that the habitat impacted is extensively agricultural this project will have no effect on the Indiana bat, northern long-eared bat, Karner blue butterfly, Kirtland's warbler, piping plover, rayed bean, red knot, lakeside daisy, or Lake Erie watersnake. While it is unclear whether the eastern prairie fringed orchid occurs on-site, it is known to occur either within Bay Township or adjacent townships. The Ohio ESFO will be consulted to develop a restoration work plan that will avoid any negative impacts to these species (e.g., specifically the timing of restoration measures can be used to avoid impacts to the eastern prairie fringed orchid should they occur onsite).

IV.  Project Description: Describe the proposed project or action, including all conservation elements. If referencing other documents, prepare an executive summary. Include map and photos of site, if possible. (Attach additional pages as needed):

This a settlement of claims brought by U.S. FWS and Ohio EPA for injuries to natural resources in and

around the Ottawa River resulting from unpermitted releases of hazardous substances. The project will consist of acquisition, restoration, and protection of riparian and wetland habitat in the Lake Erie watershed, Properties have been and will be acquired from willing sellers and transferred to local public entities. Restoration will include controlling exotic species, planting native species, and restoring hydraulic connections of historically connected streams and wetlands with the Ottawa River and Maumee Bay/Lake Erie. All acquired properties will be protected by Environmental Covenants. Specific project plans are not available at this time.

V.     **Determination of Effects:**
       **A. Description of Effects:** Describe how the action(s) will affect the species and critical habitats listed in item III, including how Part IV conservation elements benefit or avoid adverse effects. Your rationale for the Section 7 determinations made below (VB.) should be fully described here.

The Restoration Plan involves converting an existing agricultural area into a wetland. This combined with the riparian, and aquatic habitat preservation would most likely benefit the species listed below which are found within the Ottawa River/Lake Erie watershed:
- Bald eagle (*Haliaeetus leucocephalus*) Species of Concern
- Eastern fringed orchid (*Platanthera leucophaea*) Threatened

Projects implemented through the Restoration Plan and Environmental Assessment are not likely to adversely affect federally listed species and critical habitat and are not likely to jeopardize candidate species because:
1.  current habitat is almost extensively agricultural, thus is not suitable for listed species.
2.  the Service will develop a restoration plan. If the restoration plan is changed or avoidance measures cannot be adhered to for a particular project, the U.S. Fish and Wildlife Service will be coordinated with prior to conducting further work.
3.  EPFO surveys were conducted in June 2015 on the proposed restoration sites, no EPFO were located given the heavy growth of invasive plants. The proposed restoration will improve the habitat conducive for EPFO growth.
4.  minimization measures will be implemented for EPFO during the restoration implementation
- in areas of potential habitat for EPFO the area will be surveyed sometime during the growing season when plants are easily observed, (June 15 to July 15) prior to activity starting. In areas of known populations follow up surveys should be conducted 3-5 years after extensive activities.
  For all potential habitat, extreme disturbance should be avoided. To avoid extreme disturbance: limit erosion and excavation. Tracked equipment should be used if possible.
- If excavation occurs, maintain topsoil in a separate area and return it to the surface when excavation is complete.
- Prescribed burning should be conducted during plant dormancy between September 1 and April 1.
- No mowing or herbicide applications should occur after May 1st and before August 31st
For **EPFO** the hydrology must be appropriate
- Any temporary dams must be removed if they negatively affect hydrology
- Topography must be returned to conditions to maintain appropriate hydrology

**B. Determination:** Determine the anticipated effects of the proposed project(s) on species and critical habitats listed in item III. Check all applicable boxes and list the species (or attach a list) associated with each determination. **For assistance with making appropriate Section 7 determinations, go to Region**

3's Section 7 Technical Assistance website:
http://www.fws.gov/midwest/endangered/section7/s7process/

## Determination

*No Effect:* This determination is appropriate when the proposed project will not directly or indirectly affect (neither negatively nor beneficially) individuals of listed/proposed/candidate species or designated/proposed critical habitat of such species.   No concurrence from ESFO required.



- Indiana bat (*Myotis sodalis*) Endangered
- Northern long-eared bat (*Myotis septentrionalis*) Threatened
- Karner blue butterfly (*Lycaeides melissa samuelis*) Endangered
- Kirtland's warbler (*Setophaga kirtlandii*) Endangered
- Piping plover (*Charadrius melodus*) Endangered
- Rayed bean (*Villosa fabalis*) Endangered
- Red knot (*Calidris canutus rufa*) Threatened
- Lakeside daisy (*Hymenoxys herbacea*) Threatened
- Lake Erie watersnake (*Nerodia sipedon insularum*) Species of Concern

*May Affect but Not Likely to Adversely Affect:* This determination is appropriate when the proposed project is likely to cause insignificant, discountable, or wholly beneficial effects to individuals and designated critical habitat.  Concurrence from ESFO required.



- Eastern fringed orchid (*Platanthera leucophaea*) Threatened
- Bald eagle (*Haliaeetus leucocephalus*) Species of Concern

*May Affect and Likely to Adversely Affect:* This determination is appropriate when the proposed project is likely to adversely impact individuals of listed species or designated critical habitat of such species. Concurrence from ESFO required.

———

*Not Likely to Jeopardize candidate or proposed species/critical habitat:* This determination is appropriate when the proposed project is not expected to jeopardize the continued existence of a species proposed for listing or a candidate species, or adversely modify an area proposed for designation as critical habitat. Concurrence from ESFO required.

———

*Likely to Jeopardize candidate or proposed species/critical habitat:* This determination is appropriate when the proposed project is reasonably expected to jeopardize the continued existence of a species proposed for listing or a candidate species, or adversely modify an area proposed for designation as critical habitat. Concurrence from ESFO required.

———

Signature  _____     Date  _____

[Supervisor at originating office]

**Reviewing Ecological Services Office Evaluation** (check all that apply):

A. **Concurrence** ✗                    **Nonconcurrence**
Explanation for nonconcurrence:

B. Formal consultation required _____
List species or critical habitat unit

C. Conference required _____.
List species or critical habitat unit

Name of Reviewing ES Office   Columbus Ecological Services Field Office

Signature  _____     Date  5-6-16

O:\TE\S7\FORMS\R3intra-s7_form.wpd\27 June 2013
JSzymanski\19 June 2002

Appendix B: Transcript of April 7, 2016 Public Meeting on Draft RP/EA and
Written Comments Submitted to the Trustees

```
 1                  OHIO ENVIRONMENTAL PROTECTION AGENCY
                    INFORMATION SESSION & PUBLIC HEARING
 2
                    Draft Ottawa River Restoration Plan
 3                     and Environmental Assessment

 4                             -  -  -

 5      Date and Time:         Thursday, April 7, 2016
                               6:00 p.m.
 6

 7      Place:                 Toledo City Council Chambers
                               One Government Center
 8                             401 South Erie Street
                               Toledo, Ohio
 9

10      Reporter:              Marie B. Fresch
                               Registered Merit Reporter
11                             Notary Public, State of Ohio

12
        PRESENT:
13
        Ms. Darla L. Peelle, Hearing Officer
14      Ohio EPA
        Public Interest Center
15
        Mr. Brian Tucker, Ohio EPA
16      Division of Environmental and Response and Restoration

17      Ms. Deborah Milsap, U.S. Fish and Wildlife

18      Mr. Archie Lunsey, Ohio EPA
        Division of Environmental and Response and Restoration
19

20

21

22

23

24

25
```

```
 1                    INFORMATION SESSION

 2              Introduction by Darla L. Peelle.

 3              Presentation by Brian Tucker.

 4                        - - -

 5                    PUBLIC HEARING

 6              Comments accepted on the Record

 7              Q&A held

 8                        - - -

 9              MS. PEELLE:              The purpose of

10    this public hearing is to accept comments on the

11    official record regarding the draft restoration plan and

12    environmental assessment for the Ottawa River in Toledo

13    issued by Ohio EPA and U.S. Fish and Wildlife Services,

14    referred to as joint trustees.

15         The restoration plan and environmental assessment

16    addresses natural resources injured and ecological

17    services lost due to releases of hazard substances to

18    the Ottawa River, and outlines the Trustees' preferred

19    alternative for restoration.

20         A public notice to announce the hearing and public

21    comment period regarding the draft restoration plan and

22    environmental assessment was published in the newspapers

23    in the area, such as the Toledo Blade, for instance.

24    This notice was issued in Ohio EPA's Weekly Review,

25    which is a publication that lists by county, all Agency
```

1    activities and actions taking place in the State of

2    Ohio.

3         All written and oral comments received as a part of

4    the official record will be reviewed by the Trustees

5    before making a final decision, before finalizing the

6    plan.  Written comments must be received by the Trustees

7    by close of business on April 15, 2016.  Comments

8    received after this date may be considered as time and

9    circumstances permit, but you will not be a part of the

10   official record for this hearing.

11        Written comments can be filed with us today or

12   submitted in writing to Archie Lunsey, Environmental

13   Manager, Ohio EPA, Northwest District Office, 347 North

14   Dunbridge Road, Bowling Green, Ohio, 43402, or via email

15   at Archie.Lunsey@epa.ohio.gov.

16        This information can also be found in the

17   presentation handout, and I would say comments can also

18   be addressed to Brian or to Deborah as well.

19        It's important for you to know all comments,

20   whether written or spoken, are given the same

21   consideration.

22        Questions and comments made during the hearing will

23   be responded to in a document known as a Response to

24   Comments.  The Trustees, after taking into consideration

25   comments presented by you, the public, will make a final

1    decision.

2         Once the Trustees make a decision, information

3    about the decision and how to access the Response to

4    Comments, will be provided to those interested parties

5    who have signed in this evening or who are already on

6    the interested parties list.

7         This evening, individuals may testify only once and

8    they can speak for five minutes, so I ask that you use

9    your time wisely.  Ohio EPA and the U.S. Fish and

10   Wildlife Services cannot interact with the speaker

11   during testimony other than to ask clarifying questions

12   to ensure that the record is as accurate as possible.

13        If you have questions that weren't responded to

14   earlier, then ask them on the record and they will be

15   responded to in writing in the Response to Comments.

16        If you would like to provide testimony, please

17   raise your hand.  If you don't have a blue card and

18   would like to provide testimony, we can hand one of

19   those off to you.

20        As of this moment, the person wishing to provide

21   testimony is Lynn Sherman.

22        Please come forward to the microphone to be heard.

23   If you'll state and spell your name for the record.

24        MR. SHERMAN:              Lynn Sherman,

25   L Y N N, S H E R M A N.

1          And, I sent some comments in to Mr. Lunsey already,

2     but my comments on the project are that you need to take

3     care of the sources of contamination first.  I couldn't

4     hear very well with all that, you're saying that the

5     levels from your sampling were going down at some point,

6     whatever.

7          When the remediation was done at Dura, a partial

8     wall was put in.  Doctor Rothman of the ERS, I believe,

9     recommended that that be the solution for the seepage of

10    the oil out from the side of Dura into the Ottawa River;

11    and it was the chemical pit that supplied most of that.

12         One of the sources of the material in the chemical

13    pit was from across the river, which is Textile Leather.

14    Textile Leather this past year has been torn down and

15    physically is not there.

16         I personally have already bid a project for the

17    second, it was the second project of seepage of PCPs and

18    THGs into the sub-basement of Textile Leather.  So there

19    is something outside seeping in through the concrete.

20    That property needs to be properly addressed.  And also

21    is connected to the unnamed tributary which also had a

22    lot of PCBs.

23         If you get rid of the PCBs, you'll get rid of a lot

24    of the long-term problems that we have in the Ottawa

25    River and in Lake Erie, with the feeding of PCBs through

```
 1      the food chain up to Walleye to the point that we can
 2      only eat, what, one or two Walleye a week, is I think
 3      that's the limit; right, or wrong?
 4            MS. PEELLE:                We can't
 5      respond.
 6            THE WITNESS:                Somewhere in
 7      there.
 8         Okay, so the point is, if you correct the leakage
 9      first, then you can work on the rest of the restoration
10      part of that project.  So my concerns are that, once
11      again, we're going to avoid the problem.
12         While Doctor Rothman was giving his presentation on
13      what he believes should have been the correct
14      remediation at Dura Landfill, I also from my experience,
15      people that I deal with, that the water in Dura Landfill
16      rises when the water comes up the Ottawa River from a
17      noreaster, and goes down when the water recedes out of
18      the Ottawa River.  So, there is a connection between the
19      Ottawa River and Dura Landfill.
20         If you look at the Blade article, and there was a
21      Blade article way back in the 90s, I think, excellent,
22      excellent article.  It shows you the different
23      renderings of Dura Landfill and how it was a swamp.
24      They didn't tear out the swamp; they just filled over
25      with the dike.  So you have all the rivulets and
```

1    everything else connected to the Ottawa River that are

2    still there.  So if you cut those off, you cut off

3    Textile Leather; now you can really do a remediation.

4         My comment.  Thank you.

5             MS. PEELLE:              All right, thank

6    you, Mr. Sherman.

7         Does anyone else wish to provide testimony or

8    comments, orally?

9         Mr. Shanklin.

10            THE WITNESS:              Terry Shanklin,

11   I live in Toledo, ███ ████████ address.

12        I'm sitting here listening to how you folks are

13   cleaning up the Ottawa River.  It seems that in our

14   history of Toledo and other parts of the country, it

15   seems that every time we had a waterway or a soft spot

16   or a swamp, we filled it in with garbage.

17        We're talking about the Dura.  We're talking about

18   Hoffman Road.  We've capped one of them.  We've probably

19   capped the other one by Stickney, but you've had a map

20   of all the dumps in the City of Toledo and it's got two,

21   three hundred dumps.

22        It isn't just Textile Leather leaching into the

23   Ottawa River.  Jeep used to have a fantastic dump right

24   there on 75.  And the only thing saved them, when 75

25   expressway came through and buried it.  There is still a

1    part in the corner that belonged to Jeep that has never
2    been tested, and I don't think Jeep will let you go in
3    there and test the thing, because it's full of crap.
4        Jeep buried everything in there but bodies and I
5    wouldn't doubt if there is bodies in there yet.
6        One item, one dump, is not going to stop pollution
7    going into the Ottawa River.  The only thing that's
8    going to do it, I'm afraid, is time.  There is so much
9    leaching in there, there is so much crap being dumped in
10   there over the years, and now we're going to try to go
11   after the people supposedly that dumped it.  It ain't
12   going to fly, folks.
13        MS. PEELLE:            Thank you,
14   Mr. Shanklin.
15        All right.  Anyone else?  I'm giving some last
16   opportunities here.
17        All right.  My son-in-law is an auctioneer, so I
18   always use him for the closing.  Your chances are going
19   once, going twice, all right.
20        The time is now 7:08 and this hearing is adjourned.
21   Thank you for coming this evening.
22   (Off the record).
23
24
25

1                    C E R T I F I C A T E

2          I, Marie B. Fresch, Registered Merit Reporter, and
   Notary Public in and for the State of Ohio, duly
3   commissioned and qualified, do hereby certify that the
   statements of witnesses were taken by me in machine
4   shorthand and were thereafter reduced to typewritten
   form by me and that the foregoing transcript is a true
5   and accurate record of the statements so given by the
   witnesses and that this hearing was taken at the time
6   and place specified in the foregoing caption.

7          I further certify that I am neither counsel for,
   related to, nor employed by any of the parties to the
8   action in which this proceeding was taken; and, further,
   that I am not a relative or employee of any attorney or
9   counsel employed by the parties hereto, nor financially
   interested, or otherwise, in the outcome of this action;
10  and that I have no contract with the parties, attorneys,
   or persons with an interest in the action, as defined in
11  Civil Rule 28(D).

12         IN WITNESS WHEREOF, I have hereunto set my hand
   and affixed my seal of office at Norwalk, Ohio, on the
13  14th day of April, 2016.

14

15                              _____

16                              MARIE B. FRESCH, RMR
                                Notary Public, State of Ohio
17                              My Commission expires: 10-9-2018

18

19

20

21

22

23

24

25

April 15, 2016



Mr. Archie Lunsey, DERR Manager
Ohio EPA, NWDO
347 N. Dunbridge Road
Bowling Green, OH 43402

Comments re: Draft Natural Resource Restoration Plan & Environmental Assessment for the
Ottawa River Assessment Area, dated 9 February 2016.

Submitted by Partners for Clean Streams (PCS)

Please accept these comments and questions as part of the public comment period. Please incude
a response in the responsiveness summary when it is made available to the public and let me
know when it is available. I would like to note that these questions and opinions are from
Partners for Clean Streams, not the Maumee AOC Advisory Committee. While individuals on
the Maumee AOC Advisory Committee or organizations who participate on the committee may
submit their own comments, the Committee as a whole did not take a formal motion or vote on
this subject and is not submitting comments.

PCS has the following comments and questions:

1. There is a dramatic difference in the number of acres injured and those proposed as part
   of the three restoration projects.  According to Page 3 of the draft Restoration Plan, an
   estimated 724 acres of the Ottawa River and related riparian habitat have been
   contaminated by hazardous substances; however, in the preferred alternative, restoration
   is proposed on only 303 acres. The "goal [of the NRD process] is to make the
   environment and public whole for injuries to natural resources and natural resource
   services...(US FWS website)." This settlement proposes restoration of only 42% of the
   damaged acreage. This does not appear to replace the equivalent amount of the natural
   resources injured. How does this reduced restoration acreage make the public whole?

2. In PCS's opinion, more restoration should be done within the Area of Concern (AOC)
   and specifically within the Ottawa River watershed, including work within the mainstem
   itself (such as in stream fish habitat, fish baskets, floating islands, or other in stream
   work). There is only one small project in Ottawa River watershed. That project is not on
   the mainstem of the Ottawa River and only 128 acres, at most, of potential restoration are
   within the AOC when the documented injury was wholly within the AOC (using the most
   recent assessment area).

Water is Life!  Help Sustain PCS... One drop at a time!

Partners For Clean Streams, Inc.
P.O. Box 203
Perrysburg, OH  43552
Office Phone: 419-874-0PCS (0727)
Cell Phone: 419-205-5588
E-Mail: PCS@PartnersForCleanStreams.org
Web: www.PartnersForCleanStreams.org





3. PCS would strongly encourage diversity in the type, function, and services provided in the restoration projects to better reflect the diverse and wide-ranging injuries documented. For instance, the preliminary assessment and restoration plan document injuries to the fish, turtle (i.e. consumption advisories), bird, and mammal populations; and to the habitat, which in the lower Ottawa River includes floating leaf emergent wetlands, coastal marsh/wetland, riparian vegetation, in stream sediment & and water chemistry. Yet all of the projects are very similar to each other with a limited focus primarly on the coastal marsh habitat, which may not compensate wholly for the diversity of habitat, wildlife, sediment and water chemistry injured over a lengthy period of time in the Ottawa River.

4. There is very little information on the project scope and environmental metrics that each project should achieve. This makes it very difficult to evaluate whether these projects will actually achieve restoration that would adequately compensate for the specific injuries that occurred. More detail is needed to effectively determine what these projects would need to be designed and managed for over both the short and long term in order to demonstrate that the PRPs had achieved the appropriate compensation and restoration. Simply purchasing property and holding it in public trust does not adequately restore the quality and services of the resources that were injured, as like for like and same for same. More detailed restoration plans should be developed prior to the consent decree and shared with the public.

5. One of the goals mentioned in the plan is for "establishment of hydrological connections between the wetlands and Lake Erie tributaries, which will provide significant spawning and nursery areas for fish." Which project specifically provides this direct hydrologic connection between the project and Lake Erie tributaries so that the project area can serve as spawning and nursery areas for fish? How will these projects then contribute to diversifying, increasing, and providing healthy fish populations in the Ottawa River main stem?

6. In the plan it states, "the assessment process showed substantial injury to fish that are a food source for fish eating birds, and because of this, injury to fish eating birds has likely occurred in the Assessment Area". There is a discussion of migratory birds but very little on residential fish eating birds, which I would assume would have longer exposure, more reliance on the impacted fish populations and therefore would potentially be injured as well. Which projects will provide restoration for residential fish eating birds, especially those species specifically dependant on the fish in the Ottawa River watershed?

7. In addition, how were both fish populations and bird populations who rely on benthic macro-invertebrates injured due to the extensive prior sediment contamination? Very low ICI & IBI scores were document by past Ohio EPA sampling. There is extensive

Partners For Clean Streams, Inc.
P.O. Box 203
Perrysburg, OH  43552
Office Phone: 419-874-0PCS (0727)
Cell Phone: 419-205-5588
E-Mail: PCS@PartnersForCleanStreams.org
Web: www.PartnersForCleanStreams.org





documentation noted in this plan on the contamination uptake and impacts to fish. How will these projects provide restoration for fish populations and macro invertebrate populations in the lower Ottawa River?

8. How will these proposed restoration projects specifically contribute to reducing or removing the contact and consumption advisories, which are documented injuries to the Ottawa River?

9. In the Final Draft Assessment Plan, it states that the lower Ottawa River suffered "The loss or impairment of recreational fishing and boating opportunities representing the lost human uses of injured biological resources." How will public use & recreation be assured when each project decides later, and may need additional financial resources, to make that happen? Why doesn't the settlement require public use and recreational use (not just public ownership) as part of the compensate for the human use services lost? Why isn't the cost for the infrastructure for recreational use, such as parking lots, signage, boat launches, elevated walkways, viewing/fishing platforms, etc, included in the settlement? The NRD guidance specifically provides for injures to services, such as recreational, fishing, and other human use, to be compensated for in this process.

10. Please revise and update the project descriptions to accurately reflect acreages and scope of the PRP's contributions to each project (and not total acreage of the general area), especially for projects where work is already underway outside of the settlement, such as the purchases made by the Metroparks of the Toledo Area from the Lucas County Land Bank for Manahattan Marsh. It is my understanding that the Metroparks will be providing these corrections under separate cover.

11. When will baseline conditions be achieved?

12. Does the NRDA process and/or authority allow for settlement to be finalized before baseline conditions are documented as restored?

13. Where is the Restoration and Compensation Determination Plan (RCDP)? The Final Draft Assessment Plan lists this future document and states that a public comment period would be held on the RCDP as well. The NRDA regulations indicate that a Restoration and Compensation Determination Plan (RCDP) shall be prepared that lists a reasonable number of alternatives for restoration, rehabilitation, replacement, and/or acquisition of equivalent resources; selects one of the alternatives; gives the rationale for selecting that alternative; and identifies methodologies to be used to determine the cost of the selected alternative and the compensable value of 17 services lost to the public [43 CFR § 11.81 (a)(1)]. This document would have included important information that would inform the public of the other projects that were considered (or at least how many were initially

Water is Life!  Help Sustain PCS... One drop at a time!

Partners For Clean Streams, Inc.
P.O. Box 203
Perrysburg, OH  43552
Office Phone: 419-874-0PCS (0727)
Cell Phone: 419-205-5588
E-Mail: PCS@PartnersForCleanStreams.org
Web: www.PartnersForCleanStreams.org





considered), the cost of the selected alternative, and the compensable value of services lost; all of which is missing from this document.

14. Where is the Damage Assessment? When will PED be released?

15. Page 5, Section 6 of the Pre-assessment screen for the Ottawa River and Maumee Bay lists specific potential PRPs and others may have been subsequently identified. Which PRPs are part of this settlement? Which remaining PRPs do the Trustees still expect to pursue settlement with? What PRPs have the Trustees already settled with and what will those settlement monies be spent on? If settlement monies are spent on restoration projects or future restoration projects are proposed and selected, will there be another public comment period?

16. From the public meeting, the restoration plan, and my familiarity with the projects, it appears as if property has already been purchased and some projects are already underway. This seems like "jumping the gun" and appears as if public input won't have any impact or be considered as meaningful to the process. Will the Trustees make any changes based on feedback from the public?

Thank you for your time and consideration.

Sincerely,



Kristina Patterson, Executive Director

Water is Life!  Help Sustain PCS... One drop at a time!

Partners For Clean Streams, Inc.
P.O. Box 203
Perrysburg, OH  43552
Office Phone: 419-874-0PCS (0727)
Cell Phone: 419-205-5588
E-Mail: PCS@PartnersForCleanStreams.org
Web: www.PartnersForCleanStreams.org



3-17-16

RECEIVED

MAR 2 1 2016

OHIO E.P.A.
N.W.D.O.

Archie Lunsey, Environmental Manager,
Division of Environmental Response and Revitalization Northwest District Office
347 N. Dunbridge Road
Bowling Green, Ohio 43402

Deborah Millsap
NRDA Case Manager  Region 3
U.S. Fish and Wildlife Service 4625 Morse Road, Suite 104
Columbus, Ohio 43230 614-416-8993 extension 14

Ms Millsap and Mr. Lunsey,

I will attend the meeting on April 7, 2016. Prior to the meeting I would like to voice my opinions on the
RP/EA.

The Proposal would be fine if the source of the PCBs and Toxic Chemicals leaching into the Ottawa River
were stopped. The sources still exist. The Leaching still occurs. If from the Chrysler Plant to the mouth of
the Ottawa River with Maumee Bay and the Lake all of the sediments to a depth that removed all of the
PCBs and Toxic Chemicals, It would be re-contaminated by the leaching mainly from Dura Landfill,
Stickney Landfill, and the Textile Leather sites.

The history and the drainage channels from Dura Landfill were well documented in a Series of Toledo
Blade Articles at the beginning of the 1990s. I have a copy of these maps from the Blade that I used as
overheads in training others how to look at old solid waste landfills that took industrial waste prior to
RCRA regulations and how to investigate these sites. Stickney Landfill was not investigated to this depth
but, what was done at Dura Landfill should be repeated. Mr. Rothman of URS that directed a 700' sheet
pile cut-off wall be installed at Dura near an oil seep on the side wall down to the Ottawa River may have
been needed. The wall did not cut off the stream beds that lie at the bottom of the river side dirt dike for
Dura. When the water level of the Ottawa River rises when a Northeast wind blows the lake into the
stream and river systems, the wells in the Dura Landfill rise.

The Textile Leather Plant was physically dismantled in 2015. To investigate the site it will now be
necessary to work off old aerial photographs. Chemical wastes from Textile Leather was taken to Dura
Landfill. The Liquid wastes were discharged to the "chemical pit" and garbage was dumped in the pit to
"co-mingle" with the solid was soaking up the liquid chemical waste and then pushed up the landfill face
for disposal. See the Dura Report. OEPA or the Lucas County Health Department (controlled solid waste
landfill inspections prior to the formation of OEPA). These are all records that have been available to
OEPA.
In the mid 1980s, a sales representative of Envirosafe Services of Ohio Inc. (Fondessy Enterprises Inc.) was
on a sales bid with a number of other waste brokers. While outside touring the facility and the location of
roll-off boxes and other wastes, the ESOI representative heard a rumble and out of a large pipe from one
building into a roll-off that has rust holes in the bottom edge of the roll-off. All in the group turned and
saw pieces of scrap and a clear fluid pour out into the roll-off which was one of the wastes we were bidding
on. The clear liquid poured out the bottom of the roll off onto the ground. Then an overpowering smell of
trichloroethylene solvent passed over the crowd.

Later, this author, working for an environmental remediation company in Canton, Ohio in 1990, bid a
project for Textile Leather in Toledo, Ohio. They thought we were out of town firm and would be quiet.
2-3 years before this Bid, Textile Leather had PCB contamination of its sub-basement. OH Materials
scrabbled the concrete walls. Removed the PCB saturated concrete and then coated the wall with Thoro-
seal (a concrete sealing paint). This remediation was done by OH Materials Inc. of Findlay. OEPA may
be able to request these files from OH Materials as they were a Federal Emergency Contractor and required
to keep their records. The 2-3 years later a bid went out again. The company I worked for in Canton,

Ohio received the RFP.  I personally worked on the bid.  It was in the subbasement of Textile Leather in Toledo, Ohio.  It was to scrabble the wall again and seal with Thorough Seal.  The PCBs has come through the wall again.  PCBs were commonly used to make ink presses make a mark without missing part of the stamp.  It was used in Newspaper printing and other ink applications.  Cleaning stamps was done by using TCE.  PCBs do not easily move in soil.  TCE moves easily in soil.  Mix the two in waste and the TCE will dissolve the PCBs and help move them faster in soil and sand and gravel beds of old swamps.

As I have stated previously,  Before we spend a lot of money on restoration, We should insure the "Current Continuing" sources of contamination are stopped.    It requires an effort to seal Dura and Stickney landfills and then on the east side of the Ottawa River cutting off the Textile Leather Contaminated soil and the soil from the "Un – named Tributary.  See Mr. Kinsley in NWDO.

It is technologically possible.   Excavate sequentially using  sheet piling to create a dry area,  the contaminated sediments between these three contamination sources.  Put in an HDPE liner  then put in HDPE lines Concrete Rectangles (What is under our bridges in the country now.)  or round Concrete pipes with the same cross sectional area as the Ottawa River for this length of the river.  Seal the beginning and end with HDPE Flumes  and you have by-passed three sources that can not be economically excavated and removed as there is no place to take it anyway.

If you do not stop the sources of contamination they will leak "like a Tea Bag"  and contaminate the invertebrates, the crustaceans, the bi-valves, the insects,  the fish and the humans that use this water resource called Lake Erie.   The relatively small cost to stop the pollution immediately is the start of the RP/EA.

Please consider my comments and include them in the decision on where to start and not to assume that these sources have somehow miraculously stopped leaking.  The market decided the Textile Leather property was not worth much when the Textile Leather Owners recently sold the property to the City of Toledo for Chrysler.  The City of Toledo should have used "Eminent Domain" in the Brownfield Law  and the liability would not now be theirs.

Respectfully,

Lynn Sherman

Entity: Ottawa Riv Health Advisory Zone Sediments, Toledo
Doc Type: Remediation Response
Doc Subtype: Plan
Program: Remedial Response
County: Lucas
Secondary ID: 348001747006

Appendix C:  Trustees' Responses to Public Comments

27 June 2016

This section summarizes public comments received on the Draft Restoration Plan and Environmental Assessment (RP/EA), and provides the Trustees' responses to the comments.   The Draft RP/EA was released to the public on February 29, 2016. Comments were received during the public comment period through April 15, 2016.

In total, four sets of comments were received on the draft RP/EA. The commenters were both private individuals and those representing organizations with an interest in the Ottawa River and the Western Lake Erie Basin watershed, including a comment from Partners for Clean Streams (PCS).  Two sets of comments were received during the April 7, 2016 public meeting from private individuals, and two sets of written comments were received (one of the written commenters also provided oral comment during the public meeting).

The comments are either summarized or transcribed below. Copies of all original comments are provided in Appendix B of the Final RP/EA.

***Comment Summary:***  *Two comments provided during the April 7, 2016 public meeting and one written comment expressed concern about the clean-up of the Ottawa River and of re-contamination issues by landfills and the Textileather industrial property leaching contaminants into the Ottawa River. The commenters further stated that the restoration activities should wait until the river is cleaned up.  No statement was made either in support or against the selected Alternative.*

**Response:** Through Great Lakes Legacy Act (GLLA) activities, at a cost of about $47 million, approximately 10,000 cubic yards (CY) of contaminated sediment were removed from Sibley Creek and another 240,000 CY of contaminated sediment were removed

1

from the Ottawa River with approximately 7,000 CY of Toxic Substances Control Act (TSCA) level sediment, dredged and placed in a TSCA licensed facility.  This remedial action is also considered primary restoration of the injured resources of the Ottawa River.  Other remedial actions, (*e.g.,* capping leaking landfills along the river, PCB source removals) have eliminated known sources of PCBs and other hazardous substances from entering the river. Remedy effectiveness surveys were conducted by OEPA and USEPA in 2012 and 2015 to evaluate post-dredging sediment concentrations, fish tissue concentrations, fish health, and overall aquatic community health. The results indicate that the river is improving as expected and supports the return to baseline conditions estimate of approximately 2030. Baseline is defined as the condition that would have existed in the assessment or affected area had the discharge(s) not occurred.  Other sites from where contaminants had migrated or leached to the Ottawa River had previously been cleaned up, and the Trustees have not detected a continuation of migration of contaminants into the River. In addition, as part of the GLLA project evaluation and prior to the sediment removal, a source control study was performed to ensure that sources to the Ottawa River were controlled and that the river would not become re-contaminated from past sources.  Future releases, if they occur, will be evaluated as new releases are addressed under current environmental laws.  The Trustees do not believe the Ottawa River will be re-contaminated from the sources that have been addressed through the GLLA remedial action and previous cleanup actions.

Concerns were voiced about the former Textileather Corporation site.  USEPA is currently overseeing a cleanup action for the site, which includes as a preferred alternative, the removal of contaminated soil, removal of underground storage tanks, and installation of a storm water management system.  These activities are not part of the Ottawa River NRDA case.  They were required to address violations associated with the Resource Conservation and Recovery Act (RCRA) and aimed at cleaning up the property for beneficial reuse.  Also, completed in 1998, soils from around the facility and sediments from an un-named tributary, which became Fraleigh Creek, were removed and capped to address PCB contamination from the Textileather property.  No additional sources of PCBs are known at the former Textileather property and ongoing

2

and future contamination of the Ottawa River from sources related to Texileather is not expected

One written letter was received from PCS with multiple comments/questions.

**Comment 1:** *"There is a dramatic difference in the number of acres injured and those proposed as part of the three restoration projects. According to Page 3 of the draft Restoration Plan, an estimated 724 acres of the Ottawa River and related riparian habitat have been contaminated by hazardous substances; however, in the preferred alternative, restoration is proposed on only 303 acres. The 'goal [of the NRD process] is to make the environment and public whole for injuries to natural resources and natural resource services… (US FWS website).' This settlement proposes restoration of only 42% of the damaged acreage. This does not appear to replace the equivalent amount of the natural resources injured. How does this reduced restoration acreage make the public whole?"*

**Response 1:**   The Trustees use a Habitat Equivalency Analysis (HEA) model to calculate the injury and the amount of restoration needed to compensate the public for injured trust resources.  The Trustees used the HEA in this case to scale the injury and restoration projects until there is parity in the values. Different environments and habitats are not equal in size or quality; therefore, there is not a 1:1 relationship with number of injured acres used in the HEA and the number of acres restored by the restoration projects.  In addition, as a result of the $47 million primary restoration of the Ottawa River itself, conducted pursuant to the GLLA, the Trustees anticipate that the Ottawa River itself should return to baseline conditions by 2030.   The restoration projects are designed to compensate the public for the period of time that the natural resources have been injured, so all other matters being equal, there would not be a 1:1 relationship.  The Trustees also proportioned liability among the PRPs, so no one PRP is responsible for 100% of the damages.

**Comment 2:** *"In PCS's opinion, more restoration should be done within the Area of Concern (AOC) and specifically within the Ottawa River watershed, including work within the mainstem itself (such as in stream fish habitat, fish baskets, floating islands, or other in stream work). There is only one small project in Ottawa River watershed. That project is not on the mainstem of the Ottawa River and only 128 acres, at most, of potential restoration are within the AOC when the documented injury was wholly within the AOC (using the most recent assessment area)."*

**Response 2:** The CERCLA NRDA Regulations provide ten factors to consider when evaluating or selecting among possible alternatives to restore, replace, or acquire the resource equivalent of injured resources (43 C.F.R. §11.82):

1. Technical feasibility
2. The relationship of the cost of the alternative to expected benefits
3. Cost effectiveness
4. The result of actual or planned response actions
5. The potential for additional injury resulting from the proposed action
6. The natural recovery period
7. Ability of the resources to recover with or without alternative actions
8. Potential effects of the action on human health and safety
9. Consistency with relevant federal and state policies
10. Compliance with relevant federal and state laws

Accordingly, following the completion of the primary restoration project at the Ottawa River itself, the GLLA project, the purpose of the selected Ottawa River natural resource restoration actions in the Restoration Plan is to use recovered damages in a manner consistent with these factors. The watershed is in a highly industrialized area so it is extremely difficult to find restoration projects that will meet these ten factors and also restore the equivalent natural resources. The Trustees evaluated many potential projects within the watershed; however, most did not compare well with the selected projects in meeting the above criteria, were not able to be protected through time, did

not provide enough or of similar types of benefit/habitat types, or were fragmented or too small in scale to be viable projects to compensate for the injury to trust resources. Notwithstanding the difficulty of finding potential restoration projects that meet the ten factors, the Trustees listed the Manhattan Marsh project, referred to indirectly by the commenter, as part of the Selective Alternative.  The Manhattan Marsh Project is located near lower income households and minority populations within the City of Toledo and in the Ottawa River watershed.  While the primary purpose of the restoration of this land is for fish and wildlife, portions of the acquired properties may be used by the public for active and passive natural resource based recreational and educational activities, such as fishing and/or wildlife viewing.  Aquatic habitat improvement resulting from the primary restoration, the Ottawa River GLLA remediation project, would also enhance recreational opportunities in and around the Ottawa River.

**Comment 3:** *"PCS would strongly encourage diversity in the type, function, and services provided in the restoration projects to better reflect the diverse and wide-ranging injuries documented. For instance, the preliminary assessment and restoration plan document injuries to the fish, turtle (i.e., consumption advisories), bird, and mammal populations; and to the habitat, which in the lower Ottawa River includes floating leaf emergent wetlands, coastal marsh/wetland, riparian vegetation, in stream sediment & and water chemistry. Yet all of the projects are very similar to each other with a limited focus primarily on the coastal marsh habitat, which may not compensate wholly for the diversity of habitat, wildlife, sediment and water chemistry injured over a lengthy period of time in the Ottawa River."*

**Response 3:** Section 107(f)(1) of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) states money recovered for injury to natural resources can only be used to "restore, rehabilitate, replace, and/or acquire the equivalent" of trust resources injured, destroyed, or lost as a result of the release of hazardous substances. The natural resources injured at Ottawa are fish, invertebrates, migratory birds, their supporting ecosystems and the sediments and surface waters of

5

the River. Thus, restoration projects must focus upon restoring or replacing those injured resources.  The Trustees believe that the selected Alternative B does address the long term benefits to the injured resources.  All of the natural resource injuries relate to the River, so all of the projects have an ecological aquatic connectivity which include establishing connected wetlands, enhanced fish and invertebrate habitat, and riparian property acquisitions to ensure future watershed protection, erosion reduction and protection of water quality.  In addition, the three specific projects selected in the RP/EA will restore and improve varied and diverse habitat types which include forested wetlands, connected and isolated wetlands, transitional upland/wet meadow, and riparian areas, all of which support a broad range of species and habitat services.

**Comment 4:** *"There is very little information on the project scope and environmental metrics that each project should achieve. This makes it very difficult to evaluate whether these projects will actually achieve restoration that would adequately compensate for the specific injuries that occurred. More detail is needed to effectively determine what these projects would need to be designed and managed for over both the short and long term in order to demonstrate that the PRPs had achieved the appropriate compensation and restoration. Simply purchasing property and holding it in public trust does not adequately restore the quality and services of the resources that were injured, as like for like and same for same. More detailed restoration plans should be developed prior to the consent decree and shared with the public."*

**Response 4:** The Corogin property will not only be preserved but it will also be restored.  Currently, the Corogin property consists of agricultural fields and a degraded forested wetland.  Restoration will include removing drainage tiles, installing water control structures, and planting native wetland species. The degraded wetland will be restored by controlling and managing invasive species. The restored Corogin property will provide coastal wetlands (which are a highly valued type of wetland) and riparian areas with connectivity to the Portage and Little Portage Rivers near the confluence of

6

Lake Erie. This property will be a valued addition to the Ottawa National Wildlife Refuge because it is located along the Mississippi and Mid-Atlantic migratory bird flyways.

If the proposed settlement with the ORG is approved by the Trustees and the U.S. Department of Justice, the Trustees will attach to a proposed consent decree the Final Restoration Plan/EA, and Statement of Work (SOWs) for the proposed Corogin restoration project.  The consent decree with attachments will be lodged with the U.S. district court for its approval.  If the consent decree is approved by the court, it will require the ORG to provide work plans that will include detailed information such as design drawings, maps, descriptions of activities proposed to be undertaken to restore, in part, the equivalent of natural resources injured as a result of releases of hazardous substances into or within the Ottawa River Assessment Area, proposed schedules for implementation of such activities, and estimated costs of such activities. The work plans will be made public and will be available online.  The same will be true for other future settlements for the Ottawa River Assessment Area that may be reached by the Trustees and with other potentially responsible parties.

**Comment 5:** *"One of the goals mentioned in the plan is for "establishment of hydrological connections between the wetlands and Lake Erie tributaries, which will provide significant spawning and nursery areas for fish." Which project specifically provides this direct hydrologic connection between the project and Lake Erie tributaries so that the project area can serve as spawning and nursery areas for fish? How will these projects then contribute to diversifying, increasing, and providing healthy fish populations in the Ottawa River main stem?"*

**Response 5:** The three selected projects (*i.e.*, Manhattan Marsh, Low Service Pump Station, and ORG Restoration Project/former Corogin property) are hydrologically connected to Lake Erie. The proposed restoration activities would restore and/or increase coastal wetlands, riparian, and other habitat types.  Of the three selected projects, the Corogin restoration will provide the most, new spawning and nursey areas

as farm fields will be converted to seasonal wetlands connected directly to the Portage and Little Portage Rivers. The other two projects will provide new and enhanced spawning and nursery areas by greatly reducing current areas of invasive species.  This increase in spawning and nursery areas and improvements in the Ottawa River resulting from the sediment dredging, will contribute to diverse and increasing healthy fish populations within the Western Lake Erie Basin and may contribute to healthy fish populations within the Ottawa River.

**Comment 6:** *"In the plan it states, "the assessment process showed substantial injury to fish that are a food source for fish eating birds, and because of this, injury to fish eating birds has likely occurred in the Assessment Area". There is a discussion of migratory birds but very little on residential fish eating birds, which I would assume would have longer exposure, more reliance on the impacted fish populations and therefore would potentially be injured as well. Which projects will provide restoration for residential fish eating birds, especially those species specifically dependent on the fish in the Ottawa River watershed?"*

**Response 6:** The GLLA (primary restoration) project resulted in the removal of approximately 250,000 cubic yards (CY) of PCB and other hazardous substances-contaminated sediment from the Ottawa River which will improve the quality of the water and ultimately the health of the fish and the residential fish eating (piscivorous) birds. Through cleaner sediments and lower body burdens of contaminants in fish, healthier predator/prey populations are expected in the Ottawa River.  Additionally, restoration and preservation activities in coastal wetlands and riparian areas along the Ottawa and nearby rivers will increase fish diversity and numbers by providing additional and improved spawning and rearing habitat.  Improved fish populations will also better support both residential and migratory piscivorous birds and animals.

**Comment 7:** *"In addition, how were both fish populations and bird populations who rely on benthic macro-invertebrates injured due to the extensive prior sediment*

*contamination? Very low ICI & IBI scores were document by past Ohio EPA sampling. There is extensive documentation noted in this plan on the contamination uptake and impacts to fish. How will these projects provide restoration for fish populations and macro invertebrate populations in the lower Ottawa River?"*

**Response 7:** The Trustees have determined that the sediment removal and proposed restoration projects will improve habitat for macro-invertebrates and many other organisms. Restored macro-invertebrate populations in turn support healthy fish populations and a diverse ecosystem.  In addition, the proposed restoration projects will increase riparian and coastal wetland habitat for avian and fisheries resources in the Western Lake Erie Basin and be beneficial by providing nesting, foraging, and loafing habitat for a wide variety of avian species.

***Comment 8:*** *"How will these proposed restoration projects specifically contribute to reducing or removing the contact and consumption advisories, which are documented injuries to the Ottawa River?"*

**Response 8:**  The removal of contaminated sediment from the Ottawa River and Sibley Creek will improve the water quality and this will contribute to the possible removal of the contact and consumption advisories. The sediment removal, or primary restoration, followed by natural attenuation is the primary mechanism that will eventually lower the fish tissue and sediment concentrations to levels to allow changes in the contact and consumption advisories. The contact advisory could be modified or lifted in the near future.  Work has started on determining what data are needed and how they will be collected to evaluate the need for the contact advisory.  Changes in the fish consumption advisory will take more time given the persistent nature of PCBs. However, fish tissue levels have begun to decrease and will be evaluated over time with the goal of removing the "Do Not Eat" advisory for fish in the Ottawa River.  The restoration activities of enhancement and preservation of riparian and wetland habitat will also provide some benefits to avian and biological resources in the Ottawa River.

However, the Ottawa River is located within an urban watershed and urban runoff will continue to be a factor in the quality of the river. As stated in 43 C.F.R. §11.82 (b)(iii), restoration activities are limited to those actions that would restore or rehabilitate the injured natural resource, or if not possible, restore and acquire equivalent natural resources capable of providing those services.

**Comment 9:** *"In the Final Draft Assessment Plan, it states that the lower Ottawa River suffered 'The loss or impairment of recreational fishing and boating opportunities representing the lost human uses of injured biological resources.' How will public use & recreation be assured when each project decides later, and may need additional financial resources, to make that happen? Why doesn't the settlement require public use and recreational use (not just public ownership) as part of the compensate for the human use services lost? Why isn't the cost for the infrastructure for recreational use, such as parking lots, signage, boat launches, elevated walkways, viewing/fishing platforms, etc, included in the settlement? The NRD guidance specifically provides for injures to services, such as recreational, fishing, and other human use, to be compensated for in this process."*

**Response 9:** Combined with the primary restoration at the Ottawa River performed pursuant to the GLLA, the selected Alternative B projects address both restoration of injured natural resources and compensation for lost services (including human use) for those injured natural resources. The Fish and Turtle Health Advisories, for example, may likely be lifted in the future as contaminant levels decline and fish communities improve. The selected Alternative B will provide environmental, educational, and long term economic benefits to the community, through projects such as the Manhattan Marsh restoration.  Section 107(f)(1) of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) states that natural resource damage settlements can only be used to "restore, rehabilitate, replace, and/or acquire the equivalent" of trust resources injured, destroyed, or lost as a result of the release of hazardous substances. The primary natural resources injured in the Ottawa River are

the surface waters and sediments of the River, the fish, and avian resources.  Thus, restoration projects must restore or replace those resources.  Measuring services is a way to quantify injured natural resources.  43 C.F.R. §11.70(f). However, services are not separate from the natural resources and are not to be restored independently of the resource.  See also, 58 Fed. Reg. 39328, 39339-39340 (July 22, 1993).  In this case most of the lost services are ecological rather than human use. Potential projects such as building parking lots, signage, boat launches and/or elevated walkways, viewing/fishing platforms do not result in restoring the natural resources nor recovering the lost ecological services and are not necessarily cost effective.  Additional information about the benefit to the public in general and to disadvantaged populations, specifically, is set forth in response to Comment 2.

**Comment 10:** *"Please revise and update the project descriptions to accurately reflect acreages and scope of the PRP's contributions to each project (and not total acreage of the general area), especially for projects where work is already underway outside of the settlement, such as the purchases made by the Metroparks of the Toledo Area from the Lucas County Land Bank for Manahattan [sic] Marsh. It is my understanding that the Metroparks will be providing these corrections under separate cover."*

**Response 10:** As discussed above, detailed information such as design drawings, maps, etc. cannot be provided until settlements are complete and the post-consent decree restoration workplans are drafted.  The Lucas County Land Bank has been and will be working with the City of Toledo and the Metroparks in the property acquisition phase of the Manhattan restoration project.  Discussions on potential future settlements are continuing, and, further details on the selected Manhattan Marsh project will be worked out in conjunction with such settlement discussions if the discussions are successful.

**Comment 11:** *"When will baseline conditions be achieved?"*

**Response 11:** The Trustees cannot precisely predict when baseline conditions will be achieved.  However, the Trustees anticipate that baseline should be reached near 2030. This estimate takes into account the recovery trajectory based on continued natural attenuation following the remedial actions of dredging PCB contaminated sediment completed in 2012.

**Comment 12:** *"Does the NRDA process and/or authority allow for settlement to be finalized before baseline conditions are documented as restored?"*

**Response 12:** Yes. Calculating the amount of money (*i.e.*, damages) needed to compensate the public for injuries to natural resources contemplates that the money will be used to restore the injured resource(s) to baseline condition or when that is not possible, for replacing and/or acquiring the equivalent natural resources.  43 C.F.R. §11.83(a).  There is no requirement that the Trustees wait until after baseline conditions are met in order to allow settlement.

**Comment 13:** *"Where is the Restoration and Compensation Determination Plan (RCDP)? The Final Draft Assessment Plan lists this future document and states that a public comment period would be held on the RCDP as well. The NRDA regulations indicate that a Restoration and Compensation Determination Plan (RCDP) shall be prepared that lists a reasonable number of alternatives for restoration, rehabilitation, replacement, and/or acquisition of equivalent resources; selects one of the alternatives; gives the rationale for selecting that alternative; and identifies methodologies to be used to determine the cost of the selected alternative and the compensable value of 17 services lost to the public [43 CFR § 11.81 (a)(1)]. This document would have included important information that would inform the public of the other projects that were considered (or at least how many were initially considered),*

*the cost of the selected alternative, and the compensable value of services lost; all of which is missing from this document."*

**Response 13:** The Department of Interior (DOI) NRDA regulations are not mandatory and that includes the Restoration and Compensation Determination Plan (RCDP). 43 C.F.R. §11.10. This Final Ottawa River RP/EA selects Alternative B and provides the rationale for that selection.  In addition, when negotiated settlements are reached during a natural resource damage assessment, there is no requirement to complete the assessment.

*Comment 14: "Where is the Damage Assessment? When will PED be released?"*

**Response 14:** As stated above, the DOI NRDA regulations are not mandatory. Because the Trustees are attempting to complete a project based settlement, a Type B assessment and a preliminary estimate of damages (PED) are not required by neither the regulations nor CERCLA.  The Trustees and the PRPs are negotiating restoration-based settlements that will result in earlier restoration than if the settlements were purely monetary-based.

*Comment 15: "Page 5, Section 6 of the Pre-assessment screen for the Ottawa River and Maumee Bay lists specific potential PRPs and others may have been subsequently identified. Which PRPs are part of this settlement? Which remaining PRPs do the Trustees still expect to pursue settlement with? What PRPs have the Trustees already settled with and what will those settlement monies be spent on? If settlement monies are spent on restoration projects or future restoration projects are proposed and selected, will there be another public comment period?"*

**Response 15:**  The Trustees settled through an administrative order with the Ohio Department of Transportation (ODOT).  ODOT paid $221,865.00 to the Trustees which will be used by the Trustees for restoration of injured natural resources.  On October 14,

2015 a notice was published in the Federal Register for the proposed ODOT settlement, with a 30-day comment period for the public to provide comments on this settlement. (https://www.gpo.gov/fdsys/pkg/FR-2015-10-14/html/2015-25992.htm). Settlements with other PRPs have not been finalized.  If those settlements are finalized, consent decrees will be lodged and there will be public comment periods for the consent decree following lodging. The Final Restoration Plan would be an attachment to the Consent Decrees. The Trustees cannot comment on whether or not they will pursue other PRPs.

*Comment 16:* *"From the public meeting, the restoration plan, and my familiarity with the projects, it appears as if property has already been purchased and some projects are already underway. This seems like 'jumping the gun' and appears as if public input won't have any impact or be considered as meaningful to the process. Will the Trustees make any changes based on feedback from the public?"*

**Response 16:** Property under development pressure was purchased by parties negotiating settlement with the Trustees prior to settlement at their own risk. Money received in the settlements will be used for restoration or to reimburse the Trustees for their assessment costs.   An amended restoration plan for any future restoration projects proposed to be financed by the recovered funds will be developed by the Trustees with adequate public notice and comment.

14

Appendix D:  U.S. Department of Interior Approval, Environmental Action
Statement and Finding of No Significant Impact

## FINDING OF NO SIGNIFICANT IMPACT

### Restoration Plan and Environmental Assessment for the Ottawa River Assessment Area, Toledo, Lucas County, Ohio

The U.S. Fish and Wildlife Service (the "Service"), representing the U.S. Department of the Interior (DOI), is a cooperating agency pursuant to the National Environmental Policy Act (NEPA) for the final Restoration Plan and Environmental Assessment (RP/EA) for the Ottawa River Assessment Area Natural Resource Damage Assessment (NRDA) . The Service and the Ohio Environmental Protection Agency (Ohio EPA) propose to implement restoration to benefit natural resources injured by the release of hazardous substances into and near the Ottawa River. The Service and Ohio EPA (the "Trustees") initiated an NRDA to assess damages under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), for natural resource injuries resulting from exposure to hazardous substances, primarily, PCBs.

The release of hazardous substances injured natural resources under the trusteeship of the Service and Ohio EPA, including but not limited to, surface water, migratory birds, fish, and their supporting ecosystems. The recovered natural resource damages compensate for these injuries to trust resources in or near the Ottawa River. Compensation will include preserving, rehabilitating, replacing, and acquiring equivalent natural resources at various locations within the Ottawa River and Western Lake Erie watershed, depending upon the availability and participation of willing landowners.

Under CERCLA, damages recovered from parties responsible for natural resource injuries are used to "restore, replace, rehabilitate and/or acquire the equivalent of the injured natural resources. *See*, 42 U.S.C. 9607(f)(1). Any funds used by the Federal Trustee (DOI) to implement restoration activities are subject to the requirements of NEPA , 42 U.S.C. 4321. Accordingly, the Trustees developed the RP/EA to identify restoration alternatives that address the resources injured and ecosystem services lost due to the release of hazardous substances, and to analyze the effects of those alternatives on the human environment. The RP/EA lists and describes three alternatives. The preferred alternative consists of preservation of wetlands, riparian corridors, adjacent uplands, and restoration of wetland habitat.

The acquisition and/or preservation of selected sites are an essential first step in meeting the Trustees' restoration goals. Selection of potential properties will be determined by participation of willing landowners. These actions will compensate for injuries to natural resources by preserving aquatic, wetland, riparian and upland habitat for affected natural resources including migratory birds and fish.

### DETERMINATION

Based upon an environmental review and evaluation of the Final Restoration Plan and Environmental Assessment for the Ottawa River Assessment Area NRDA, I have determined that restoring, rehabilitating, replacing and/or acquiring the equivalent of injured resources within the natural resource damage assessment area as described under Alternative B in the Final RP/EA for the Ottawa River Assessment Area is not a major Federal action which would

significantly affect the quality of human environment within the meaning of Section 102(2)(c) of the National Environmental Policy Act of 1969, accordingly, an Environmental Impact Statement will not be prepared.

Reasons:

1  A number of federally listed threatened or endangered and candidate species would receive further protection and benefit through wetland, associated upland and aquatic habitat preservation and improvement. Specific restoration projects will be evaluated for impacts to federally listed species under section 7 of the Endangered Species act prior to implementation. Protective measures (Appendix A), which should provide for no adverse effects, would be taken during implementation of all projects.

2  Implementation of the proposed action may result in minimal short-term impacts to habitat due to physical manipulation needed to restore and enhance ecological systems. These projects would also protect and improve the quality of natural resources by restoring and enhancing wetland and aquatic habitat. All necessary permits will be obtained and regulations, policies and laws followed.

3  During preparation of the Restoration Work Plan for the restoration of the Corogin property from a farm field to connected wetlands, the Field Supervisor, Columbus Ecological Field Office and the contractor for the Responsible Party, will initiate consultation with the Ohio State Historic Preservation Officer and, with the assistance of the FWS Regional Historic Preservation Officer, will complete the Section 106 process as described in 36 Code of Federal Regulations Part 800. (Section 6.1)

4  Preservation of habitats through acquisition of land, Environmental Covenants, or Conservation Easements will only be from willing sellers or participants. Neighbors adjacent to land purchased for preservation under this restoration will retain all of their current rights to their land. Since habitat preservation would be through fee title or easements with willing sellers who would be paid fair market value, acquisition procedures would have little or no impact on the market price, or on landowners who choose not to sell.

5  A Notice of Availability was published in the local media outlets. Copies of the RP/EA were available for review at the offices of the Ohio Environmental Protection Agency (OEPA), Twinsburg, Ohio. The Restoration Plan and EA are available on the OEPA website. Comments were accepted from March 16, 2016 through April 15, 2016. A public meeting was held on April 6, 2016 in Toledo, Ohio. The Trustees gave a presentation on the restoration alternatives, and a formal question and answer period followed. Three written comments were considered during and after the comment period and have been addressed in the Final RP/EA. The public comments received did not identify any significant environmental issues or impacts. No written comments were received that required substantive modification of the RP/EA. As indicated in the RP/EA, the proposed alternative will have no or inconsequential effects on social,

economic, recreational, biological, and cultural resources.  Conversely, over the long term, restoration projects are expected to benefit trust resources.

Supporting References:

1. Natural Resource Restoration Plan and Environment Assessment for the Ottawa River Assessment Area
2. Section 7 Endangered Species Consultation (Appendix B of Restoration Plan and EA)
3. Public Comments (Section 7 of Restoration Plan and Environmental Assessment for the Ottawa River Assessment Area)

ACTING Regional Director, FWS, Region 3

Date: 5|16|16

## UNITED STATES FISH & WILDLIFE SERVICE

### ENVIRONMENTAL ACTION STATEMENT

Within the spirit and intent of the Council of Environmental Quality's regulations for implementing the National Environmental Policy Act (NEPA) and other statutes, orders, and policies that protect fish and wildlife resources, the Trustees have established the following administrative record and have determined that the action of (describe action):

_____ is a categorical exclusion as provided by 516 DM 6, Appendix 1 and 516 DM 2, Appendix 1. No further documentation will therefore be made.

__x__ is found not to have significant environmental effects as determined by the attached Environmental Assessment and Finding of No Significant Impact.

_____ is found to have significant effects, and therefore further consideration of this action will require a notice of intent to be published in the Federal Register announcing the decision to prepare an EIS.

_____ is not approved because of unacceptable environmental damage, or violation of Fish and Wildlife Service mandates, policy, regulations, or procedures.

_____ is an emergency action within the context of 40 CFR 1506.11. Only those actions necessary to control the immediate impacts of the emergency will be taken. Other related actions remain subject to NEPA review.

Other supporting documents (list):

__x__ Environmental Assessment and FONSI

__x__ Public comments

_____   5-3-2016
Initiator                          Date

_____  5/16/16      _____  5/16/16
ARD            Date                       RD            Date

Charles M. Wooley
Acting Regional Director